IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| WALGREEN CO., THE KROGER CO., ALBERTSONS COMPANIES, INC., H-E-B, L.P. and SUPERVALU, INC., | Case No. |
| Plaintiffs, | COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| BAUSCH HEALTH COMPANIES, INC., SALIX PHARMACEUTICALS, LTD., SALIX PHARMACEUTICALS, INC., TEVA PHARMACEUTICAL INDUSTRIES LTD., and TEVA PHARMACEUTICALS USA, INC., | |
| Defendants. | |

Plaintiffs Walgreen Co., The Kroger Co., Albertsons Companies, Inc., H-E-B, L.P. and Supervalu, Inc. ("Plaintiffs") sue Defendants Bausch Health Companies, Inc., Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc. (collectively "Bausch"), Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (collectively "Teva") (together, "Defendants"), under the antitrust laws of the United States, and for their Complaint allege as follows:

## I.     INTRODUCTION

1.     Defendant Bausch markets Xifaxan 550 mg, containing the active pharmaceutical ingredient rifaximin.  Xifaxan 550 mg is the only rifaximin product available on the market to treat Irritable Bowel Syndrome with Diarrhea ("IBS-D"). IBS-D causes repeated episodes of prolonged diarrhea, reducing patients' quality of life, affecting their daily work, and increasing their financial burdens. Up to 15% of Americans suffer from the condition, and millions of them depend on rifaximin for relief, taking it intermittently for years and sometimes the rest of their lives.

2.     Fair competition would have limited the price of a 14-day supply of Xifaxan to less than $200. Instead, Bausch today is charging more than $2,000. As of 2024, Bausch's annual sales of Xifaxan in the U.S. were approximately $1.99 billion.  Virtually all of those sales were of the 550 mg strength.

3.     This Complaint explains how Defendants' violation of federal antitrust law allowed Bausch to charge more than ten times the competitive price for Xifaxan 550 mg, extracting billions of dollars from Xifaxan purchasers marketwide.

4.      Rifaxamin is a broad-spectrum antibiotic that has been used across the globe since 1987 for treating various gastrointestinal ailments. The compound was patented in 1982 and first sold in Italy beginning in 1987.

5.      Bausch ultimately obtained a series of secondary patents on the use of rifaximin to treat IBS-D. But those patents were very weak and could not prevent competition from generic versions of the drug. In fact, as explained in detail below, the federal courts have already invalidated those patents.

6.      The effects of generic competition for a brand drug are predictable: sales switch quickly from the brand drug to the generic version. Generic drugs are priced well below the brand drug price, with prices for the generics falling farther as more generic manufacturers enter the market. Within six months to a year of entering the market, generics capture about 90% of the brand's unit sales.  The rate of generic substitution is not materially affected by the number of entrants, but the generic price decreases as the number of entrants increases.

7.      Brand manufacturers' profits fall dramatically when generic competition begins. Unscrupulous brand manufacturers sometimes try to avoid that fate by unlawfully preventing or delaying generic entry. Bausch did that here.

8.      When Defendant Teva's predecessor corporation developed a generic Xifaxan, Bausch sued for patent infringement. Before the court ruled on the merits of Bausch's claims, Bausch and Teva settled the patent lawsuit.

9.      Bausch paid Teva to delay entering the market with 550 mg generic Xifaxan. The companies settled the patent litigation in September 2018 with a "reverse payment," that is, a payment from the plaintiff in the patent lawsuit, Bausch, to the defendant in the patent lawsuit,

Teva. In exchange for the payment, Teva agreed to stay out of the market for more than *nine* years, from September 2018 until January 2028.

10.    One of the payments from Bausch to Teva took the form of an agreement that, if Teva agreed not to compete with Bausch until January 2028, Bausch would not compete with Teva when Teva finally did enter the market by marketing Bausch's own generic version of Xifaxan—a so-called authorized generic ("AG"). Teva's agreement to delay its entry was extremely valuable to Bausch, and Bausch's agreement not to compete with Teva by launching an AG was extremely valuable to Teva.

11.    As shown below, Bausch's unlawful payment was likely worth more than $300 million to Teva. That was far more than Teva could have made by winning the patent case and competing fairly, and lawfully, against Bausch.

12.    Bausch and Teva also used a series of additional anticompetitive tactics to deter other generic manufacturers from beating Teva to market by entering the market before January 2028.

13.    The weakness of Bausch's patents created the risk that other generic manufacturers could avoid or defeat them and market a generic Xifaxan 550 mg before Teva belatedly enters the market in January 2028. To reduce that possibility, Bausch and Teva included in their agreement three provisions aimed at deterring other generic competitors. They agreed that, if another generic manufacturer enters the market before January 2028—by prevailing against Bausch in patent litigation, getting a license from Bausch, or using a special statutory provision that Congress created—then Teva can also enter on that earlier date.  These provisions eliminated the possibility that a subsequent filer could enter the market before Teva and be the sole ANDA product on the market for some significant period of time.

14.     These deterrence clauses reduced other generic manufacturers' incentive to challenge Bausch's patents. The deterrence clauses in fact worked against several generic manufacturers, which agreed to drop their patent challenges and stay out of the market until the delayed January 2028 date that Bausch and Teva set.

15.     Another generic manufacturer was not deterred. It litigated Bausch's principal patents to conclusion, and it won. A federal court held that Bausch's IBS-D patents were invalid, and a court of appeals upheld that decision. But that manufacturer had made a legal/technical mistake: it failed to "carve out" certain *non*-IBS-D uses of Xifaxan from its application to the FDA, which it could easily have done. So that manufacturer is precluded from entering the market until the non-IBS-D patents expire in 2029, even though the IBS-D patents have been found invalid.

16.     Despite Bausch's principal IBS-D patents having now been invalidated, generic entry has still not occurred and will likely not occur until Teva enters the market in January 2028.  Teva has 180-day ANDA exclusivity that effectively blocks subsequent filers from entering the market until Teva enjoys the benefit of its 180-day exclusivity.  In addition, Bausch has received additional patents and listed those patents in the FDA's Orange Book, providing it with *automatic* 30-month stays of competition from other generic manufacturers that recently filed applications with the FDA seeking to market generic Xifaxan 550 mg.  It listed those patents despite the fact that, under the Hatch-Waxman statute and controlling regulations, they could not lawfully be listed. These later-filing generics are now blocked from entering the market, both because of the 30-month stay and because of Teva's 180-day exclusivity.

17.     Neither obstacle would exist but for Bausch's unlawful payments to Teva to delay entry.  But for those payments, Teva would be on the market and its exclusivity would have

expired by now.  And under those circumstances, with Xifaxan having lost nearly all of its sales to generic Xifaxan, Bausch would have no reason to risk antitrust liability by listing unlistable patents merely to get the benefit of the statutory 30-month stay.

18.     As a result of Bausch's and Teva's unlawful conduct, generic Xifaxan 550 mg still has not entered the market seven years after the unlawful agreement with Teva and three years after a federal court declared Bausch's IBS-D patents invalid.  Plaintiffs and other purchasers of the drug continue to pay monopoly prices rather than competitive prices for rifamaxin and are likely to do so until some time significantly after January 2028.

## II.     PARTIES

19.     Plaintiff Walgreen Co. ("Walgreen") is an Illinois corporation having its principal place of business at 200 Wilmot Road, Deerfield, Illinois 60015. Walgreen owns and operates retail stores in several states at which it dispenses prescription drugs, including Xifaxan, to the public. Walgreen brings this action in its own behalf and as the assignee of AmerisourceBergen Drug Corporation, a pharmaceutical wholesaler, which during the relevant period purchased Xifaxan directly from Bausch for resale to Walgreen and which has expressly assigned its claims arising out of those purchases to Walgreen.

20.     Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation having its principal place of business at 1014 Vine Street, Cincinnati, Ohio 45202. Kroger owns and operates retail stores in several states at which it dispenses prescription drugs, including Xifaxan, to the public. Kroger brings this action in its own behalf and as the assignee of Cardinal Health, Inc., a pharmaceutical wholesaler, which during the relevant period purchased Xifaxan directly from Basuch for resale to Kroger and which has expressly assigned its claims arising out of those purchases to Kroger.

21.    Plaintiff Albertsons Companies, Inc. ("Albertsons") is a Delaware corporation having its principal place of business at 250 Parkcenter Boulevard, Boise, Idaho 83706. Albertsons' affiliates own and operate retail stores in several states at which they dispense prescription drugs, including Xifaxan, to the public. Albertsons brings this action in its own behalf and as the assignee of McKesson Corporation ("McKesson"), a pharmaceutical wholesaler, which during the relevant period purchased Xifaxan directly from Bausch for resale to Albertsons' affiliates and which has expressly assigned its claim arising out of those purchases to Albertsons.

22.    Plaintiff H-E-B, L.P. ("HEB") is a Texas limited partnership having its principal place of business at 646 South Main Avenue, San Antonio, Texas 78204. HEB owns and operates retail stores at which it dispenses prescription drugs, including Xifaxan, to the public. HEB brings this action in its own behalf and as the assignee of McKesson, which during the relevant period purchased Xifaxan directly from Bausch for resale to HEB and which has expressly assigned its claim arising out of those purchases to HEB.

23.    Plaintiff Supervalu, Inc. ("Supervalu") is a Delaware corporation having its principal place of business in Eden Prairie, Minnesota.  Supervalu owns and operates retail stores at which it dispenses prescription drugs, including Xifaxan, to the public. Supervalu brings this action in its own behalf and as the assignee of McKesson, which during the relevant period purchased Xifaxan directly from Bausch for resale to Supervalu and which has expressly assigned its claim arising out of those purchases to Supervalu.

24.    Defendant Salix Pharmaceuticals, Ltd. is a corporation organized under the laws of Delaware with its principal place of business in Bridgewater, New Jersey.

25.     Defendant Salix Pharmaceuticals, Inc. is a corporation organized under the laws of California with its principal place of business in Bridgewater, New Jersey. Salix Pharmaceuticals, Inc. is a wholly owned subsidiary of Salix Pharmaceuticals, Ltd.  Salix Pharmaceuticals, Inc. and Salix Pharmaceuticals, Ltd. are collectively referred to as "Salix."

26.     On April 1, 2015, Valeant Pharmaceuticals International, Inc. acquired Salix Pharmaceuticals, Ltd. and, on or about that date, assumed its rights and obligations under the patents that were at issue in the patent litigation between Salix and Teva Pharmaceutical Industries Ltd. Effective July 13, 2018, Valeant Pharmaceuticals International, Inc. changed its corporate name to Bausch Health Companies Inc. Salix Pharmaceuticals, Ltd. is now a wholly owned subsidiary of Bausch Health Companies Inc. and Salix Pharmaceuticals, Inc. is an indirect wholly owned subsidiary of Bausch Health Companies, Inc.

27.      Defendant Bausch Health Companies Inc. is a corporation organized and existing under the laws of British Columbia, Canada with its U.S. headquarters in Bridgewater, New Jersey.

28.     Defendant Teva Pharmaceutical Industries Ltd. is a corporation incorporated under the laws of Israel, with its principal place of business in Tel Aviv, Israel.

29.     Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation having its principal place of business in Parsippany, New Jersey.

30.     All of Defendants' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful restraints of trade and monopolization alleged by Plaintiffs, and were authorized, ordered, and/or undertaken by various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their

predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of Defendants.

### III.    JURISDICTION, VENUE AND INTERSTATE COMMERCE

31.    This action arises under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 26, and seeks to recover threefold damages, permanent injunctive relief, the costs of suit and reasonable attorneys' fees for the injuries sustained by Plaintiffs resulting from Defendants' conspiracy to restrain trade in, and Bausch's monopolization of, the relevant market. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

32.    Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) because, during the relevant period, Defendants were found and transacted business in this District, and a substantial portion of the events and omissions underlying this action occurred in this District.

33.    The drugs at issue in this case are sold in interstate commerce, and Defendants' conduct, as described in this Complaint, have occurred in, and have had a substantial effect on, interstate commerce.

### IV.    REGULATORY BACKGROUND

#### A.    Characteristics of the Prescription Pharmaceutical Marketplace.

34.    The marketplace for the sale of prescription pharmaceutical products in the United States suffers from a significant imperfection that brand manufacturers can exploit in order to obtain and maintain market power in the sale of a particular pharmaceutical composition. Markets function best when the person responsible for paying for a product is also the person who chooses which product to purchase. When the same person has both the payment

obligation and the choice of products, the price of the product plays an appropriate role in the person's choice of products and, consequently, the manufacturers have an appropriate incentive to lower the prices of their products.

35.    The pharmaceutical marketplace, however, is characterized by a "disconnect" between the payment obligation and the product selection. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Xifaxan, without a prescription written by a doctor. The prohibition on dispensing certain products without a prescription introduces a disconnect between the payment obligation and the product selection. The patient (and in most cases his or her insurer) has the obligation to pay for the pharmaceutical product, but the patient's doctor chooses which product the patient will buy.

36.    Brand pharmaceutical sellers exploit this price disconnect by employing large forces of sales representatives to visit doctors' offices and persuade them to prescribe the manufacturer's products. These sales representatives do not advise doctors of the cost of the branded products. Moreover, studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive to price differences because they do not have to pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

37.    The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand – the extent to which unit sales go down when price goes up. This reduced price elasticity in turn gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to raise price substantially above marginal cost profitably is what economists and antitrust courts refer to as market power. The result of the market

imperfections and marketing practices described above is to allow brand manufacturers to gain

and maintain market power with respect to many branded prescription pharmaceuticals,

including Xifaxan.

**B.     The Regulatory Structure for Approval of Generic Drugs and the Substitution of Generic Drugs for Brand Name Drugs.**

38.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that

create a new drug must obtain FDA approval to sell the product by filing a New Drug

Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include specific data concerning the

safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C.

§ 355(a), (b).

39.     When the FDA approves a brand manufacturer's NDA, the drug product is listed

in an FDA publication entitled Approved Drug Products with Therapeutic Equivalence

Evaluations, commonly known as the "Orange Book." The manufacturer must list in the Orange

Book any patents that the manufacturer believes could reasonably be asserted against a generic

manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration

of the listed patents. The manufacturer must list in the Orange Book any such patents that issue

after the FDA approves the NDA within thirty days of issuance. 21 U.S.C. §§ 355(b)(1) & (c)(2).

40.     The FDA relies completely on the brand manufacturer's truthfulness in submitting

patents to be listed, as it does not have the resources or authority to verify the validity or

relevance of the manufacturer's patents. In listing patents in the Orange Book, the FDA merely

performs a ministerial act.

**C.     The Hatch-Waxman Amendments.**

41.     The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory

hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy

and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984). A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA, and must further show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug—that is, that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug. The FDA assigns an "AB" rating to a generic drug in capsule or tablet form that is therapeutically equivalent to its brand-name counterpart.

42.     The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart. 21 U.S.C. § 355(j)(8)(B).

43.     Congress had two goals in enacting the Hatch-Waxman Amendments. First, it sought to expedite the entry of legitimate (non-infringing) generic competitors, thereby reducing healthcare expenses nationwide. Second, it sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

44.     To incentivize the development of new drugs, the Hatch-Waxman Amendment created a 5-year period of new chemical entity ("NCE") exclusivity. Following the approval of

an NDA for a drug that has not been approved in any other application, no ANDA may be submitted for that drug for 5 years (or 4 years if the ANDA contains a paragraph IV certification, as discussed in the next section).

45.    The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic high profit margins for brand manufacturers. In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009 total prescription drug revenue had soared to $300 billion.

### D.    Paragraph IV Certifications.

46.    To obtain FDA approval of an ANDA, a manufacturer must certify that the generic drug will not infringe any patents listed in the Orange Book. Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

    i.    that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

    ii.    that the patent for the brand drug has expired (a "Paragraph II certification");

    iii.    that the patent for the brand drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or

    iv.    that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

47.    If a generic manufacturer files a Paragraph IV certification, a brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent

infringement. If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to market its product by granting final approval. The FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay or the expiration of a first filer's exclusivity.

48.     As an incentive to spur manufacturers to seek approval of generic alternatives to branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV certification typically gets a period of protection from competition from other ANDA filers seeking approval to market generic versions of the same drug. For Paragraph IV certifications made after December 2003, the first generic applicant receives 180 days of market exclusivity vis-à-vis other ANDA filers (unless some forfeiture event, like that discussed below, occurs). Generics are usually at least 15% less expensive than their brand name counterparts when there is a single generic competitor, but this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market. Being able to sell at the higher price for six months or more may be worth hundreds of millions of dollars to a generic manufacturer.

49.     Brand manufacturers can "game the system" by listing patents in the Orange Book (even if such patents are not eligible for listing) and suing any generic competitor that files an ANDA with a Paragraph IV certification (even if the competitor's product does not actually infringe the listed patents) in order to delay final FDA approval of an ANDA for up to 30

months. Listing patents in the Orange Book allows brand manufacturers to block generic entry before it occurs rather than waiting until the generic receives FDA approval and launches and then asserting its patents at that time.  That brand manufacturers often sue generics simply to delay generic competition—as opposed to enforcing a valid patent that is actually infringed by the generic—is demonstrated by the fact that generic firms have prevailed in Paragraph IV litigation in cases involving 73% of the drug products studied.

50.    On December 8, 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") in order to make it more difficult for brand and generic manufacturers to conspire to delay the start of the first filer's 180-day period of generic market exclusivity. The MMA outlines a number of conditions under which an ANDA applicant forfeits its eligibility for 180-day exclusivity, making way for other ANDA filers to launch their generic products. For example, forfeiture occurs if the first ANDA applicant fails to obtain tentative approval from the FDA within 30 months of filing a substantially complete ANDA, unless the failure is caused by a change in or review of the approval requirements. Forfeiture under the MMA most commonly occurs for failure to obtain tentative approval within the requisite 30 months.

51.    Under the "failure to market" provision, a first ANDA applicant forfeits 180-day exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the date that is (i) 75 days after receiving final FDA approval; or (ii) 30 months after the date it submitted its ANDA; or (b) the date that is 75 days after the date as of which, as to each of the patents that qualified the first applicant for exclusivity (*i.e.*, as to each patent for which the first applicant submitted a Paragraph IV certification), at least one of the following has occurred: (i) a final decision of invalidity or non-infringement; (ii) a settlement order entering final judgment that

includes a finding that the patent is invalid or not infringed; or (iii) the NDA holder delists the patent from the Orange Book.

### E.    The Benefits of Generic Drugs.

52.    Generic versions of brand name drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective, as their brand name counterparts. The only material difference between generic and brand name drugs is their price. The launch of a generic drug usually brings huge cost savings for all drug purchasers. The Federal Trade Commission estimates that about one year after market entry, the generic version typically takes over 90% of the brand's unit sales and sells for as little as 15% of the price of the brand name product. As a result, competition from generic drugs is viewed by brand name drug companies such as Bausch as a grave threat to their bottom lines.

53.    Due to the price differentials between brand and generic drugs, and other institutional features of the pharmaceutical industry, pharmacists liberally substitute the generic equivalent when presented with a prescription for a brand-name drug.  Moreover, since passage of the Hatch-Waxman Amendments, every state has adopted substitution laws that either require or permit pharmacies to substitute generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise by writing "dispense as written" or similar language on the prescription).

54.    There is an incentive to choose the less expensive generic equivalent in every link in the prescription drug chain. Pharmaceutical wholesalers and retailers pay lower prices to acquire generic drugs than to acquire the corresponding brand-name drug. Health insurers and patients also benefit from the lower prices that result from generic competition.

55.     Generic competition enables Plaintiffs (and their assignors) to purchase generic versions of the drug at substantially lower prices.

56.     Until a generic version of the brand drug enters the market, however, there is no bioequivalent generic drug to substitute for and compete with the brand drug, and therefore the brand manufacturer can continue to profitably charge supracompetitive prices without losing substantial sales. As a result, brand manufacturers, who are well aware of generics' rapid erosion of their brand sales, have a strong incentive to delay the introduction of generic competition into the market, including through tactics such as those alleged here.

### F.     Authorized Generics.

57.     The 180-day marketing exclusivity to which first-filing generics may be entitled vis-à-vis other ANDA filers does not prevent a brand manufacturer from marketing its own generic alternative to the brand drug during that 180-day exclusivity period under its own approved New Drug Application or NDA. Such a generic is called an "authorized generic" and is identical to the brand drug, but is sold as a generic product, typically through a subsidiary of the brand manufacturer or through a third-party generic manufacturer. Competition from an authorized generic during the 180-day exclusivity period allows the brand manufacturer to capture some portion of the generic sales that would otherwise be lost to the ANDA filer and substantially reduces drug prices for consumers.  Such competition is the normal outcome unless the brand and the generic have colluded to avoid that outcome.

58.     In its study, Authorized Generic Drugs: Short-term Effects and Long-Term Impact (August 2011), the Federal Trade Commission found that authorized generics capture a significant portion of sales and reduce the first filer generic's revenues by approximately 50% on average during the 180-day exclusivity period. The first-filing generic makes significantly less

money when it faces competition from an authorized generic because (1) the authorized generic takes unit sales away from the first filer; and (2) the presence of an additional generic in the market causes prices to decrease.

59.     Although first-filing generic manufacturers make significantly less money when they must compete with an authorized generic during the first 180 days, drug purchasers such as Plaintiffs benefit from the lower prices caused by competition between the authorized generic and the first-filing generic.

60.     As a practical matter, authorized generics are the only means by which brand-name manufacturers engage in price competition with manufacturers of AB-rated generic drugs. Brand-name manufacturers generally do not reduce the list price of their branded drugs in response to the entry of AB-rated generics. Instead, they either raise the price to extract higher prices from the small number of "brand-loyal" patients or, more typically, they continue to raise the price of the branded drugs at the same intervals and the same rate at which they raised the price of the drugs prior to generic entry.

61.     Given the significant negative impact of an authorized generic on an ANDA filer's revenues, and the absence of any other form of price competition from the branded manufacturer, a brand manufacturer's agreement not to launch an authorized generic has tremendous economic value to a generic manufacturer. Brand manufacturers have used such agreements as a way to pay ANDA filers to delay entering the market. Such agreements deprive drug purchasers of the lower prices resulting from competition in two ways. During the initial period of delay agreed to by the ANDA filer, they effectively eliminate all competition from AB-rated generic products and allow the brand manufacturer to preserve its monopoly. And, during the period in which the branded company has agreed not to sell an authorized generic, they

eliminate competition between the ANDA filer's generic and the authorized generic, giving the ANDA filer a monopoly on generic sales.

62.     As a means of compensating generic manufacturers for delaying entry, brand manufacturers prefer no-AG agreements to cash payments because, in the case of no-AG agreements, a portion of the compensation is paid by purchasers of the drug in the form of higher generic drug prices. The generic manufacturer receives not only the profits that the brand manufacturer would have made by launching an authorized generic in competition with the ANDA filer's product, but also the higher prices that result from the absence of that competition. Thus, the payment to the generic manufacturer is shared between the brand manufacturer and the generic manufacturer's customers. *See King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 405 (3d Cir. 2015) ("The no-AG agreement transfers the profits the patentee would have made from its authorized generic to the settling generic—plus potentially more, in the form of higher prices, because there will now be a generic monopoly instead of a generic duopoly").

63.     Historically, no-AG agreements between brand and generic manufacturers took the form of an explicit promise written into a settlement agreement. However, as more courts have recognized no-AG promises as a form of unlawful payment for delay that could violate the antitrust laws, brand and generic manufacturers have moved to a different model.

64.     More recently, in an attempt to conceal the no-AG promise, brand and generic manufacturers often enter settlements containing either a volume-limited generic license or a profit-share provision (sometimes called a royalty) pertaining to generic sales. Rather than an express promise not to launch an authorized generic, the economics of a settlement containing volume limits or profit share provisions make it unprofitable for the brand company to do so.

19

Thus, while the brand company may retain the theoretical right to launch an authorized generic, both parties to the agreement understand at the time they are entering the agreement that no rational brand company would do so under the circumstances.  The sole purpose of these provisions is to ensure that there will be only generic product on the market during the first six months rather than two and to share the resulting monopoly profits, both by inducing the generic to accept a later entry date and, in some cases, by also requiring the generic to return a portion of its profits to the brand company in the form of a royalty.

65.     No-AG agreements need not be explicit to achieve their anticompetitive ends. Any agreement that alters the economic incentives of branded companies and ANDA filers in such a way as to give the ANDA filer a temporary monopoly over generic sales is effectively a no-AG agreement and will typically result in (i) a delay in generic entry, because the ANDA filer will accept a later entry date, and (ii) higher generic prices than would exist absent the agreement. Since generic drugs are typically priced at a discount off the prevailing brand price at the time of generic entry, and since brand prices go up over time, a delay in generic entry for any reason will generally result in higher generic prices because the price of the generic will be set based on a higher brand price. If the agreement between the brand and the generic includes a restraint on post-entry generic competition, such as a no-AG agreement or a volume limitation (or both), that restraint will compound the price effect and bring about even higher generic prices.

### G.     The Limits of Patent Protection for Drugs

66.     The existence of one or more patents purporting to claim a drug substance or drug product does not by itself give a brand drug company an enforceable monopoly over the drug. Patents are routinely invalidated or held unenforceable, either upon reexamination or *inter partes*

proceedings by the U.S. Patent and Trademark Office ("PTO"), by court decision, or by jury verdict.

67.    Under the framework set forth in the Hatch-Waxman Amendments, a generic drug company can challenge patents ostensibly covering the branded drug. A patent infringement lawsuit by the patent holder within 45 days after notification of the generic drug company's challenge of the patents will trigger a 30-month stay of regulatory approval, during which the FDA cannot approve the generic drug.

68.    At all times, a patent holder bears the burden of proving infringement.

69.    One way that a generic can prevail in patent infringement litigation is to show that the patent holder cannot meet its burden to prove infringement. Another is to show that the patent is invalid or unenforceable.

70.    A patent is invalid or unenforceable when, *e.g.*, (i) the disclosed invention is anticipated or obvious in light of earlier prior art, sale or use; (ii) when an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or deceive the PTO, fails to disclose material information known to that person to be material, or submits materially false information to the PTO during prosecution; and/or (iii) when a later-acquired patent is not patentably distinct from the invention claimed in an earlier patent (and no exception, such as the safe harbor, applies).

71.    In these circumstances, the PTO's decision to issue a patent does not substitute for a fact-specific assessment of: (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent, (ii) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a

patent infringement suit, or (iii) whether a patent may be "reasonably asserted" against a competitor or otherwise properly listed in the Orange Book.

72.     As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely that a challenged patent will be found invalid or not infringed than upheld. The Federal Trade Commission ("FTC") reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002. An empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.

73.     If a generic manufacturer successfully defends against the brand's infringement lawsuit—either by showing that its proposed generic product does not infringe any asserted patents and/or that any asserted patents are invalid or unenforceable—the generic may enter the market immediately upon receiving approval from the FDA.

### H.     Deterrents to Subsequent Filers

74.     A brand manufacturer can also pay off the generic manufacturer by including provisions in the agreement designed to deter other generic manufacturers (*i.e.*, second, third and subsequent filers) from entering the market before the delayed entry date to which the first filer has agreed. These deterrence clauses come in at least three varieties: (a) deterring entry via litigation; (b) deterring entry via license; and (c) deterring entry via "section viii" statements.

75.     One type of deterrence clause provides that the delayed entry date to which the first filer has agreed will be accelerated (moved earlier) if any other generic manufacturer (*i.e.*, a second filer) prevails in patent litigation against the brand manufacturer.

76.     The purpose and effect of such a clause is to reduce subsequent filers' incentives to litigate the brand manufacturers' patents to conclusion. Absent the deterrence clause, a second filer could enter the market before the first filer under certain circumstances, thereby enjoying a substantial period where it would have the only ANDA-based generic product on the market. Fewer generic competitors means higher profits.

77.     As noted above, when a second filer secures a final court judgment that the brand manufacturer's patents are invalid or not infringed, the first filer forfeits its 180-day ANDA exclusivity period if it does not enter the market within 75 days of the court decision.  The first filer would forfeit its statutory exclusivity period if, for example, it had agreed with the brand manufacturer to delay entry until Year 4 and a second filer establishes patent invalidity in Year 2. Having agreed not to begin marketing until Year 4, the first filer could not enter the market within 75 days of the second filer's favorable court decision in Year 2. The first filer would then forfeit its 180-day ANDA exclusivity period, and the second filer could enter the market and potentially enjoy a substantial period selling the only ANDA-based generic product on the market.

78.     The deterrence clause allows the brand manufacturer and the first filer, through their joint conduct, to circumvent the statutory incentive for second filers to try to improve on the entry date to which the brand manufacturer and first filer have agreed. In the example above, absent the deterrence clause, the Hatch-Waxman Amendments would allow the second filer to enter the market in Year 2 and enjoy a substantial period as the only ANDA-based generic product on the market. The first filer would be stuck on the sidelines until its agreed entry date. The prospect of being the only ANDA-based generic product on the market would normally motivate a second filer to incur the substantial costs and burdens of litigating the patent case to

try to enter the market before the first filer's agreed entry date. The deterrence clause eliminates that possibility, reducing second filers' incentives to litigate the patent case to conclusion.

79.     The deterrence clause results in delayed generic entry in at least two ways: (i) it eliminates subsequent filers' ability to use successful patent litigation to enter the market before the first filer's agreed entry date; and (ii) by reducing the threat to the first filer's 180-day ANDA exclusivity period, the clause compensates the first filer for agreeing to delay its entry into the market. In short, the clause eliminates a significant competitive threat to the first filer, in return for which the first filer agrees to delay its entry into the market.

80.     The second way in which an unscrupulous brand manufacturer could deter subsequent filers and compensate the first filer for agreeing to delay entry into the market is a clause providing that the brand manufacturer will not grant a license to any other generic manufacturer, under authority of the brand manufacturer's NDA, to enter the market before the first filer.

81.     Absent the brand manufacturer's agreement not to grant such a license to a subsequent filer, it could use its own challenges to the brand manufacturer's patents as leverage to negotiate a license (under authority of its NDA) to enter the market before the first filer. The second filer could thereby enjoy a substantial period where it would have the only generic product on the market.

82.     This second type of deterrence clause prevents the brand manufacturer from granting such a license, in exchange for which the first filer agrees to delay its entry.

83.     So-called section viii statements provide the opportunity for a third means of deterring entry by subsequent filers.  In a section viii statement, the ANDA applicant states that it is not seeking approval for the particular use covered by the brand manufacturer's method-of-use

patent. The FDA can approve an ANDA containing only a section viii statement *without regard* to whether any other ANDA applicant is otherwise entitled to a 180-day ANDA exclusivity period. 21 U.S.C. § 355(j)(2)(A)(viii); 21 C.F.R. § 314.94(a)(12)(iii).  By "carving out" from their ANDAs the uses covered the brand manufacturer's method-of-use patents, these second filers can enter the market without having won any patent litigation and without a license from the brand manufacturer.

84.     Section viii statements can be used to deter entry by subsequent filers in cases where the only patents at issue claim methods of use that can be carved out of the label with a section viii statement.  To do so, the settling parties include a clause providing that if a second filer enters the market through any other means (*i.e.*, without having won patent litigation and without a license), the first filer's entry date is moved up to the date that the second filer enters. The clause thus prevents the second filer from having any period on the market as the only ANDA generic. The loss of that possibility reduces subsequent filers' incentives to enter the market ahead of the first filer via section viii statements. Again, the deterrence clause protects the first filer and, in exchange for that protection, the first filer will accept a later entry date.

85.     In short, the Hatch-Waxman Amendments leave open at least three pathways for second filers to enter the market before a first filer that has agreed to delay entry into the market. The second filer can win the patent litigation and trigger forfeiture of the first filer's 180-day ANDA exclusivity period if it fails to enter the market within 75 days of the favorable court decision. The second filer can negotiate an earlier entry date in an NDA-based license agreement with the brand manufacturer. And the second filer can enter the market by means of a section viii statement. The deterrence clauses work together to dissuade subsequent filers from trying to

enter the market before the first filer's agreed entry date, thereby compensating the first filer for agreeing to delay its entry into the market.

## V.    OPERATIVE FACTS

### A.    Bausch's Patents on Xifaxan Were Weak.

86.    Over time, Bausch filed, prosecuted, and listed in the Orange Book at least 30 patents claiming Xifaxan 550 mg or its uses. But those patents were weak and could not stave off competition from generic versions of the drug. And in some cases they did not in fact claim Xifaxan 550 mg or any of its uses and therefore could not lawfully be listed in the Orange Book.

87.    Rifaximin, the active ingredient in Bausch's Xifaxan, has been widely used as an antibiotic for decades.

88.    The FDA approved Xifaxan for use in the United States in 2004, as 200 mg tablets for the treatment of travelers' diarrhea.

89.    In 2010 the FDA approved 550 mg tablets. Today those tablets are indicated for: (i) treatment of travelers' diarrhea (TD) caused by noninvasive strains of *E. coli* in adult and pediatric patients 12 years of age and older; (ii) reduction in risk of overt hepatic encephalopathy recurrence in adults; and (iii) treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.

90.    Xifaxan was the crown jewel of Salix's business and a primary reason that Bausch acquired Salix in 2015.

91.    Sales of Xifaxan grew at a rapid pace, from $979 million in 2017, to $1.195 billion in 2018, to $1.452 billion in 2019.  As of 2024, Bausch's annual U.S. sales of Xifaxan were approximately $1.99 billion. Virtually all of those sales were of the 550 mg strength, and the majority were for treatment of IBS-D.

92.     Irritable bowel syndrome is characterized by symptoms including abdominal pain, bloating, frequency, urgency, gas, and changed bowel habits, such as diarrhea, constipation, or alternating diarrhea and constipation. Subtypes of IBS include IBS with diarrhea (IBS-D), IBS with constipation (IBS-C), or IBS with alternating diarrhea and constipation (IBS-A).

93.     The IBS-D subtype comprises about one-third of IBS patients. IBS may be caused, for example, by abnormal motility, abnormal muscular coordination, changes in the microbiome in the colon or small intestine, intolerance to certain foods, or psychological factors.

94.     On December 21, 2001, Salix (Bausch's subsidiary) submitted NDA No. 021361 for rifaximin tablets to be marketed and sold under the brand name Xifaxan 200 mg, indicated for the treatment of patients (>12 years of age) with travelers' diarrhea caused by noninvasive strains of *E. coli*. The FDA approved the NDA on May 25, 2004.

95.     On June 24, 2009, Salix submitted NDA No. 022554 for rifaximin tablets to be marketed and sold under the brand name Xifaxan 550 mg, indicated for the treatment the reduction in risk of overt hepatic encephalopathy recurrence in adults. On June 7, 2010, Salix submitted a Supplemental New Drug Application ("sNDA") for Xifaxan 550 mg, introducing a new indication for the treatment of irritable bowel syndrome with diarrhea ("IBS-D") in adults.

96.     On March 24, 2010, the FDA granted the application with respect to the hepatic encephalopathy ("HE") indication.

97.     On May 27, 2015, FDA approved the sNDA for Xifaxan 550 mg for the treatment of IBS-D in adults.

98.     By 2016, Salix had obtained and listed in the FDA's Orange Book 22 patents claiming aspects of Xifaxan 550 mg and its uses, with expiration dates ranging from August 11, 2019 to October 2, 2029. By 2023, the patents listed in the Orange Book for Xifaxan 550 mg and

its uses no longer included the patents that had already expired in 2019, but the number of listed patents had grown to 24, and by 2024 had grown further to 26.

99.    The earliest-expiring of the patents listed in the Orange Book claimed methods of using the prior art rifaxamin compound (the active ingredient in Xifaxan) for various indications such as treating irritable bowel syndrome and treating bloating.  Those patents expired on August 11, 2019.

100.    The remaining listed patents have expiration dates ranging from June 19, 2024 to October 2, 2029. They fall into three general categories: (i) patents claiming various distinct crystalline forms or polymorphs of rifaximin ("polymorph patents"); (ii) patents claiming methods of treating IBS with rifaximin ("IBS patents"); and (iii) patents claiming methods of using rifaximin to treat hepatic encephalopathy ("HE patents"), as shown below.

| Patent | Expiration | Submission | Coverage |
|--------|-----------|------------|----------|
| 6,861,053 | 08/11/2019 | n/a | IBS |
| 7,452,857 | 08/11/2019 | n/a | IBS |
| 7,605,240 | 08/11/2019 | n/a | IBS |
| 7,718,608 | 08/11/2019 | n/a | IBS |
| 7,935,799 | 08/11/2019 | n/a | IBS |
| 7,045,620 | 06/19/2024 | n/a | Polymorph |
| 7,612,199 | 06/19/2024 | 04/07/2011 | Polymorph |
| 7,902,206 | 06/19/2024 | 04/07/2011 | Polymorph |
| 8,158,644 | 06/19/2024 | 05/09/2012 | Polymorph |

| | | | |
|---|---|---|---|
| 8,158,781 | 06/19/2024 | 05/08/2012 | Polymorph |
| 8,835,452 | 06/19/2024 | 10/01/2014 | Polymorph |
| 8,853,231 | 06/19/2024 | 11/05/2014 | Polymorph |
| 7,915,275 | 02/23/2025 | 06/18/2015 | Polymorph |
| 7,906,542 | 06/01/2025 | 04/07/2011 | Polymorph |
| 8,518,949 | 02/27/2026 | 09/16/2013 | Polymorph |
| 8,741,904 | 02/27/2026 | 07/11/2014 | Polymorph |
| 9,271,968 | 02/27/2026 | 06/08/2016 | Polymorph |
| 10,703,763 | 02/27/2026 | 07/14/2020 | Polymorph |
| 8,193,196 | 09/02/2027 | 06/18/2012 | Polymorph |
| 10,456,384 | 02/26/2029 | 11/12/2019 | IBS |
| 10,765,667 | 02/26/2029 | 10/19/2020 | IBS |
| 11,564,912 | 02/26/2029 | 02/02/2023 | IBS |
| 11,779,571 | 02/26/2029 | 10/23/2023 | IBS |
| 8,309,569 | 07/18/2029 | 06/18/2015 | IBS |
| 8,829,017 | 07/24/2029 | 09/09/2014 | HE |
| 8,946,252 | 07/24/2029 | 02/03/2015 | HE |
| 9,421,195 | 07/24/2029 | 10/11/2016 | HE |
| 9,629,828 | 07/24/2029 | 04/27/2017 | HE |
| 10,314,828 | 07/24/2029 | 07/01/2019 | HE |
| 10,335,397 | 07/24/2029 | 07/24/2019 | HE |
| 10,709,694 | 07/24/2029 | 07/23/2020 | HE |

| 8,642,573 | 10/02/2029 | n/a | HE |
| 8,969,398 | 10/02/2029 | 03/04/2015 | HE |

101.    Like many active pharmaceutical ingredients, Rifaximin may exist in a number of different crystalline forms (known as polymorphs). The '620, '199, '206, '275, '542, '644, '781, '196, '949, '904, '452, '231 and '968 patents claim some of these rifaximin polymorphs.

102.    For example, the '620, '199, '206, '275, '542, '644, '452, '231 and '781 patents claim the alpha, beta, and gamma rifaximin polymorphs, including those made by a specific process, compositions containing the same and uses for the same. The '196, '949, '904, and '968 patents claim the delta and epsilon rifaximin polymorphs, including those made by a specific process, compositions containing the same and uses for the same.

103.    All these polymorph patents were subject to validity challenges.  Moreover, they were specific to a particular polymorph or to particular properties or methods of making a given polymorph, making it relatively easy for a generic manufacturer to avoid infringing these patents even if they were valid.

104.    The patents that expired in 2019 claimed certain methods of using rifaximin in patients with IBS, but without specific dosing regimens. Some of the patents expiring after 2019 are directed to the same or similar treatment indications as those that expired in 2019, but have claims reciting specific dosing regimens or target patients. For example, the '608 and '799 patents, both of which expired on August 11, 2019, claimed a method of treating a subject suffering from IBS and a method of treating a subject who has relapsing diarrhea from small intestinal bacterial overgrowth comprising administering rifaximin to the subject in need. The later-expiring '569 patent is directed to certain methods of using rifaximin at a dose of 1650

mg/day for 14 days for the treatment of IBS-D in order to achieve a "durability of response" (about 12 weeks of adequate relief of symptoms). Similarly, the '667 patent claims a method of treating IBS in a subject 65 years of age or older by administering 550 mg of rifaximin three times a day for 14 days, and also had dependent claims claiming treatment of specific symptoms or types of IBS such as where the IBS is IBS-D.

105.    Regardless of the merits of the patents expiring in 2019, those patents all would have been avoided by generics entering the market after the patents' August 11, 2019 expiration. As for the later-expiring patents, they are all subject to serious validity challenges and/or claim specific indications that a generic manufacturer easily could avoid.

106.    Nine listed patents claim treatment methods specific to hepatic encephalopathy through administering rifaximin.

107.    For example, the '573 patent covers certain methods of "maintaining remission of hepatic encephalopathy" by "administering . . . rifaximin daily to a subject for a period of about 12 months of longer."

108.    The '017 patent covers certain methods of using rifaximin at a dose of 1,000-1,200 mg/day and "cautiously" for the treatment of hepatic encephalopathy in patients who also have travelers' diarrhea and either a Child-Pugh Class C score or a model end stage liver disease score of 25 or greater.

109.    The '252 patent covers certain methods of using rifaximin to reduce the risk of HE recurrence in certain patients who have travelers' diarrhea and hepatic insufficiency.

110.    The '398 patent covers certain methods of using "rifaximin daily for a period of about 12 months or longer" to decrease a subject's risk of an HE breakthrough episode.

111.    The '195 patent covers methods of using rifaximin at a dose of 1,000-1,200 mg/day "for a period of 12 months or longer" to reduce the risk of HE recurrence in adults.

112.    The '828 patent covers methods of using rifaximin at a dose of 1,000-1,200 mg/day to reduce the risk of HE recurrence in certain patients who have travelers' diarrhea and chronic liver disease.

113.    These patents are all specific to treating HE, so a generic could easily avoid these patents by carving out these HE indications in its labeling via a section viii statement.

114.    In sum, each of the post-2019-expiring listed patents claiming methods of treating IBS indications and each of the listed polymorph patents was vulnerable to challenges regarding validity, enforceability, and infringement.

115.    In fact, as explained below, the Court of Appeals for the Federal Circuit affirmed a district court's judgment finding that the claims of the IBS and polymorph patents that Bausch asserted against a manufacturer of generic Xifaxan were invalid for obviousness.  Specifically, the court invalidated the claims of the representative later-expiring '569 and '667 patents directed to treating IBS-D with 550 mg rifaximin three times a day for 14 days, and claims of the representative later-expiring '199 and '206 patents directed to rifaximin form beta. *See Salix Pharms., Ltd. v. Norwich Pharms. Inc.*, 98 F.4th 1056 (Fed. Cir. 2024).

116.    The substantial vulnerability and weakness of all the IBS and polymorph patents meant that none stood as legitimate impediments to generic competition. By listing them in the Orange Book, however, Bausch ensured that every potential generic competitor would have to address them.

117.    Actavis Laboratories FL, Inc ("Actavis"), a generic manufacturer subsequently acquired by Teva, was the first to file an ANDA seeking approval to manufacture, market, and

sell a generic version of Xifaxan 550 mg. Actavis filed ANDA No. 208959 in or about February 2016 directed to Xifaxan 550 mg. As the first generic to submit a substantially complete ANDA for rifaximin, Actavis was eligible for the 180-day ANDA exclusivity period for generic Xifaxan 550 mg tablets.

118.    On February 11, 2016, Actavis sent a paragraph IV certification to Bausch, asserting that the following patents are invalid, unenforceable, or will not be infringed by the activities described in Actavis's ANDA: the '569 patent; the '573 patent; the '017 patent; the '252 patent; the '398 patent; the '620 patent; the '199 patent; the '206 patent; the '542 patent; the '275 patent; the '644 patent; the '781 patent; the '196 patent; the '949 patent; the '904 patent; the '452 patent; the '231 patent; the '053 patent; the '857 patent; the '240 patent; the '608 patent; and the '799 patent.

119.    Actavis provided Bausch with the factual and legal basis supporting its position that these patents are invalid, unenforceable, or would not be infringed by Actavis's proposed ANDA products.

120.    On March 23, 2016, Bausch filed suit against Teva in the U.S. District Court for the District of Delaware (the "Bausch-Teva Litigation"), alleging that Actavis infringed one or more claims of the '569, '573, '017, '252, '398, '620, '199, '206, '542, '275, '644, '781, '196, '949, '904, '452, '231, '053, '857, '240, '608, and '799 patents. Pursuant to the Hatch-Waxman Amendments, the mere filing of the action triggered an automatic 30-month stay of the approval of Actavis's ANDA. Later in the litigation, Bausch amended its complaint to add new allegations that Actavis also infringed the '968 and '195 patents.

121.    Actavis filed an answer to the claims, denying Bausch's allegations and asserting affirmative defenses and counterclaims (1) denying that its rifaximin tablets would infringe

claims of any of the asserted patents, (2) alleging that the asserted patents were invalid, and (3) alleging that the asserted patents were unenforceable due to Bausch's inequitable conduct during prosecution.

122.    On June 14, 2016, Bausch filed its First Amended Complaint, adding U.S. patent 9,271,968 (the "'968 patent") to the suit. Actavis filed its Amended Complaint and Counterclaims on July 1, 2016. Bausch filed its Reply on July 18, 2016.

123.    On August 2, 2016, Teva acquired Actavis and thereby became the owner of ANDA No. 208959 and a participant in the Bausch-Teva Litigation.

124.    On October 5, 2016, the court scheduled a seven-day trial to begin on January 29, 2018.

125.    On December 12, 2016, Bausch filed its Second Amended Complaint, adding U.S. patent 9,421,195 (the "'195 patent") to the suit. Teva filed its Second Amended Answer and Counterclaims on December 27. Bausch filed its Reply on January 10, 2017.

126.    On May 10, 2017, at Teva's request, the parties agreed to a roughly one-year suspension of the litigation that would last until April 30, 2018. All scheduled litigation deadlines and events, including the January 2018 trial date, were indefinitely removed from the Court docket. The parties subsequently requested that the stay be extended four more times, ultimately extending the hiatus to October 1, 2018.

127.    The Bausch-Teva Litigation involved 24 patents (either asserted by Bausch against Teva or introduced by Teva in its declaratory judgment counterclaims). Teva had strong defenses to all those patents. None presented a reason for Teva to agree to wait until 2028 to enter the market with a generic Xifaxan 550 mg.

128.    As described above, the patents asserted against Teva fell into four groups: IBS method-of-treatment patents expiring on August 11, 2019; IBS-D method-of-treatment patents with specific dosing regimens and/or target subjects expiring in 2029; polymorph patents expiring between June 2024 and September 2027; and HE method-of-treatment patents expiring in 2029.

129.    By the time Bausch and Teva settled the patent case in September 2018, the IBS method of treatment patents expiring on August 11, 2019 had less than one year of life left and thus, even if they were valid, infringed and enforceable, they presented no reason for Teva to agree to wait a day beyond August 11, 2019 to enter the market—let alone until 2028.

130.    Teva had strong validity challenges to the IBS-D method of treatment patents with specific dosing regimens and/or target subjects expiring in 2029, and those patents were exceptionally vulnerable to being invalidated. The federal courts did indeed invalidate the representative '569 and '667 patents in the later *Salix v. Norwich* action.

131.    Similarly, Teva had strong validity challenges to the polymorph patents and those patents were exceptionally vulnerable to being invalidated, as again evidenced by the invalidation (in the *Salix v. Norwich* action) of the representative '199 and '206 patents, which claimed the beta polymorphic form of rifaximin.

132.    Furthermore, the latest-expiring polymorphic rifaximin patent was the '196 patent expiring on September 2, 2027, which was directed to processes for making and pharmaceutical compositions of the delta and epsilon polymorphic forms of rifaximin. Even if it was valid, the 2027 expiration date of the '196 patent could not warrant Teva waiting until 2028 to enter the market.  The same is true of the earlier-expiring '949 and '762 patents (directed to the delta and epsilon forms of rifaximin), which expire on February 27, 2026.

133.    Teva also had solid noninfringement defenses to the delta and epsilon polymorphic rifaximin patents, because the Teva product does not use the delta or epsilon forms.

134.    As for the patents directed to the HE indication, separate and apart from its invalidity and noninfringement defenses, Teva could have eliminated all of those patents as a barrier to entry by means of a section viii statement carving out the HE indications.

**B.    Bausch Paid Teva to Delay Its Entry**

135.    Recognizing its vulnerability to generic competition, Bausch paid Teva to delay its entry into the market in order to protect its massive Xifaxan revenues.

136.    Bausch has acknowledged to its investors that Xifaxan sales accounted for "approximately 80% of the Salix segment revenues and approximately 21% of [Bausch's overall] revenues for 2023 and 2022, respectively." In comparison, "no other single product group represented 10% or more of the company's Salix segment product sales." Bausch has cautioned since 2017 that if Xifaxan's patents could not be successfully defended, the company could face losing "a significant portion of sales in a very short period." Xifaxan 550 mg revenue was so critical that any loss of patent protection sooner than anticipated would adversely impact Bausch's future cash flows, result in shortened useful lives of Xifaxan's intangible assets, increase amortization expenses, and "materially affect company operations."

137.    On September 12, 2018, Bausch announced the settlement of the pending litigation against Teva relating to the alleged infringement of Bausch's Xifaxan 550 mg patents. Bausch and Teva settled the patent lawsuit before the Court issued a ruling on the validity and/or infringement of Bausch's patents. That settlement included large and unexplained reverse payments to Teva to delay its market entry until January 1, 2028 and, in doing so, to block other generic entrants as well.

138.    Bausch's press release announcing the settlement stated that Teva was given the

option, beginning on January 1, 2028 (or earlier if another generic Xifaxan product entered the

market), to "(1) market a royalty-free generic version of XIFAXAN 550 mg tablets, should it

receive approval from the U.S. Food and Drug Administration on its Abbreviated New Drug

Applicant, or (2) to market an authorized generic version of XIFAXAN 550 mg tablets with drug

supply being provided by Salix. In the case an authorized generic is marketed, the volume of the

authorized generic will be subject to manufacturing and supply quantities until final patent

expiry, and Bausch Health will receive an undisclosed share of the economics from [Teva] on its

sales of an authorized generic."

139.    For decades it has been part of Teva's corporate strategy to settle Hatch-Waxman

patent cases in ways that provide it "value" beyond what the statute itself provides. The principal

way that it extracts this value is by insisting on contract provisions that create "exclusivities" that

the statute itself does not provide.

140.    These contractual exclusivities—none of which is authorized by the Hatch-

Waxman Amendments—include no-authorized-generic clauses and the deterrence clauses

described above. As late as 2018, it was common for Teva to insist on such provisions as part of

settling Hatch-Waxman patent litigations.

141.    For its part, Salix's parent company (then known as Valeant) had such an

unsavory history of anticompetitive conduct that it was hauled before a Congressional

Committee in 2016. Representative Cummings highlighted Salix's exploitation of a brand

prescription drug called Glumetza, whose price Salix had suddenly raised by 750%.

*Developments in the Prescription Drug Market: Oversight Hearing Before the House Comm. On*

*Oversight and Government Reform*, 114 Cong., at 3, 119 (Feb. 4, 2016), *available at*

https://www.govinfo.gov/ content/pkg/CHRG- 114hhrg25500/pdf/CHRG-114hhrg25500.pdf. He noted that Salix had "raise[d] the prices astronomically [for a] temporary period of time before other competitors enter the market." *Id*.

142.    In order to placate Congress, Valeant's then-CEO testified to the U.S. Senate on April 27, 2016 that "it was a mistake to pursue, and in hindsight I regret pursuing, transactions where a central premise was a planned increase in the prices of the medicines." Statement of J. Michael Pearson before the Senate Special Committee on Aging (Apr. 27, 2016), https://www.aging.senate.gov/imo/ media/doc/SCA_Pearson_4_27_16.PDF. And he gave them the false comfort that, going forward, "[w]e expect our pricing actions to track industry norms." *Id*.

143.    Yet, at that very moment, Valeant and Salix were concealing from Congress exactly why Salix was able to take the dramatic price increases on Glumetza. Salix had paid its generic competitor to delay entry into the market.  In that case, the payment took two basic forms: (1) a no-AG clause; and (2) deterrence clauses. Salix took the price increases on Glumetza during the period of delayed generic entry that it had bought from the generic competitor in exchange for those payments.  *See In re Glumetza Antitrust Litig.*, 2021 WL 1817092 (N.D. Cal. May 6, 2021) (denying summary judgment).

144.    In the wake of the Congressional investigations, in 2016 Valeant got a new CEO and a new General Counsel. On July 13, 2018, Valeant changed its name to Bausch Health Companies Inc.—a public-relations gambit to try to distance itself from its unsavory past.

145.    But the new management team was keenly aware of the enormous profits that Salix gained from the reverse payments that it had made—and failed to disclose to Congress— with respect to Glumetza. And in 2018, when generic Xifaxan was poised to enter the market,

Bausch and Salix were under enormous financial pressure. Bausch was in the midst of a multi-year effort to restructure its operations and to pay off debt. And Xifaxan was key to those efforts—Salix had recently heavily invested in a sales force centered on Xifaxan, the company's most significant product.

146.    So Bausch responded to the prospect of generic Xifaxan with the same anticompetitive strategy it had used with respect to Glumetza. Bausch paid its generic competitor to delay entry so that it could continue to reap unwarranted profits on a critical drug. Bausch provided Teva with the same type of reverse payments that it had used with respect to Glumetza, namely: (1) a no-AG agreement; a (2) deterrence clauses.

147.    Bausch paid Teva to delay generic entry by effectively giving Teva a no-AG agreement—an agreement that Bausch would not sell an AG in competition with Teva during the six-month period after Teva's launch.  Since Teva was the first filer and entitled to six months of exclusivity vis-à-vis other ANDA filers, that agreement guaranteed that Teva would be the *only* generic Xifaxan 550 mg on the market during that time. The no-AG payment will allow Teva to sell its generic product at a higher price, and to make twice as many sales, as it would if Bausch were to market an AG in competition with Teva.  Those higher prices come out of the pockets of purchasers.

148.    The no-AG agreement between Bausch and Teva took a particular form.  Bausch and Teva agreed that Teva had the option of either launching its own ANDA product, assuming it received FDA approval, or electing to have Bausch supply Teva with rifaximin to market and sell as the Xifaxan authorized generic, but with a limitation on the quantity it could sell under the agreement. This contractual arrangement makes it economically irrational for Bausch to market an authorized generic in competition with Teva. The quantity limit is in economic reality a thinly

disguised agreement by Bausch not to market an authorized generic during Teva's 180-day exclusivity period.

149.    At the time of the settlement in 2018, Bausch and Teva could reasonably have expected annual sales of 550 mg Xifaxan to be approximately $2.2 billion in 2028. As noted, annual sales of the drug reached approximately $2 billion in 2024 and are virtually certain to reach the $2.2 billion level in 2025 or 2026.  We will conservatively assume that Bausch and Teva expected sales of $2.2 billion in 2028.

150.    If Teva elects to market its ANDA product without any volume limitation, two generic competitors will be on the market during the 180-day period—Teva with no quantity limitation on its sales, plus Bausch's own authorized generic. Approximately $1.0 billion of brand sales would be substituted to generic sales during those 180 days ($2.2 billion annual brand sales * 90% generic erosion * 0.5 years). The two generics would be priced at approximately 50% of the brand price and would split the generic unit sales equally. Teva's generic sales during the 180-day period would total $1.0 billion sales * 50% of the brand price with two generics * 50% of the generic market = $250.0 million. Bausch's authorized generic sales would be roughly the same.

151.    If Teva elects to market the AG with a volume limitation, Bausch could nominally launch a second AG, but under reasonable assumptions it would be foolish for Bausch to do so. Given the volume limitation on Teva's sales, launching an AG would simply expand the generic market and displace higher-priced *brand* sales with lower-priced *generic* sales.

152.    Any volume limitation that is less than the expected rate of generic substitution will mean that launching an AG will result in the replacement of branded sales with generic sales at a lower price.  Suppose that Teva is subject to a volume limitation of 60% of the total market

and that the expected generic substitution rate is 90%.  If Bausch does not launch an AG, and Teva is the only generic on the market, Teva's generic will take 60% of unit sales (the maximum it is permitted) and Bausch's brand product will take the other 40%.  If Bausch were to launch an AG, the generic substitution rate would rise to 90% and brand sales would drop to 10%, so 30% of the market would be converted from higher-priced brand sales to lower-priced authorized generic sales.  That will be profitable for Bausch only if the overall revenues generated from the sale of the AG outweigh the cannibalization of Bausch's branded sales.  And that will occur only if the amount of cannibalization is small—*i.e.*, if the volume limit is high.

153.    Using reasonable assumptions (a 90% generic substitution rate, a 50% price discount with two generics and an equal split of the generic sales), a wide range of volume limits would make it economically irrational for Bausch to sell its own authorized generic because doing so would simply replace sales of branded Xifaxan with sales of the authorized generic.

154.    In their September 2018 settlement agreement, Bausch and Teva set the quantity limit so as to make it economically irrational for Bausch to launch an authorized generic. In exchange, Teva agreed to delay its entry into the market far beyond the entry date justified by the strength of Bausch's patents. The economic substance of their agreement is that Bausch will not market an authorized generic during Teva's 180-day ANDA exclusivity period and, in exchange, Teva will delay its entry into the market.

155.    Those economics work for Bausch and Teva because they restrain the competition that otherwise would have occurred between them, and they split the gains that competition would have delivered to purchasers. Bausch receives delayed and impaired generic entry, and Teva is permitted to sell during the 180-day period without competition from an authorized

generic. Bausch's and Teva's gains are purchasers' losses. Bausch and Teva win; purchasers lose.

156.    As noted above, Teva could also elect to market generic rifaximin under its own approved ANDA rather than launching an AG supplied by Bausch. But that, too, was a fig leaf designed to disguise the substance of the deal.

157.    Given a choice between marketing its ANDA product and competing with an AG, or marketing an AG and having the only generic product on the market for six months, it will almost always be in the generic's interest to choose the latter.  This is true even if the generic's output under the AG option is limited.  Not facing competition from an AG allows the generic to take the entire generic market *and* to sell at higher prices.  Without generic competition, Teva is better off despite the quantity limit because it can sell more units at a higher price.

158.    For example, assume that the volume limit imposed on Teva is 60% of total market units and that the generic price with only one generic on the market is 85% of the brand price.  As explained above, if Teva chooses to launch its ANDA product it will make approximately $250 million in sales during its first six months on the market.  If Teva chooses to launch the AG, it will make $2.2 billion in annual sales * .5 years * 60% volume limit * 85% of the brand price with one generic = $561 million, more than twice as much. If the volume limitation is 67% and Teva chooses to launch the AG, it will make even more—$2.2 billion in annual sales * .5 years * 67% volume limit * 85% of the brand price = $626 million.

159.    The only economic function of the quantity limitation is to dissuade Bausch from marketing an authorized generic during Teva's ANDA exclusivity period.  This commercial reality is confirmed by nearly universal business practice when the parties to a licensing agreement are *not* manipulating the licensing terms to dissuade the brand manufacturer from

marketing an AG. Under a traditional license and settlement agreement, a brand manufacturer typically does not provide the first filing generic an option to launch an AG. And in the rare cases where the brand does offer an AG arrangement to the first filing generic, the compensation to the brand typically comes in the form of a marked up supply price and/or royalty, not a volume limit, such that the brand would still be incentivized to launch its own AG in competition with the AG marketed by the first filer.  For example, when the first filer for Forfivo XL launched an AG, the brand launched a competing AG the same day.  Other examples include Silenor, Flector, and Zyclara.

160.    Bausch also paid Teva to delay its entry into the market by deterring other generic manufacturers from entering the market before Teva. Bausch agreed to deter those threats to Teva; in exchange, Teva agreed to delay entry until January 2028.

161.    When crafting the terms of their agreement, Bausch and Teva knew that other generic manufacturers would pose a competitive threat to each of them. In September 2018 Xifaxan 550 mg annual sales were already at the blockbuster level, and Teva was about to agree to delay unrestrained competition for more than nine years. This created the incentive and ability for other generic manufacturers to try to enter the market before Teva to get a period of *de facto* market exclusivity—*i.e.*, to be the only ANDA generic on the market.

162.    As explained above, Congress provided at least three pathways for second filers to enter the market ahead of a first filer that agreed to such a substantially delayed entry: (a) via successful litigation; (b) via a license from the brand manufacturer; and (c) via section viii statements.

163.    Bausch agreed to contractual provisions designed to help protect Teva from the threat of subsequent filers beating Teva to the market by allowing Teva to accelerate its entry in

the event that a subsequent filer entered before January 2028. Those provisions deterred subsequent filers from trying to reach the market ahead of Teva.

164.    First, Bausch's payments to Teva included a clause that prevents second filers from entering the market ahead of Teva by winning a patent challenge against Bausch. Under the settlement, Bausch gave Teva the right to launch whenever a second filer receives an appellate court ruling affirming that all the patents entitling Teva to 180-day exclusivity are invalid and/or not infringed. The clause allows Teva to move up its entry date while also retaining its ANDA exclusivity. Without the clause, Teva would forfeit its ANDA exclusivity by failing to enter the market within 75 days of an appellate court affirming that judgment.

165.    Second, Bausch agreed to advance Teva's entry date in the event that a subsequent filer were to enter the market by any means, including the use of section viii statements. For example, if Teva were to forfeit exclusivity by failing to obtain timely approval, another generic could obtain approval and enter the market by addressing one set of patents (*e.g.*, the HE patents) using section viii statements and winning litigation with respect to another set of patents (*e.g.*, the polymorph and IBS patents). Again, absent this clause, Teva would be stuck on the sidelines while these more enterprising generic manufacturers entered the market long before Teva's delayed January 2028 date.

166.    Third, Bausch also agreed that if Bausch were to grant a license to any manufacturer to enter the market before Teva's delayed date of January 1, 2028, Teva's agreed entry date would be moved up to the second filer's earlier date.

167.    Thus, Bausch and Teva arranged that second filers could not get ahead of Teva—despite its agreement to a 9+ year delay—via a litigation victory against Bausch or a license from Bausch.

168.    These provisions eliminated pathways that Congress provided for second filers to enter the market ahead of first filers that have agreed with the brand manufacturer to delay entering the market with competing generic products.

169.    In exchange for the no-AG payment and these additional payments from Bausch, Teva agreed to delay entry into the market until January 1, 2028.

**C.    The Payments Were Large and Unexplained.**

170.    The payments from Bausch to Teva were large, which is why Teva agreed in 20*18* to delay entry until January 20*28*.

171.    As noted above, without the no-AG payment, Teva would face competition from Bausch's authorized generic during the 180-day ANDA exclusivity period and could expect to make sales of approximately $250 million during that time. The no-AG agreement will allow Teva to capture the entire generic market at a higher price, more than doubling its revenues.

172.    As shown above, assuming a volume limit of 60% and a price with one generic on the market of 85% of the brand price, Teva could expect to make $2.2 billion in annual sales * .5 years * 60% volume limit * 85% price with one generic on the market = $561 million.  The size of the payment to Teva is the difference between Teva's sales with the no-AG pact ($561 million) and its sales in a competitive market ($250 million), or $311 million.  The exact volume limitation contained in the Bausch/Teva agreement has not been disclosed, and the size of the payment could be higher or lower than $311 million depending on the exact volume limitation agreed to, but the payment is under any circumstances large and unexplained.

173.    In addition to the enormous value given to Teva, the reverse payment represented an economic sacrifice by Bausch.  In a competitive market, Bausch would have earned $250 million (about equal to what Teva would have earned) by marketing its own authorized generic.

Of course, the anticompetitive profits that Bausch will earn by delaying generic competition until 2028 will far outweigh that sacrifice.

174.    The size of the payment also far exceeds the litigation costs that Bausch saved by settling the patent case. Bausch saved less than $10 million in litigation costs by settling.  Thus, Bausch's agreement to forgo AG sales of $250 million cannot be explained as merely an effort to avoid litigation costs. It is instead explained as a successful effort to impair and delay generic competition.

### D.    But For the Payments, Generic Competition Would Already Have Begun.

175.    Bausch's unlawful agreement with Teva has forestalled generic entry of Xifaxan 550 mg.  Notwithstanding the size of the market and the number of generic competitors that have sought FDA approval to market a generic version of Xifaxan, there is no generic version of Xifaxan available today and it is likely that no generic version of Xifaxan will be available until January 2028.  Even when that occurs there will be only one generic version of Xifaxan on the market, the sales of that one generic will be limited and generic prices will be significantly higher than they would have been absent the unlawful payments and delay. Without the unlawful payments, Teva would have already entered the market and other competitors would have followed.

176.    Before the unlawful agreement with Teva, Bausch had concluded that generic Xifaxan 550 mg was likely to be available by 2024.  Bausch discussed the Teva deal in its 2019 annual report filed with the U.S. Securities and Exchange Commission. Bausch did not disclose in the SEC filing the *means* that it used to secure the deal, but it did report the *effect* of the deal.

177.    Before the deal with Teva, Bausch reported that generic entry was likely by 2024. Bausch wrote in its FY 2019 SEC filing (emphasis added):

Effective September 12, 2018 [the date of the Teva deal], the Company changed the estimated useful life of its Xifaxan 550 mg®-related intangible assets **due to the positive impact of an agreement between the Company and [Teva]** resolving the intellectual property litigation regarding Xifaxan 550 mg® tablets. Under the agreement, the parties have agreed to dismiss all litigation related to Xifaxan 550 mg® tablets, and all intellectual property protecting Xifaxan 550 mg® will remain intact and enforceable. **As a result, the useful life of the Xifaxan 550 mg® related intangible assets was extended from 2024 to January 1, 2028."**

178.    The financial markets, while unaware that Bausch obtained the late entry date by making unlawful payments to Teva, had no doubt as to the deal's enormous value to Bausch given the weakness of its patents. When valuing a brand manufacturer's stock price, analysts assess the likely outcome of generic manufacturers' challenges to the brand's patents. Settlements without reverse payments do not significantly affect stock prices, on average, indicating they usually meet traders' expectations about generic entry. In contrast, stock prices tend to increase after a settlement with reverse payments because the generic entry date has been delayed beyond traders' expectations.

179.    On September 12, 2018, Bausch announced the entry date that it had paid Teva to accept. The stock market was shocked. Immediately upon Bausch's announcement, its stock price skyrocketed. The stock price rose 14% on the first day of trading after the announcement, and it remained elevated in the ensuing days.

180.    The daily changes in the value of Bausch's stock (its market capitalization) from September 4, 2018 until September 19, 2018 are shown in the following graph:

47



181.    In a single day, the Teva deal added a billion dollars to Bausch's market capitalization. That deal pushed Teva's entry date way later than merited by the strength of Bausch's patents. Absent that unlawful deal, Teva in fact would have entered the market far sooner than January 1, 2028.

182.    Bausch did not advise investors that it had paid Teva to accept the near-decade-long delay in entering the market. Instead, it falsely reported in its SEC filings that "[t]he Company will not make any financial payments or other transfers of value as part of the agreement."

183.    Absent the unlawful reverse payment, a reasonable generic company in Teva's position would have launched generic Xifaxan 550 mg much earlier than January 1, 2028, either: (i) at risk; (ii) after litigating and winning; or (iii) under a lawful license from Bausch that did not include a reverse payment. Absent the unlawful reverse payments, Teva would have begun

marketing generic Xifaxan 550 mg prior to the date of this Complaint and many years sooner than the agreed January 2028 entry date.

184.    Notably, the payments that Bausch made to Teva were more than Teva could have made *even if it had litigated and won the patent case*. As described in detail above, if Teva had litigated and won, it would have made about $250 million during the 180-day ANDA exclusivity period.  Assuming a 60% volume limitation, Bausch's payments were worth $311 million more than Teva could have made by competing.

185.    Most Hatch-Waxman patent cases are settled without a reverse payment.  It is likely that, absent the unlawful payments, Bausch and Teva would have settled the patent case lawfully—*i.e.*, without a reverse payment and with an earlier entry date.

186.    Alternatively, if the parties had not settled, Teva would have won the patent case. As discussed below, another generic manufacturer—Norwich Pharmaceuticals—in fact litigated essentially the same patent case against Bausch and won. Norwich filed its ANDA much later than Teva did, so Norwich did not receive its favorable ruling until August 2022 in the district court, and April 2024 in the Court of Appeals. Teva would have received similar rulings much earlier.

187.    Further, the FDA approvals of other generic manufacturers have been bottlenecked behind Teva's 180-day ANDA exclusivity. Absent the unlawful reverse payments, Teva would have already launched a generic Xifaxan 550 mg, and its 180-day ANDA exclusivity would have expired. The market for Xifaxan 550 mg would have been fully genericized by now and Bausch would have had no reason to block additional entrants.  Plaintiffs and other purchasers of the drug would be paying a fraction of what they currently pay to acquire rifaximin.

### E.    Additional Manufacturers Have Sought to Enter the Markt and Have Been Delayed by Bausch and Teva.

188.    Even after the announcement of the Bausch-Teva settlement, numerous other generics pursued ANDAs seeking to sell generic Xifaxan. Three generic manufacturers filed Xifaxan ANDAs in 2019. Two, Sun and Sandoz, were deterred from litigating and reached settlements. However, the third, Norwich, did not settle. It litigated the patents to a trial which it largely won, confirming the weakness of the majority of Bausch's patent protection. As discussed below, however, Norwich remains bottlenecked behind by Teva due to the unlawful agreement to delay entry into 2028.

189.    In early 2019 Sun Pharmaceutical Industries Ltd. ("Sun") submitted an ANDA (No. 213042) to the FDA, seeking authorization to market a generic version of Xifaxan 200 mg.

190.    By way of a letter dated March 11, 2019, Sun notified Bausch that it had submitted its ANDA and provided a paragraph IV certification to Bausch, providing the detailed factual and legal basis supporting its position that the certain patents listed in the FDA's Orange Book for Xifaxan 200 mg are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, or sale of Suns' generic product.

191.    On April 24, 2019, Bausch initiated a patent lawsuit against Sun in April 2019 in the U.S. District Court for the District of Delaware asserting the '620, '199, '206, '542, '644, '781, '452, '231, '275, '196, 949, '904, '968, and '115 patents.

192.    On June 24, 2019, Sun filed its Answer, Affirmative Defenses, and Counterclaim to Bausch's complaint, asserting declaratory judgment counterclaims of non-infringement and invalidity as to each asserted patent.

193.    On July 15, 2019, Bausch filed its Answer to Sun's Counterclaims.

194.    In 2019 Sandoz Inc. ("Sandoz") submitted an ANDA with a paragraph IV certifications to the FDA seeking authorization to market a generic version of Xifaxan 550 mg.

195.    By way of a letter dated September 4, 2019, Sandoz notified Bausch that it had submitted its ANDA and provided a paragraph IV certification to Bausch, providing the detailed factual and legal basis supporting its position that certain patents listed in the FDA's Orange Book for Xifaxan 550 mg are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, or sale of Sandoz's generic product.

196.    On September 30, 2019, Bausch began a patent lawsuit against Sandoz in the U.S. District Court for the District of New Jersey asserting the '620, '199, '206, '542, '275, '644, '781,'196, '569, '949, '904, '452, '231, and '968 patents.

197.    On December 16, 2019, Bausch filed an amended complaint, adding infringement claims relating to the '384 patent, which had issued on October 29, 2019.

198.    On January 15, 2020, Sandoz filed its Answer and Counterclaim to Bausch's Amended Complaint, asserting declaratory judgment counterclaims of non-infringement and invalidity as to each asserted patent.

199.    On February 5, 2020 Bausch answered Sandoz's counterclaims.

200.    On May 6, 2020, Bausch announced that it had entered a settlement with Sandoz pursuant to which Sandoz agreed to refrain from selling generic Xifaxan 550 mg until at least January 1, 2028 (or earlier under certain circumstances) provided it had obtained FDA approval of its ANDA by that date.

201.    Of course, at the time of this settlement, Sandoz was well aware of Teva's first-to-file status (and resulting 180-day ANDA exclusivity) and the basic terms of the Bausch-Teva agreement.

202.    In particular, Sandoz was aware of the deterrence clauses in the Bausch/Teva agreement.  As noted above, those clauses had the purpose and effect of precluding later filers, such as Sandoz, from entering the market before Teva's unlawfully delayed entry date. Those anticompetitive clauses significantly diminished Sandoz's incentives to continue litigating its patent challenges against Bausch. Absent the unlawful restraints, Sandoz would have would have had multiple paths to earlier entry, including (i) after a litigation victory, (ii) an "at risk" launch as to any patents not carved out of its ANDA pursuant to a section viii statement, or (iii) under a lawful license from Bausch.

203.    Absent the unlawful restraints in the Bausch/Teva agreement, Sandoz's generic Xifaxan 550 mg would already be on the market.

204.    While the Bausch-Sun lawsuit over Sun's 200 mg ANDA was pending, in or about August 2020, Sun submitted a paragraph IV certification to the FDA, seeking authorization to market a generic version of Xifaxan 550 mg.

205.    By way of a letter dated August 10, 2020 Sun sent Bausch a Notice of paragraph IV certification asserting that the U.S. patents listed in the FDA's Orange Book for Xifaxan 550 mg were invalid, unenforceable, and/or would not be infringed by the commercial manufacture, use, or sale of Sun's generic product.

206.    On September 22, 2020, shortly after Bausch received Sun's paragraph IV certification regarding Xifaxan 550 mg and before any lawsuit over the implicated patents was filed, Bausch and Sun entered into an agreement by which Sun agreed to refrain from selling generic Xifaxan 550 mg and 200 mg until at least January 1, 2028 (or earlier under certain circumstances) provided it had obtained FDA approval of its ANDA by that date.

207.    Of course, at the time of this settlement, Sun, like Sandoz, was well aware of Teva's first-to-file status (and resulting 180 day ANA exclusivity) and the basic terms of the Bausch-Teva agreement.

208.    In particular, Sun was aware of the deterrence clauses in the Bausch/Teva agreement. Those clauses deterred Sun from trying to enter the market before Teva's unlawfully delayed entry date. And absent the unlawful restraints in the Bausch/Teva agreement, Sun would have not settled for a January 2028 licensed entry date—the date that the unlawful restraints caused Sun to accept—but would have had multiple paths to earlier entry, including: (i) after a litigation victory, (ii) an "at risk" launch as to any patents not carved out of its ANDA pursuant to a section viii statement, or (iii) under a lawful license from Bausch.

209.    Absent the unlawful restraints in the Bausch/Teva agreement, Sun's generic Xifaxan 550 mg would already be on the market.

**F.    The Courts Have Invalidated Some of Bausch's Key Patents.**

210.    Other generic manufacturers have submitted ANDAs and have declined to settle.

211.    In December 2019, Norwich submitted ANDA No. 214369, seeking approval for both IBS-D and HE indications, and included paragraph IV certifications to a number of the Orange Book-listed patents.

212.    On December 20, 2019, Norwich submitted ANDA No. 214370, seeking FDA approval to market generic rifaximin 200 mg.  Norwich's 200 mg ANDA (No. 214370) did not include any paragraph IV certifications.

213.    On February 14, 2020, Norwich notified Bausch that it had submitted an ANDA seeking FDA approval to market generic rifaximin 550 mg and provided paragraph IV certifications to Bausch to certain patents Bausch had listed in the Orange Book, which set forth

the detailed factual and legal basis supporting its position that those patents were invalid, unenforceable, and/or would not be infringed by the commercial manufacture, use, or sale of Norwich's generic 550 mg product.

214.    On March 26, 2020, Bausch filed suit against Norwich, alleging infringement by Norwich of one or more claims of twenty-three Xifaxan patents. *Salix Pharmaceuticals, LTD. et al v. Norwich Pharmaceuticals, Inc*., No. 20-cv-00430 (D. Del.).

215.    On November 13, 2020, Bausch filed its First Amended Complaint, adding an additional three patents alleged to be infringed by Norwich.

216.    The case against Norwich went to trial in March 2022 based on three key groups of representative patents: (i) patents claiming methods of treating IBS-D with a dosing regimen based on 1650 mg per day (or 550 mg three times a day) of rifaximin; (ii) patents claiming the beta polymorphic form of rifaximin; and (iii) patents claiming treatment methods related to hepatic encephalopathy ("HE").

217.    The U.S. District Court for the District of Delaware issued a final judgment on August 10, 2022, (the "Norwich Judgment"), finding invalid the representative patents protecting the beta polymorph rifaximin composition and the claims for the methods of using Xifaxan for treating IBS-D based on a 1650 mg per day or three-times-a-day 550 mg dosing regimen.  It also found certain of Bausch's HE patents valid and infringed.

218.    As a result of the Norwich Judgment, Bausch effectively lost the protection of its U.S. patents against generic competition for IBS-D indications.

219.    The district court's findings apply equally to the other claims Bausch had previously asserted but later withdrew. The court found the polymorph claims invalid because the prior art taught the preparation and use of crystalline rifaximin, and that one skilled in the art

had good reason to use routine techniques to characterize the crystalline rifaximin produced by the prior art which would have led to detection of the polymorph β form claimed and asserted as present in the accused product. The other polymorphic forms of rifaximin would similarly been detected by routine characterization of the crystalline rifaximin produced by the prior art and the other rifaximin polymorph patent claims differ only in minor variations of excipients, hydration levels, or pharmaceutical formulation—none of which, under the court's obviousness analysis, would have conferred patentability. Accordingly, the other polymorph patent claims likewise would have been found invalid as obvious had they been tried.

220.    Bausch appealed the Norwich Judgment to the U.S. Court of Appeals for the Federal Circuit on August 16, 2022.

221.    On April 11, 2024, the appellate court affirmed the Norwich Judgment.

222.    Although the Norwich Judgment invalidated Bausch's key polymorph and IBS-D indication patents, it also found that Bausch's representative patents protecting the use of Xifaxan 550 mg tablets for hepatic encephalopathy ("HE") indications were valid and infringed by the HE indications in Norwich's ANDA.

223.    Norwich's 550 mg ANDA label included both IBS-D and HE treatment indications, so the District Court's final judgment enjoined FDA approval of Norwich's 550 mg ANDA until the last expiring HE patent in October 2029.

224.    After the Norwich Judgment, Norwich amended its ANDA to carve out the HE indications from its label via section viii statements. Norwich then filed a motion in the District Court requesting modification of the final judgment to permit the FDA to approve Norwich's revised ANDA, which is now directed to only the IBS-D indications.

225.    On May 17, 2023, the District Court denied Norwich's motion to modify the final judgment to allow Norwich to market its 550 mg ANDA product for the IBS-D indications. The court confirmed that the FDA remains enjoined from granting final approval to Norwich's ANDA until October 2, 2029. The Court of Appeals for the Federal Circuit affirmed that decision. Accordingly, Norwich cannot yet market its generic Xifaxan 550 mg even for the IBS-D indications on which it prevailed in the patent case.

226.    Bausch and Teva's unlawful conduct has delayed the entry of Norwich's generic Xifaxan 550 mg into the market. Absent the reverse payment, Teva could have litigated its challenge to conclusion and would have won, just as Norwich did, but much earlier. Because Teva would have received a favorable district court decision well before Norwich's judgment, Norwich would have been apprised of the need to "carve out" the HE indications from its ANDA application, and it would have done so from the start.

227.    Alternatively, but for Bausch's unlawful payments to Teva, Teva would have launched by now and Bausch's incentive to keep other generics off the market would have been significantly reduced.

228.    Consequently, Norwich—like Sandoz and Sun—would have been on the market selling generic Xifaxan 500mg by now.

**G.    Bausch and Teva Have Excluded Amneal From the Market.**

229.    In or about February 2024 Amneal Pharmaceuticals of New York, LLC and Amneal EU, Limited (collectively "Amneal") submitted an ANDA to the FDA seeking approval to market generic Xifaxan 550 mg tablets. Amneal's ANDA included a paragraph IV certification that Bausch's listed patents were invalid, unenforceable, and/or would not be

infringed by Amneal's proposed ANDA product. The only indication for which Amneal's ANDA seeks FDA approval is for the treatment of IBS-D.

230.    On February 27, 2024, Amneal sent a Notice of the paragraph IV certification to Bausch, asserting that the Amneal generic would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it.

231.    Bausch had listed the following patents in the Orange Book as claiming Xifaxan 550 mg (the "Polymorph Patents") or a method of using it (the "IBS Patents"), among others:

**Polymorph Patents**

U.S. Patent No. 8,193,196 ("the '196 patent")

U.S. Patent No. 8,518,949 ("the '949 patent")

U.S. Patent No. 8,741,904 ("the '904 patent")

U.S. Patent No. 9,271,968 ("the '968 patent")

U.S. Patent No. 10,703,763 ("the '763 patent")

**IBS Patents**

U.S. Patent No. 11,779,571 ("the '571 patent")

U.S. Patent No. 11,564,912 ("the '912 patent")

232.    On or around April 5, 2024, Bausch filed a patent infringement lawsuit in the District of New Jersey against Amneal, alleging that Amneal's proposed product infringed these patents.  Bausch amended its complaint on June 4, 2024.

233.    Bausch's lawsuit against Amneal triggered an automatic 30-month stay of final FDA approval of Amneal's ANDA. The 30-month stay is not set to expire until August 29, 2026.

234.    In listing the Polymorph Patents and the IBS-D Patents in the Orange Book, Bausch asserted that they claim Xifaxan 550 mg or a method of using it, and that Bausch could reasonably assert a claim of patent infringement against anyone who made a generic version of Xifaxan 550 mg without a license from Bausch. 21 U.S.C. § 355(b)(1)(A)(viii). The Hatch-Waxman Amendments prohibit NDA holders from submitting information on patents that do not meet these criteria. 21 U.S.C. § 355(c)(2) ("Patent information that is not the type of patent information required by subsection (b)(1)(A)(viii) shall not be submitted under this paragraph.").

235.    The FDA does not verify that submitted patents actually meet the statutory listing criteria. Instead, the FDA's role with respect to the Orange Book patent listings is purely ministerial. The NDA holder is responsible for determining whether a patent claims the drug or a method of using the drug that is the subject of the NDA and therefore should be listed in the Orange Book.

236.    Likewise, the 30-month stay on Amneal's entry into the market was *automatic*, without the FDA or any other agency or regulator first determining whether Bausch's lawsuit had any merit.  It did not.

237.    For example, the method-of-use claims that Bausch is asserting against Amneal are nearly identical to the now-invalidated claims that were at issue in the *Norwich* litigation. The only difference between the claims is that the now-invalidated claims were directed to treating IBS-D in "subject[s] 65 years of age or older," while the claims of the '571 and '912 patents are directed to treating IBS in "a female subject." See '571 patent ("A method of treating bloating associated with diarrhea-predominant irritable bowel syndrome (dIBS) in a female subject, said method comprising administering, 550 mg of rifaximin TID for 14 days to the female subject, thereby treating bloating associated with dIBS in the female subject"); and '912

patent ("A method of treating one or more symptoms of irritable bowel syndrome (IBS) in a female subject, said method comprising administering, 550 mg of rifaximin TID for 14 days to the female subject, thereby treating one or more symptoms of IBS in the female subject").

238.    Amneal received tentative FDA approval on January 16, 2025. The approval was tentative rather than final due to the pending 30-month stay and Teva's unexpired exclusivity. But for Bausch's and Teva's unlawful conduct, Amneal would have received final approval in January 2025 and its generic version of Xifaxan would be on the market today.

**H.    Bausch and Teva Have Excluded Zydus From the Market.**

239.    In or about August 2024, Zydux Pharmaceuticals (USA) Inc. ("Zydus) submitted an ANDA to the FDA, seeking approval for its rifaximin 550 mg tablets. Zydus's ANDA included a paragraph IV certification asserting that Bausch's listed patents were invalid, unenforceable, and/or would not be infringed by Zydus's proposed generic product. The only indication for which Zydus seeks FDA approval is for the treatment of IBS-D.

240.    On or about August 15, 2024, Zydus sent a Notice of the paragraph IV certification to Bausch, asserting that the Zydus generic would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using Xifaxan 550 mg.

241.    Bausch had listed in the Orange Book the Polymorph Patents (as defined above) and the IBS Patents (as defined above).

242.    On September 27, 2024, Bausch sued Zydus on those patents in the District of New Jersey. Bausch alleged that each of the Polymorph Patents and IBS Patents is valid and infringed.

243.    By having listed those patents in the Orange Book and suing on them, Bausch elicited an automatic 30-month stay—until March 2027—on the FDA's granting approval to Zydus's ANDA.

244.    Bausch and Zydus subsequently negotiated a settlement and license agreement and, on August 19, 2025, the Court entered a stipulation dismissing Bausch's patent infringement claims.

245.    Zydus is bottlenecked by Teva's unexpired exclusivity.

**I.      Bausch and Teva Have Excluded Cipla and Carnegie From the Market.**

246.    In or about August 2024, Cipla USA, Inc., and Cipla Limited (collectively "Cipla"), submitted an ANDA (No. 219570) to the FDA, seeking FDA approval for its rifaximin 550 mg tablets.

247.    Cipla's ANDA includes a paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and/or would not be infringed by Cipla's proposed generic product. Cipla's ANDA seeks FDA approval for the treatment of IBS-D.

248.    On or about September 18, 2024, Cipla sent a notice letter and detailed statement as to of its paragraph IV certification to Bausch, asserting that the Cipla generic would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it.

249.    On November 1, 2024, Bausch filed a patent infringement lawsuit against Cipla under the Hatch-Waxman Amendments, in the United States District Court for the District of New Jersey alleging that Cipla's ANDA product would infringe the '571, '912, '384, '196, '949, '904, '968, and '763 patents.

250. Cipla is blocked from the market by Teva's unexpired exclusivity and the 30-month stay triggered by Bausch's patent lawsuit. But for Bausch's unlawful payments to Teva, neither obstacle would exist. Absent Bausch's and Teva's unlawful conduct, Cipla's ANDA would be approved earlier and Cipla would then immediately enter the market.

251. In or about September 2024 Carnegie Pharmaceuticals LLC and Carnegie Pharma Limited (collectively "Carnegie"), submitted an ANDA (No. 219892) to the FDA, seeking FDA approval for its rifaximin 550 mg tablets.

252. Carnegie's ANDA includes a paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and/or would not be infringed by Carnegie's proposed generic producgt. Carnegie's ANDA seeks FDA approval for the treatment of IBS-D.

253. On or about October 1, 2024, Carnegie sent a notice letter and detailed statement as to of its paragraph IV certification to Bausch, asserting that the Carnegie ANDA Product would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it.

254. On November 7, 2024, Bausch filed a patent infringement lawsuit against Carnegie in the United States District Court for the District of New Jersey alleging that Carnegie ANDA product would infringe the '571, '912, '384, '196, '949, '904, '968, and '763 patents.

255. Bausch and Carnegie subsequently entered into a settlement and license agreement and, on June 23, 2025, the Court entered a stipulation dismissing Bausch's patent infringement claims.

256. Carnegie is blocked from the market by Teva's unexpired exclusivity. Absent Bausch's and Teva's unlawful conduct, Carnegie's ANDA would be approved earlier and Carnegie would then immediately enter the market.

**J.      Bausch and Teva Have Excluded Saba From the Market.**

257.    In February 2025, Saba Ilac Sanayi ve Ticaret A.S. ("Saba") submitted an ANDA to the FDA seeking approval to market its rifaximin 550 mg product in the United States.

258.    Saba's ANDA includes a paragraph IV certification that Bausch's relevant patents are invalid, unenforceable and would not be infringed by Saba's generic rifaxmin product. Saba's ANDA seeks FDA approval for the treatment of IBS-D.

259.    On or about February 20, 2025, Saba sent a notice letter and detailed statement asserting that the Saba product would not infringe any valid and enforceable claim of the various patents that Bausch listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it, specifically including the '571, '912, '196 and '115 patents.

260.    On April 4, 2025, Bausch filed a patent infringement lawsuit against Saba under the Hatch-Waxman Amendments in the District of New Jersey alleging that Saba's ANDA product would infringe the '571, '912, '196 and '115 patents.

261.    Bausch and Saba subsequently negotiated a settlement and license agreement and, on August 21, 2025, the parties filed a stipulation of dismissal as to Bausch's patent infringement claims.

262.    Saba's ANDA remains bottlenecked behind Teva.

**K.      Bausch and Teva Have Excluded Alkem From the Market.**

263.    In or about April 2025, Alkem Laboratories Ltd. ("Alkem") submitted an ANDA to the FDA seeking approval to market its rifaximin 550 mg tablet product.

264.    Alkem's ANDA includes a paragraph IV certification that Bausch's relevant patents are invalid, unenforceable and would not be infringed by Alkem's generic product. Alkem's ANDA seeks approval for the treatment of IBS-D.

265.    On or about April 28, 2025, Alkem sent a notice letter and detailed statement asserting that Alkem's generic product would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it, specifically including the '571, '912 and '196 patents.

266.    On June 10, 2025, Bausch filed a patent infringement lawsuit against Alkem under the Hatch-Waxman Amendments in the District of New Jersey alleging that Alkem's product would infringe the '571, '912 and '196 patents.

267.    Bausch and Alkem subsequently a settlement and license agreement and, on August 14, 2025, the parties filed a stipulation of dismissal as to Bausch's patent infringement claims.

268.    Alkem's ANDA remains bottlenecked behind Teva.

## VI.    MARKET POWER AND RELEVANT MARKET

269.    At all relevant times, Bausch has had monopoly power in the market for Xifaxan and its AB-rated generic equivalents (of which there are none) because it had the power to maintain the price of rifaxamin at supracompetitive levels without losing enough sales to make those supracompetitive prices unprofitable.

270.    At all relevant times, a small but significant, non-transitory increase in the price of brand Xifaxan would not have caused a loss of sales sufficient to make the price increase non-profitable.

271.    Xifaxan does not exhibit significant, positive cross-elasticity of demand with respect to price with any other drug other than AB-rated generic versions of Xifaxan.

272.    Xifaxan is differentiated from all drugs other than AB-rated generic versions of Xifaxan.

273.    Bausch needed to control only branded Xifaxan and its AB-rated generic equivalents, and no other products, in order to maintain the price of rifaxamin profitably at supracompetitive prices.

274.    Bausch sold brand Xifaxan at prices well in excess of its marginal cost and in excess of the competitive price, and as a result had extremely high profit margins.

275.    Bausch had, and exercised, the power to exclude generic competition to branded Xifaxan.

276.    At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected brand Xifaxan from the forces of price competition.

277.    There is direct evidence of Bausch's monopoly power with respect to Xifaxan. That evidence includes, among other things, the ratio of the price of Xifaxan to its marginal cost; the margins earned by Bausch on the sale of Xifaxan; and the size and existence of the reverse payment from Bausch to Teva. As the Supreme Court recognized in *Actavis*, firms lacking market power are not likely to pay a competitor a large sum to avoid the risk of competition. 570 U.S. at 157.

278.    To the extent proof of monopoly power by defining a relevant product market is required, the relevant antitrust product market is the market for Xifaxan and its AB-rated generic equivalents, and the relevant geographic market is the United States.

279.    Bausch's share of the relevant market has been 100% since the drug was launched.

## VII.    MARKET EFFECTS

280.    Defendants' conspiracy has had the purpose and effect of restraining competition in the relevant market, allowing Bausch to maintain and extend its monopoly over rifaximin and

avoid AB-rated generic competition until January 1, 2028.  It will also allow Teva to enjoy a

monopoly over sales of generic Xifaxan starting on January 1, 2028.

## VIII.   ANTITRUST IMPACT

281.    During the relevant time period, Plaintiffs' assignors purchased substantial

quantities of Xifaxan directly from Bausch.  As a result of Defendants' illegal conduct, the entry

of a generic version of Xifaxan will be delayed until January 2028 and the price of generic

Xifaxan when it ultimately becomes available will be higher than it would have been if the

violation had not occurred. As a result, Plaintiffs and their assignors have been compelled to pay

artificially inflated prices for branded Xifaxan and will be compelled to pay artificially inflated

prices for generic Xifaxan when it finally becomes available in 2028.

282.    Defendants' unlawful conduct and its anticompetitive effects continue through the

present day.  Defendants' violations threaten continuing loss and damage to Plaintiffs if not

enjoined.

## IX.    CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF 15 U.S.C. § 1
### (AGAINST ALL DEFENDANTS)

283.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1

through 282 above as though fully set forth herein.

284.    Bausch has possessed monopoly power in the relevant market from the launch of

Xifaxan through the present.

285.    In or about September 2018, Bausch and Teva entered into an unlawful reverse-

payment agreement whereby Bausch made large and unjustified payments to Teva in exchange

for Teva's agreement to delay the sale of generic Xifaxan until January 1, 2028.  That payment

included an effective agreement by Bausch not to launch an authorized generic to compete with

Teva's ANDA product and provisions that effectively deterred subsequent filers from beating Teva to the market. The purpose and effect of the agreement were: (i) to delay the entry of generic Xifaxan and allow Bausch to maintain and extend its monopoly in the relevant market until January 2028, to the detriment of Plaintiffs and other purchasers of the drug; and (ii) to induce Teva to accept a later entry date by effectively granting Teva a monopoly over the sale of generic Xifaxan for at least six months after January 2028, also to the detriment of Plaintiffs and other purchasers of the drug.

286.    Defendants' unlawful agreement has had a substantially adverse effect on competition within the relevant market.

287.    There is and was no legitimate, non-pretextual, procompetitive business justification for this reverse payment agreement that outweighs its harmful effect on direct purchasers and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve such a purpose.

288.    In the alternative, the agreement between Bausch and Teva was an illegal temporal horizontal market-allocation agreement, a *per se* violation of section one of the Sherman Act. Teva agreed not to compete with Bausch from 2018 until January 1, 2028, and Bausch agreed not to compete with Teva from January 1, 2028 until six months after Teva's entry.

289.    During the relevant period, Plaintiffs' assignors purchased substantial quantities of Xifaxan directly from Bausch. As a result of Bausch's illegal conduct, Plaintiffs and their assignors have been compelled to pay, and continue to pay, inflated prices for Xifaxan. Plaintiffs and their assignors will also pay inflated prices for generic Xifaxan when it becomes available.

290.     Plaintiffs and their assignors have been injured in their business or property by Defendants' antitrust violation. That injury consists of paying higher prices for brand (and generic) Xifaxan than would have been paid in the absence of Defendants' antitrust violations. Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

291.     Absent injunctive relief, Plaintiffs and their assignors will continue to pay artificially inflated prices for rifaxamin for many years into the future.

### COUNT TWO – VIOLATION OF 15 U.S.C. § 2 (MONOPOLIZATION) (AGAINST BAUSCH)

292.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 282 above as though fully set forth herein. This claim is asserted against Bausch only.

293.     At all relevant times, Bausch has possessed monopoly power in the relevant market.

294.     Bausch has unlawfully maintained its monopoly power by entering into a reverse-payment agreement that included large and unjustified payments to Teva in exchange for Teva's agreement to delay the launch of generic Xifaxan until January 1, 2028.  Those payments will allow Teva to enjoy a monopoly over generic Xifaxan for at least six months after January 1, 2028 and to charge Plaintiffs and other purchasers monopoly prices during that period.

295.     The goal, purpose, and effect of Bausch's unlawful conduct was to maintain and extend its monopoly power in the relevant market. The delay in the introduction of generic Xifaxan that Bausch purchased allowed it to continue charging supracompetitive prices for the drug and earning supracompetitive profits. Because the payment to Teva included the grant of a monopoly on sales of generic Xifaxan, Teva will be able to maintain supracompetitive prices on

generic Xifaxan even after its belated entry into the market in January 2028, creating further harm to the market and to Plaintiffs and other purchasers of the drug.

296.    During the relevant period, Plaintiffs' assignors purchased substantial quantities of Xifaxan directly from Bausch. As a result of Bausch's illegal conduct, Plaintiffs and their assignors have been compelled to pay, and continue to pay, inflated prices for Xifaxan. Plaintiffs and their assignors will also pay inflated prices for generic Xifaxan when it becomes available.

297.    The anticompetitive consequences of Bausch's actions far outweigh any arguable procompetitive benefits.

298.    Plaintiffs and their assignors have been injured in their business or property by Bausch's antitrust violation. That injury consists of paying higher prices for branded (and generic) Xifaxan than would have been paid in the absence of the antitrust violations. Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

299.    Absent injunctive relief, Plaintiffs and their assignors will continue to pay artificially inflated prices for rifaxamin for many years into the future.

## X.    DEMAND FOR JUDGMENT

WHEREFORE, with respect to Count One, Plaintiffs seek judgment against all Defendants, jointly and severally, and with respect to Count Two, Plaintiffs seek judgment against Bausch, and with respect to each Count Plaintiffs request the following relief:

A.    An award of Plaintiffs' overcharge damages in an amount to be determined at trial, trebled as provided by law;

B.      Permanent injunctive relief prohibiting Defendants from continuing their unlawful conduct and requiring them to take affirmative steps to remedy the continuing adverse effects of their prior conduct;

C.      The costs of this suit, including reasonable attorneys' fees, as provided by law; and

D.      Such further and additional relief as the Court deems just and proper.

## XI.    JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Plaintiffs,
Walgreen Co., The Kroger Co., Albertsons
Companies, Inc., H-E-B, L.P. and Supervalu, Inc.
By their Attorneys,

*/s/ Matthew T. Oliverio*
Matthew T. Oliverio, Esquire (#3372)
OLIVERIO & MARCACCIO LLP
30 Romano Vineyard Way, Suite 109
North Kingstown, Rhode Island 02852
Telephone: (401) 861-2900
Email: mto@om-rilaw.com

Scott E. Perwin (*pro hac vice forthcoming*)
Lauren C. Ravkind (*pro hac vice forthcoming*)
Anna T. Neill (*pro hac vice forthcoming*)
SPERLING KENNY NACHWALTER LLC
Four Seasons Tower, Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Telephone: (305) 373-1000
Email: sperwin@sperlingkenny.com
Email: lravkind@sperlingkenny.com
Email: aneill@sperlingkenny.com

Joseph M. Vanek (*pro hac vice forthcoming*)
David P. Germaine (*pro hac vice forthcoming*)
John P. Bjork (*pro hac vice forthcoming*)
SPERLING KENNY NACHWALTER, LLC
321 N. Clark Street, Suite 2500
Chicago, IL 60654
T: (312) 641-3200
Email: jvanek@sperlingkenny.com
Email: dgermaine@sperlingkenny.com
Email: jbjork@sperlingkenny.com

Phillip F. Cramer (*pro hac vice forthcoming*)
SPERLING KENNY NACHWALTER, LLC
1221 Broadway, Suite 2140
Nashville, TN 37212
Tel: (312) 641-3200
Fax: (312) 641-6492
Email: pcramer@sperlingkenny.com

*Attorneys for all Plaintiffs*

Steve D. Shadowen (*pro hac vice forthcoming*)
Matthew C. Weiner (*pro hac vice forthcoming*)
Melissa Mather (*pro hac vice forthcoming*)
HILLIARD SHADOWEN LLP
1135 W. 6th Street, Suite 125
Austin, TX 78703
Telephone: (855) 344-3298
steve@hilliardshadowen.com
matt@hilliardshadowen.com
mmather@hilliardshadowen.com

*Attorneys for Plaintiff Supervalu, Inc. only*

Dated:  October 7, 2025