UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| WALGREEN CO., THE KROGER CO., ALBERTSONS COMPANIES, INC., H-E-B, L.P. and SUPERVALU, INC., <br><br>              Plaintiffs, <br>     v. <br><br> BAUSCH HEALTH COMPANIES, INC., SALIX PHARMACEUTICALS, LTD., SALIX PHARMACEUTICALS, INC., TEVA PHARMACEUTICAL INDUSTRIES LTD., and TEVA PHARMACEUTICALS USA, INC., <br><br>            Defendants. | Case No. 1:25-cv-00515-MRD-PAS |

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Walgreen Co., The Kroger Co., Albertsons Companies, Inc., H-E-B, L.P. and Supervalu, Inc. ("Plaintiffs") sue Defendants Bausch Health Companies, Inc., Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc. (collectively "Bausch"), Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (collectively "Teva") (together, "Defendants"), under the antitrust laws of the United States, and for their Amended Complaint allege as follows:

## I. INTRODUCTION

1.    Defendant Bausch markets Xifaxan 550 mg, containing the active pharmaceutical ingredient rifaximin.  Xifaxan 550 mg is the only rifaximin product available on the market to treat Irritable Bowel Syndrome with Diarrhea ("IBS-D"). IBS-D causes repeated episodes of prolonged diarrhea, reducing patients' quality of life, affecting their daily work, and increasing their financial burdens. Up to 15% of Americans suffer from the condition, and millions of them depend on rifaximin for relief, taking it intermittently for years and sometimes the rest of their lives.

2.    Fair competition would have limited the price of a 14-day supply of Xifaxan to less than $200. Instead, Bausch today is charging more than $2,000. As of 2024, Bausch's annual sales of Xifaxan in the U.S. were approximately $1.99 billion.  Virtually all of those sales were sales of the 550 mg strength.

3.    This Complaint explains how Defendants' violation of federal antitrust law allowed Bausch to charge more than ten times the competitive price for Xifaxan 550 mg, extracting billions of dollars from Xifaxan purchasers marketwide.

4.      Rifaxamin is a broad-spectrum antibiotic that has been used across the globe since 1987 for treating various gastrointestinal ailments. The compound was patented in 1982 and first sold in Italy beginning in 1987.

5.      Bausch ultimately obtained a series of secondary patents on the use of rifaximin to treat IBS-D. But those patents were very weak and could not prevent competition from generic versions of the drug. In fact, as explained in detail below, the federal courts have already invalidated those patents.

6.      The effects of generic competition for a brand drug are predictable: sales switch quickly from the brand drug to the generic version. Generic drugs are priced well below the brand drug price, with prices for the generics falling farther as more generic manufacturers enter the market. Within six months to a year of entering the market, generics capture about 90% of the brand's unit sales.  The rate of generic substitution is not materially affected by the number of entrants, but the generic price decreases as the number of entrants increases.

7.      Brand manufacturers' profits fall dramatically when generic competition begins. Unscrupulous brand manufacturers sometimes try to avoid that fate by unlawfully preventing or delaying generic entry. Bausch did that here.

8.      When Defendant Teva's predecessor corporation developed a generic Xifaxan, Bausch sued for patent infringement. Before the court ruled on the merits of Bausch's claims, Bausch and Teva settled the patent lawsuit.

9.      As part of that settlement, Bausch paid Teva to delay entering the market with 550 mg generic Xifaxan. The companies settled the patent litigation in September 2018 with a "reverse payment," that is, a payment from the plaintiff in the patent lawsuit, Bausch, to the defendant in the patent lawsuit, Teva. In exchange for the payment, Teva agreed to stay out of

3

the market for more than *nine* years, from September 2018 until January 2028. The reverse-payment agreement violated the antitrust laws.

10.     One of the payments from Bausch to Teva took the form of an agreement that, if Teva agreed not to compete with Bausch until January 2028, Bausch would not compete with Teva when Teva finally did enter the market by marketing Bausch's own generic version of Xifaxan—a so-called authorized generic ("AG"). Teva's agreement to delay its entry was extremely valuable to Bausch, and Bausch's agreement not to compete with Teva by launching an AG was extremely valuable to Teva.

11.     As shown below, Bausch's unlawful payment was likely worth more than $300 million to Teva. That was far more than Teva could have made by winning the patent case and competing fairly, and lawfully, against Bausch.

12.     Bausch and Teva also used a series of additional anticompetitive tactics to deter other generic manufacturers from beating Teva to market by entering the market before January 2028.

13.     The weakness of Bausch's patents created the risk that other generic manufacturers could avoid or defeat them and market a generic Xifaxan 550 mg before Teva belatedly enters the market in January 2028. To reduce that possibility, Bausch and Teva included in their agreement three provisions aimed at deterring other generic competitors. They agreed that, if another generic manufacturer enters the market before January 2028—by prevailing against Bausch in patent litigation, getting a license from Bausch, or using a special statutory provision that Congress created—then Teva can also enter on that earlier date. These provisions eliminated the possibility that a subsequent filer could enter the market before Teva and be the sole generic product on the market for some significant period of time.

14.     These deterrence clauses reduced other generic manufacturers' incentive to challenge Bausch's patents. The deterrence clauses in fact worked against several generic manufacturers, which agreed to drop their patent challenges and stay out of the market until the delayed January 2028 date that Bausch and Teva set.

15.     Another generic manufacturer was not deterred. It litigated Bausch's principal patents to conclusion, and it won. A federal court held that Bausch's IBS-D patents were invalid, and a court of appeals upheld that decision. But that manufacturer had made a legal/technical mistake: it failed to "carve out" certain *non*-IBS-D uses of Xifaxan from its application to the FDA (a so-called "section viii" carve-out), which it could easily have done. So that manufacturer is precluded from entering the market until the non-IBS-D patents expire in 2029, even though the IBS-D patents have been found invalid.

16.     Despite Bausch's principal IBS-D patents having now been invalidated, generic entry has still not occurred and will likely not occur until Teva enters the market in January 2028.  Teva has 180-day regulatory exclusivity that effectively blocks subsequent filers from entering the market until Teva enjoys the benefit of its 180-day exclusivity.  In addition, as explained more fully below, Bausch has received additional patents and listed those patents in the FDA's Orange Book, despite the fact that many of those patents are not even eligible for listing in the Orange Book, and their listing has served only to further delay generic applicants seeking to market generic Xifaxan 550 mg.

17.     As discussed in further detail below, to obtain FDA approval, a generic applicant must certify that the generic drug will not infringe any patents listed in the Orange Book. One such type of certification, known as a Paragraph IV Certification, states that the listed patents are invalid or will not be infringed by the generic applicant's product.  When a Paragraph IV

Certification is filed by a generic applicant, a brand manufacturer can delay FDA approval of the generic simply by suing the generic applicant for patent infringement. Such a suit results in an *automatic* 30-month stay of FDA approval of that generic product.

18.     Even after the settlement with Teva, Bausch continued to delay generic entry by improperly listing ineligible patents in the Orange Book and then filing baseless litigation against subsequent generic applicants for purportedly infringing those ineligible patents. Filing and suing on these additional ineligible patents served no purpose other than to delay competition by subjecting subsequent generic filers to Hatch-Waxman's automatic 30-month stay of approval, and by requiring generics to file otherwise unnecessary Paragraph IV Certifications against these bogus patents.

19.     Bausch's improper Orange Book listings deprived several subsequent generic applicants of an opportunity to use the section viii carve-out pathway to approval notwithstanding Actavis's 180-day exclusivity.

20.     One such generic applicant was generic drug company Amneal Pharmaceuticals of New York, LLC ("Amneal").  In February 2024, Amneal filed an application with the FDA seeking approval to market a generic version of Xifaxan.

21.     Absent Bausch's improper Orange Book listings, Amneal would have filed an application without any Paragraph IV Certifications. Instead, Amneal would have included section viii carve outs as to certain indications, along with non-Paragraph IV Certifications (not subject to 30-month stays) as to the remaining Orange-Book listed patents, and the FDA would have approved the application by now.  Amneal has already received tentative FDA approval, which indicates that the FDA is withholding final approval only because of a 30-month stay and/or Teva's 180-day exclusivity.

22.     Unfortunately for Plaintiffs and other purchasers, as a result of Bausch's improper Orange Book listings, Amneal was required to file Paragraph IV Certifications against several of Bausch's unexpired patents.  Although Amneal properly filed section viii carve-outs with respect to some indications, the FDA has determined that such mixed certifications are not eligible for immediate approval because when a subsequent filer's application contains a Paragraph IV Certification that filer must wait in line behind the first filer's 180-day exclusivity.

23.     Had Bausch not improperly listed certain patents in the Orange Book (the unexpired Polymorph Patents and the unexpired IBS-D Patents, as defined below), Amneal's application would have contained section viii carve outs along with non-Paragraph IV Certifications, and thus Amneal would not have been subject either to a 30-month stay or to Teva's 180-day exclusivity period.

24.     Several other generics are in a similar position as Amneal, having been sued based on Paragraph IV Certifications, and then bottlenecked behind Teva's 180-day exclusivity and the Hatch-Waxman 30-month stay. These include Carnegie Pharmaceuticals LLC and Carnegie Pharma Limited ("Carnegie"), Saba Ilac Sanayi ve Ticaret A.S. ("Saba"), Alkem Laboratories Ltd. ("Alkem"), Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Limited (collectively "Zydus"), and Cipla USA, Inc., and Cipla Limited (collectively "Cipla"), and potentially others.

25.     Since the Teva litigation had already concluded, the only purpose of listing these Patents was to bottleneck subsequent filers by requiring them to file Paragraph IV Certifications.

26.     Had Teva not been induced to settle the litigation with a large and unjustified reverse payment, it would have invalidated Bausch's patents and either launched itself or cleared a path for others to do so. In any case, a generic would have been on the market earlier in time.

27. Had Amneal and others had the opportunity to file an application containing section viii carve outs and non-Paragraph IV Certifications, one or more of them would have launched by now.

28. The entry of each incremental generic competitor reduces the market price for rifaximin. As a result, had Amneal and other generics entered, generic competition would already have occurred and the price of rifaximin would have plummeted.

29. As a result of Bausch's and Teva's unlawful conduct, generic Xifaxan 550 mg still has not entered the market seven years after the unlawful agreement with Teva and three years after a federal court declared certain of Bausch's patents invalid. Plaintiffs and other purchasers of the drug continue to pay monopoly prices rather than competitive prices for rifamaxin and are likely to do so until significantly after January 2028.

## II.    PARTIES

30. Plaintiff Walgreen Co. ("Walgreen") is an Illinois corporation having its principal place of business at 200 Wilmot Road, Deerfield, Illinois 60015. Walgreen owns and operates retail stores in several states at which it dispenses prescription drugs, including Xifaxan, to the public. Walgreen brings this action in its own behalf and as the assignee of AmerisourceBergen Drug Corporation (n/k/a Cencora, Inc.), a pharmaceutical wholesaler, which during the relevant period purchased Xifaxan directly from Bausch for resale to Walgreen and which has expressly assigned its claims arising out of those purchases to Walgreen.

31. Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation having its principal place of business at 1014 Vine Street, Cincinnati, Ohio 45202. Kroger owns and operates retail stores in several states at which it dispenses prescription drugs, including Xifaxan, to the public. Kroger brings this action in its own behalf and as the assignee of Cardinal Health, Inc., a

pharmaceutical wholesaler, which during the relevant period purchased Xifaxan directly from Basuch for resale to Kroger and which has expressly assigned its claims arising out of those purchases to Kroger.

32.     Plaintiff Albertsons Companies, Inc. ("Albertsons") is a Delaware corporation having its principal place of business at 250 Parkcenter Boulevard, Boise, Idaho 83706. Albertsons' affiliates own and operate retail stores in several states at which they dispense prescription drugs, including Xifaxan, to the public. Albertsons brings this action in its own behalf and as the assignee of McKesson Corporation ("McKesson"), a pharmaceutical wholesaler, which during the relevant period purchased Xifaxan directly from Bausch for resale to Albertsons' affiliates and which has expressly assigned its claim arising out of those purchases to Albertsons.

33.     Plaintiff H-E-B, L.P. ("HEB") is a Texas limited partnership having its principal place of business at 646 South Main Avenue, San Antonio, Texas 78204. HEB owns and operates retail stores at which it dispenses prescription drugs, including Xifaxan, to the public. HEB brings this action in its own behalf and as the assignee of McKesson, which during the relevant period purchased Xifaxan directly from Bausch for resale to HEB and which has expressly assigned its claim arising out of those purchases to HEB.

34.     Plaintiff Supervalu, Inc. ("Supervalu") is a Delaware corporation having its principal place of business in Eden Prairie, Minnesota.  Supervalu owns and operates retail stores at which it dispenses prescription drugs, including Xifaxan, to the public. Supervalu brings this action in its own behalf and as the assignee of McKesson, which during the relevant period purchased Xifaxan directly from Bausch for resale to Supervalu and which has expressly assigned its claim arising out of those purchases to Supervalu.

9

35.     Defendant Salix Pharmaceuticals, Ltd. is a corporation organized under the laws of Delaware with its principal place of business in Bridgewater, New Jersey.

36.     Defendant Salix Pharmaceuticals, Inc. is a corporation organized under the laws of California with its principal place of business in Bridgewater, New Jersey. Salix Pharmaceuticals, Inc. is a wholly owned subsidiary of Salix Pharmaceuticals, Ltd.  Salix Pharmaceuticals, Inc. and Salix Pharmaceuticals, Ltd. are collectively referred to as "Salix."

37.     On April 1, 2015, Valeant Pharmaceuticals International, Inc. ("Valeant") acquired Salix Pharmaceuticals, Ltd. and, on or about that date, assumed its rights and obligations under the patents that were at issue in the patent litigation between Salix and Teva Pharmaceutical Industries Ltd.  Effective July 13, 2018, Valeant changed its corporate name to Bausch Health Companies Inc. Salix Pharmaceuticals, Ltd. is now a wholly owned subsidiary of Bausch Health Companies Inc. and Salix Pharmaceuticals, Inc. is an indirect wholly owned subsidiary of Bausch Health Companies, Inc.

38.      Defendant Bausch Health Companies Inc. is a corporation organized and existing under the laws of British Columbia, Canada with its U.S. headquarters in Bridgewater, New Jersey.

39.     As used below, "Bausch" refers to Valeant n/k/a Bausch Health Companies, Inc., Salix Pharmaceuticals, Ltd. and/or Salix Pharmaceuticals, Inc., as the context requires.  This includes the Salix entities prior to their acquisition by Valeant.

40.     Defendant Teva Pharmaceutical Industries Ltd. is a corporation incorporated under the laws of Israel, with its principal place of business in Tel Aviv, Israel.

41.     Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation having its principal place of business in Parsippany, New Jersey.

42.    All of Defendants' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful restraints of trade and monopolization alleged by Plaintiffs, and were authorized, ordered, and/or undertaken by various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors in interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of Defendants.

### III.   JURISDICTION, VENUE AND INTERSTATE COMMERCE

43.    This action arises under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 26, and seeks to recover threefold damages, permanent injunctive relief, the costs of suit and reasonable attorneys' fees for the injuries sustained by Plaintiffs resulting from Defendants' conspiracy to restrain trade in, and Bausch's monopolization of, the relevant market. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

44.    Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) because, during the relevant period, Defendants were found and transacted business in this District, and a substantial portion of the events and omissions underlying this action occurred in this District.

45.    The drugs at issue in this case are sold in interstate commerce, and Defendants' conduct has occurred in, and has had a substantial effect on, interstate commerce.

### IV.    REGULATORY BACKGROUND

**A.    Characteristics of the Prescription Pharmaceutical Marketplace.**

46.    The marketplace for the sale of prescription pharmaceutical products in the United States suffers from a significant imperfection that brand manufacturers can exploit in

order to obtain and maintain market power in the sale of a particular pharmaceutical composition. Markets function best when the person responsible for paying for a product is also the person who chooses which product to purchase. When the same person has both the payment obligation and the choice of products, the price of the product plays an appropriate role in the person's choice of products and, consequently, manufacturers have an appropriate incentive to lower the prices of their products.

47.     The pharmaceutical marketplace, however, is characterized by a "disconnect" between the payment obligation and the product selection. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Xifaxan, without a prescription written by a doctor. The prohibition on dispensing certain products without a prescription introduces a disconnect between the payment obligation and the product selection. The patient (and in most cases his or her insurer) has the obligation to pay for the pharmaceutical product, but the patient's doctor chooses which product the patient will buy.

48.     Brand pharmaceutical sellers exploit this price disconnect by employing large forces of sales representatives to visit doctors' offices and persuade them to prescribe the manufacturer's products. These sales representatives do not advise doctors of the cost of the branded products. Moreover, studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive to price differences because they do not have to pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

49.     The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand – the extent to which unit sales go down when price goes up. This reduced price elasticity in turn gives brand manufacturers the ability to

12

raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to raise price substantially above marginal cost profitably is what economists and antitrust courts refer to as market power. The result of the market imperfections and marketing practices described above is to allow brand manufacturers to gain and maintain market power with respect to many branded prescription pharmaceuticals, including Xifaxan.

**B.      The Regulatory Structure for Approval of Generic Drugs and the Substitution of Generic Drugs for Brand Name Drugs.**

50.      Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain FDA approval to sell the product by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C. § 355(a), (b).

51.      When the FDA approves a brand manufacturer's NDA, the drug product is listed in an FDA publication entitled Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the "Orange Book." The manufacturer must list in the Orange Book any patents that the manufacturer believes could reasonably be asserted against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents. The manufacturer must list in the Orange Book any such patents that issue after the FDA approves the NDA within thirty days of issuance. 21 U.S.C. §§ 355(b)(1) & (c)(2).

52.      The FDA relies completely on the brand manufacturer's truthfulness in submitting patents to be listed, as it does not have the resources or authority to verify the validity or relevance of the manufacturer's patents. In listing patents in the Orange Book, the FDA merely performs a ministerial act.

13

### C.    The Hatch-Waxman Amendments.

53.    The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984). A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA, and must further show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug—that is, that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug. The FDA assigns an "AB" rating to a generic drug in capsule or tablet form that is therapeutically equivalent to its brand-name counterpart.

54.    The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart. 21 U.S.C. § 355(j)(8)(B).

55.    Congress had two goals in enacting the Hatch-Waxman Amendments. First, it sought to expedite the entry of legitimate (non-infringing) generic competitors, thereby reducing

healthcare expenses nationwide. Second, it sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

56.    To incentivize the development of new drugs, the Hatch-Waxman Amendment created a 5-year period of new chemical entity ("NCE") exclusivity. Following the approval of an NDA for a drug that has not been approved in any other application, no ANDA may be submitted for that drug for 5 years (or 4 years if the ANDA contains a paragraph IV certification, as discussed in the next section).

57.    The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic high profit margins for brand manufacturers. In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009 total prescription drug revenue had soared to $300 billion.

**D.    Paragraph IV Certifications.**

58.    To obtain FDA approval of an ANDA, a manufacturer must certify that the generic drug will not infringe any patents listed in the Orange Book. Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

i.    that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

ii.    that the patent for the brand drug has expired (a "Paragraph II certification");

iii.    that the patent for the brand drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or

15

iv.    that the patent for the brand drug is invalid or will not be infringed by the generic

manufacturer's proposed product (a "Paragraph IV certification").

59.    If a generic manufacturer files a Paragraph IV certification, a brand manufacturer

can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent

infringement. If the brand manufacturer initiates a patent infringement action against the generic

filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph

IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of (a) the

passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not

infringed by the generic manufacturer's ANDA. Until one of those conditions occurs, the FDA

may grant "tentative approval," but cannot authorize the generic manufacturer to market its

product by granting final approval. The FDA may grant an ANDA tentative approval when it

determines that the ANDA would otherwise be ready for final approval but for the 30-month stay

or the expiration of a first filer's exclusivity.

60.    As an incentive to spur manufacturers to seek approval of generic alternatives to

branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV

certification typically gets a period of protection from competition from other ANDA filers

seeking approval to market generic versions of the same drug. For Paragraph IV certifications

made after December 2003, the first generic applicant receives 180 days of market exclusivity

vis-à-vis other ANDA filers (unless some forfeiture event, like that discussed below, occurs).

Generics are usually at least 15% less expensive than their brand name counterparts when there

is a single generic competitor, but this discount typically increases to 50% to 80% (or more)

when there are multiple generic competitors on the market. Being able to sell at the higher price

for six months or more may be worth hundreds of millions of dollars to a generic manufacturer.

61.    Brand manufacturers can "game the system" by listing patents in the Orange Book (even if such patents are not eligible for listing) and suing any generic competitor that files an ANDA with a Paragraph IV certification (even if the competitor's product does not actually infringe the listed patents) in order to delay final FDA approval of an ANDA for up to 30 months. Listing patents in the Orange Book allows brand manufacturers to block generic entry before it occurs rather than waiting until the generic receives FDA approval and launches and then asserting its patents at that time.  That brand manufacturers often sue generics simply to delay generic competition—as opposed to enforcing a valid patent that is actually infringed by the generic—is demonstrated by the fact that generic firms have prevailed in Paragraph IV litigation in cases involving 73% of the drug products studied.

62.    On December 8, 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") in order to make it more difficult for brand and generic manufacturers to conspire to delay the start of the first filer's 180-day period of generic market exclusivity. The MMA outlines a number of conditions under which an ANDA applicant forfeits its eligibility for 180-day exclusivity, making way for other ANDA filers to launch their generic products. For example, forfeiture occurs if the first ANDA applicant fails to obtain tentative approval from the FDA within 30 months of filing a substantially complete ANDA, unless the failure is caused by a change in or review of the approval requirements. Forfeiture under the MMA most commonly occurs for failure to obtain tentative approval within the requisite 30 months.

63.    Under the "failure to market" provision, a first ANDA applicant forfeits 180-day exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the date that is (i) 75 days after receiving final FDA approval; or (ii) 30 months after the date it submitted its

ANDA; or (b) the date that is 75 days after the date as of which, as to each of the patents that

qualified the first applicant for exclusivity (*i.e.*, as to each patent for which the first applicant

submitted a Paragraph IV certification), at least one of the following has occurred: (i) a final

decision of invalidity or non-infringement; (ii) a settlement order entering final judgment that

includes a finding that the patent is invalid or not infringed; or (iii) the NDA holder delists the

patent from the Orange Book.

       **E.**      **The Benefits of Generic Drugs.**

      64.     Generic versions of brand name drugs contain the same active ingredient, and are

determined by the FDA to be just as safe and effective, as their brand name counterparts. The

only material difference between generic and brand name drugs is their price. The launch of a

generic drug usually brings huge cost savings for all drug purchasers. The Federal Trade

Commission estimates that about one year after market entry, the generic version typically takes

over 90% of the brand's unit sales and sells for as little as 15% of the price of the brand name

product. As a result, competition from generic drugs is viewed by brand name drug companies

such as Bausch as a grave threat to their bottom lines.

      65.     Due to the price differentials between brand and generic drugs, and other

institutional features of the pharmaceutical industry, pharmacists liberally substitute the generic

equivalent when presented with a prescription for a brand-name drug.  Moreover, since passage

of the Hatch-Waxman Amendments, every state has adopted substitution laws that either require

or permit pharmacies to substitute generic equivalents for branded prescriptions (unless the

prescribing physician has specifically ordered otherwise by writing "dispense as written" or

similar language on the prescription).

66.     There is an incentive to choose the less expensive generic equivalent in every link in the prescription drug chain. Pharmaceutical wholesalers and retailers pay lower prices to acquire generic drugs than to acquire the corresponding brand-name drug. Health insurers and patients also benefit from the lower prices that result from generic competition.

67.     Generic competition enables Plaintiffs (and their assignors) to purchase generic versions of the drug at substantially lower prices.

68.     Until a generic version of the brand drug enters the market, however, there is no bioequivalent generic drug to substitute for and compete with the brand drug, and therefore the brand manufacturer can continue to profitably charge supracompetitive prices without losing substantial sales. As a result, brand manufacturers, who are well aware of generics' rapid erosion of their brand sales, have a strong incentive to delay the introduction of generic competition into the market, including through tactics such as those alleged here.

**F.      Authorized Generics.**

69.     The 180-day marketing exclusivity to which first-filing generics may be entitled vis-à-vis other ANDA filers does not prevent a brand manufacturer from marketing its own generic alternative to the brand drug during that 180-day exclusivity period under its own approved New Drug Application or NDA. Such a generic is called an "authorized generic" and is identical to the brand drug, but is sold as a generic product, typically through a subsidiary of the brand manufacturer or through a third-party generic manufacturer. Competition from an authorized generic during the 180-day exclusivity period allows the brand manufacturer to capture some portion of the generic sales that would otherwise be lost to the ANDA filer and substantially reduces drug prices for consumers.  Such competition is the normal outcome unless the brand and the generic have colluded to avoid that outcome.

70. In its study, Authorized Generic Drugs: Short-term Effects and Long-Term Impact (August 2011), the Federal Trade Commission found that authorized generics capture a significant portion of sales and reduce the first filer generic's revenues by approximately 50% on average during the 180-day exclusivity period. The first-filing generic makes significantly less money when it faces competition from an authorized generic because (1) the authorized generic takes unit sales away from the first filer; and (2) the presence of an additional generic in the market causes prices to decrease.

71. Although first-filing generic manufacturers make significantly less money when they must compete with an authorized generic during the first 180 days, drug purchasers such as Plaintiffs benefit from the lower prices caused by competition between the authorized generic and the first-filing generic.

72. As a practical matter, authorized generics are the only means by which brand-name manufacturers engage in price competition with manufacturers of AB-rated generic drugs. Brand-name manufacturers generally do not reduce the list price of their branded drugs in response to the entry of AB-rated generics. Instead, they either raise the price to extract higher prices from the small number of "brand-loyal" patients or, more typically, they continue to raise the price of the branded drugs at the same intervals and the same rate at which they raised the price of the drugs prior to generic entry.

73. Given the significant negative impact of an authorized generic on an ANDA filer's revenues, and the absence of any other form of price competition from the branded manufacturer, a brand manufacturer's agreement not to launch an authorized generic has tremendous economic value to a generic manufacturer. Brand manufacturers have used such agreements as a way to pay ANDA filers to delay entering the market. Such agreements deprive

20

drug purchasers of the lower prices resulting from competition in two ways. During the initial period of delay agreed to by the ANDA filer, they effectively eliminate all competition from AB-rated generic products and allow the brand manufacturer to preserve its monopoly. And, during the period in which the branded company has agreed not to sell an authorized generic, they eliminate competition between the ANDA filer's generic and the authorized generic, giving the ANDA filer a monopoly on generic sales.

74. As a means of compensating generic manufacturers for delaying entry, brand manufacturers prefer no-AG agreements to cash payments because, in the case of no-AG agreements, a portion of the compensation is paid by purchasers of the drug in the form of higher generic drug prices. The generic manufacturer receives not only the profits that the brand manufacturer would have made by launching an authorized generic in competition with the ANDA filer's product, but also the higher prices that result from the absence of that competition. Thus, the payment to the generic manufacturer is shared between the brand manufacturer and the generic manufacturer's customers. *See King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 405 (3d Cir. 2015) ("The no-AG agreement transfers the profits the patentee would have made from its authorized generic to the settling generic—plus potentially more, in the form of higher prices, because there will now be a generic monopoly instead of a generic duopoly").

75. Historically, no-AG agreements between brand and generic manufacturers took the form of an explicit promise written into a settlement agreement. However, as more courts have recognized no-AG promises as a form of unlawful payment for delay that could violate the antitrust laws, brand and generic manufacturers have moved to a different model.

76.    More recently, in an attempt to conceal the no-AG promise, brand and generic manufacturers often enter settlements containing either a volume-limited generic license or a profit-share provision (sometimes called a royalty) pertaining to generic sales. Rather than an express promise not to launch an authorized generic, the economics of a settlement containing volume limits or profit share provisions make it unprofitable for the brand company to do so. Thus, while the brand company may retain the theoretical right to launch an authorized generic, both parties to the agreement understand at the time they are entering the agreement that no rational brand company would do so under the circumstances.  The sole purpose of these provisions is to ensure that there will be only one generic product on the market during the first six months rather than two and to share the resulting monopoly profits, both by inducing the generic to accept a later entry date and, in some cases, by also requiring the generic to return a portion of its profits to the brand company in the form of a royalty.

77.    No-AG agreements need not be explicit to achieve their anticompetitive ends. Any agreement that alters the economic incentives of branded companies and ANDA filers in such a way as to give the ANDA filer a temporary monopoly over generic sales is effectively a no-AG agreement and will typically result in (i) a delay in generic entry, because the ANDA filer will accept a later entry date, and (ii) higher generic prices than would exist absent the agreement. Since generic drugs are typically priced at a discount off the prevailing brand price at the time of generic entry, and since brand prices go up over time, a delay in generic entry for any reason will generally result in higher generic prices because the price of the generic will be set based on a higher brand price. If the agreement between the brand and the generic includes a restraint on post-entry generic competition, such as a no-AG agreement or a volume limitation

(or both), that restraint will compound the price effect and bring about even higher generic prices.

### G.    The Limits of Patent Protection for Drugs

78.    The existence of one or more patents purporting to claim a drug substance or drug product does not by itself give a brand drug company an enforceable monopoly over the drug. Patents are routinely invalidated or held unenforceable, either upon reexamination or *inter partes* proceedings by the U.S. Patent and Trademark Office ("PTO"), by court decision, or by jury verdict.

79.    Under the framework set forth in the Hatch-Waxman Amendments, a generic drug company can challenge patents ostensibly covering the branded drug. A patent infringement lawsuit by the patent holder within 45 days after notification of the generic drug company's challenge of the patents will trigger a 30-month stay of regulatory approval, during which the FDA cannot approve the generic drug.

80.    At all times, a patent holder bears the burden of proving infringement.

81.    One way that a generic can prevail in patent infringement litigation is to show that the patent holder cannot meet its burden to prove infringement. Another is to show that the patent is invalid or unenforceable.

82.    A patent is invalid or unenforceable when, *e.g.*, (i) the disclosed invention is anticipated or obvious in light of earlier prior art, sale or use; (ii) when an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or deceive the PTO, fails to disclose material information known to that person to be material, or submits materially false information to the PTO during prosecution; and/or (iii) when a later-acquired

23

patent is not patentably distinct from the invention claimed in an earlier patent (and no exception, such as the safe harbor, applies).

83.     As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely that a challenged patent will be found invalid or not infringed than upheld. The Federal Trade Commission ("FTC") reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002. An empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.

84.     If a generic manufacturer successfully defends against the brand's infringement lawsuit—by showing that its proposed generic product does not infringe any asserted patents and/or that any asserted patents are invalid or unenforceable—the generic may enter the market immediately upon receiving approval from the FDA.

### H.     Deterrents to Subsequent Filers

85.     A brand manufacturer can also pay off the generic manufacturer by including provisions in the agreement designed to deter other generic manufacturers (*i.e.*, second, third and subsequent filers) from entering the market before the delayed entry date to which the first filer has agreed. These deterrence clauses come in at least three varieties: (a) deterring entry via litigation; (b) deterring entry via license; and (c) deterring entry via "section viii" statements.

86.     One type of deterrence clause provides that the delayed entry date to which the first filer has agreed will be accelerated (moved earlier) if any other generic manufacturer (*i.e.*, a second filer) prevails in patent litigation against the brand manufacturer.

87.     The purpose and effect of such a clause is to reduce subsequent filers' incentives to litigate the brand manufacturers' patents to conclusion. Absent the deterrence clause, a second filer could enter the market before the first filer under certain circumstances, thereby enjoying a substantial period where it would have the only ANDA-based generic product on the market. Fewer generic competitors means higher profits.

88.     As noted above, when a second filer secures a final court judgment that the brand manufacturer's patents are invalid or not infringed, the first filer forfeits its 180-day ANDA exclusivity period if it does not enter the market within 75 days of the court decision.  The first filer would forfeit its statutory exclusivity period if, for example, it had agreed with the brand manufacturer to delay entry until Year 4 and a second filer establishes patent invalidity in Year 2. Having agreed not to begin marketing until Year 4, the first filer could not enter the market within 75 days of the second filer's favorable court decision in Year 2. The first filer would then forfeit its 180-day ANDA exclusivity period, and the second filer could enter the market and potentially enjoy a substantial period selling the only ANDA-based generic product on the market.

89.     The deterrence clause allows the brand manufacturer and the first filer, through their joint conduct, to circumvent the statutory incentive for second filers to try to improve on the entry date to which the brand manufacturer and first filer have agreed. In the example above, absent the deterrence clause, the Hatch-Waxman Amendments would allow the second filer to enter the market in Year 2 and enjoy a substantial period as the only ANDA-based generic product on the market. The first filer would be stuck on the sidelines until its agreed entry date. The prospect of being the only ANDA-based generic product on the market would normally motivate a second filer to incur the substantial costs and burdens of litigating the patent case to

try to enter the market before the first filer's agreed entry date. The deterrence clause eliminates that possibility, reducing second filers' incentives to litigate the patent case to conclusion.

90.     The deterrence clause results in delayed generic entry in at least two ways: (i) it eliminates subsequent filers' ability to use successful patent litigation to enter the market before the first filer's agreed entry date; and (ii) by reducing the threat to the first filer's 180-day ANDA exclusivity period, the clause compensates the first filer for agreeing to delay its entry into the market. In short, the clause eliminates a significant competitive threat to the first filer, in return for which the first filer agrees to delay its entry into the market.

91.     The second way in which an unscrupulous brand manufacturer could deter subsequent filers and compensate the first filer for agreeing to delay entry into the market is a clause providing that the brand manufacturer will not grant a license to any other generic manufacturer, under authority of the brand manufacturer's NDA, to enter the market before the first filer.

92.     Absent the brand manufacturer's agreement not to grant such a license to a subsequent filer, it could use its own challenges to the brand manufacturer's patents as leverage to negotiate a license (under authority of its NDA) to enter the market before the first filer. The second filer could thereby enjoy a substantial period where it would have the only generic product on the market.

93.     This second type of deterrence clause prevents the brand manufacturer from granting such a license, in exchange for which the first filer agrees to delay its entry.

94.     So-called section viii statements provide the opportunity for a third means of deterring entry by subsequent filers.  In a section viii statement, the ANDA applicant states that it is not seeking approval for the particular use covered by the brand manufacturer's method-of-use

patent. The FDA can approve an ANDA containing only a section viii statement *without regard* to whether any other ANDA applicant is otherwise entitled to a 180-day ANDA exclusivity period. 21 U.S.C. § 355(j)(2)(A)(viii); 21 C.F.R. § 314.94(a)(12)(iii).  By "carving out" from their ANDAs the uses covered the brand manufacturer's method-of-use patents, these second filers can enter the market without having won any patent litigation and without a license from the brand manufacturer.

95.     Section viii statements can be used to deter entry by subsequent filers in cases where the only patents at issue claim methods of use that can be carved out of the label with a section viii statement.  To do so, the settling parties include a clause providing that if a second filer enters the market through any other means (*i.e.*, without having won patent litigation and without a license), the first filer's entry date is moved up to the date that the second filer enters. The clause thus prevents the second filer from having any period on the market as the only ANDA generic. The loss of that possibility reduces subsequent filers' incentives to enter the market ahead of the first filer via section viii statements. Again, the deterrence clause protects the first filer and, in exchange for that protection, the first filer will accept a later entry date.

96.     In short, Hatch-Waxman leaves open at least three pathways for second filers to enter the market before a first filer that has agreed to delay entry. The second filer can win the patent litigation and trigger forfeiture of the first filer's 180-day exclusivity period if it fails to enter the market within 75 days of the favorable court decision. The second filer can negotiate an earlier entry date in a license agreement with the brand manufacturer. And the second filer can enter the market by means of a section viii statement. The deterrence clauses work together to dissuade subsequent filers from trying to enter the market before the first filer's agreed entry date, thereby compensating the first filer for agreeing to delay its entry into the market.

## V.    OPERATIVE FACTS

### A.    Bausch's Patents on Xifaxan Were Weak.

97.    Over time, Bausch filed, prosecuted, and listed in the Orange Book at least 30 patents claiming Xifaxan 550 mg or its uses. But those patents were weak and could not stave off competition from generic versions of the drug. And in several cases they did not in fact claim Xifaxan 550 mg or any of its uses and therefore could not lawfully be listed in the Orange Book in the first place.

98.    Rifaximin, the active ingredient in Bausch's Xifaxan, has been widely used as an antibiotic for decades.

99.    The FDA approved Xifaxan for use in the United States in 2004, as 200 mg tablets for the treatment of travelers' diarrhea.

100.    In 2010 the FDA approved Xifaxan 550 mg tablets. Today those tablets are indicated for: (i) treatment of travelers' diarrhea (TD) caused by noninvasive strains of *E. coli* in adult and pediatric patients 12 years of age and older; (ii) reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults; and (iii) treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.

101.    Xifaxan was the crown jewel of Salix's business and a primary reason that Bausch acquired Salix in 2015.

102.    Sales of Xifaxan grew at a rapid pace, from $979 million in 2017, to $1.195 billion in 2018, to $1.452 billion in 2019.  As of 2024, Bausch's annual U.S. sales of Xifaxan were approximately $1.99 billion. Virtually all of those sales were of the 550 mg strength, and the majority were for treatment of IBS-D.

103.    Irritable bowel syndrome is characterized by symptoms including abdominal pain, bloating, frequency, urgency, gas, and changed bowel habits, such as diarrhea, constipation, or alternating diarrhea and constipation. Subtypes of IBS include IBS with diarrhea (IBS-D), IBS with constipation (IBS-C), or IBS with alternating diarrhea and constipation (IBS-A).

104.    The IBS-D subtype comprises about one-third of IBS patients. IBS may be caused, for example, by abnormal motility, abnormal muscular coordination, changes in the microbiome in the colon or small intestine, intolerance to certain foods, or psychological factors.

105.    On December 21, 2001, Salix submitted NDA No. 021361 for rifaximin tablets to be marketed and sold under the brand name Xifaxan 200 mg, indicated for the treatment of patients (>12 years of age) with travelers' diarrhea caused by noninvasive strains of *E. coli*. The FDA approved the NDA on May 25, 2004.

106.    On June 24, 2009, Salix submitted NDA No. 022554 for rifaximin tablets to be marketed and sold under the brand name Xifaxan 550 mg, indicated for the treatment the reduction in risk of overt hepatic encephalopathy recurrence in adults. On June 7, 2010, Salix submitted a Supplemental New Drug Application ("sNDA") for Xifaxan 550 mg, introducing a new indication for the treatment of irritable bowel syndrome with diarrhea ("IBS-D") in adults.

107.    On March 24, 2010, the FDA granted the application with respect to the hepatic encephalopathy indication.

108.    On May 27, 2015, FDA approved the sNDA for Xifaxan 550 mg for the treatment of IBS-D in adults.

109.    By 2016, Salix had obtained and listed in the FDA's Orange Book 22 patents claiming aspects of Xifaxan 550 mg and its uses, with expiration dates ranging from August 11, 2019 to October 2, 2029. By 2023, the patents listed in the Orange Book for Xifaxan 550 mg and

its uses no longer included the patents that had already expired in 2019, but the number of listed patents had grown to 24, and by 2024 had grown further to 26.

110.    The earliest-expiring of the patents listed in the Orange Book claimed methods of using the prior art rifaxamin compound (the active ingredient in Xifaxan) for various indications such as treating irritable bowel syndrome and treating bloating.  Those patents expired on August 11, 2019.

111.    The remaining listed patents have expiration dates ranging from June 19, 2024 to October 2, 2029. They fall into three general categories: (i) patents claiming various distinct crystalline forms or polymorphs of rifaximin ("Polymorph Patents"); (ii) patents claiming methods of treating IBS with rifaximin ("IBS Patents"); and (iii) patents claiming methods of using rifaximin to treat hepatic encephalopathy ("HE Patents"), as shown below.

| Patent | Expiration | Submission | Coverage |
|--------|-----------|------------|----------|
| 6,861,053 | 08/11/2019 | n/a | IBS method of treatment |
| 7,452,857 | 08/11/2019 | n/a | IBS method of treatment |
| 7,605,240 | 08/11/2019 | n/a | IBS method of treatment |
| 7,718,608 | 08/11/2019 | n/a | IBS method of treatment |
| 7,935,799 | 08/11/2019 | n/a | IBS method of treatment |
| 7,045,620 | 06/19/2024 | n/a | Polymorph |
| 7,612,199 | 06/19/2024 | 04/07/2011 | Polymorph |
| 7,902,206 | 06/19/2024 | 04/07/2011 | Polymorph |
| 8,158,644 | 06/19/2024 | 05/09/2012 | Polymorph |
| 8,158,781 | 06/19/2024 | 05/08/2012 | Polymorph |

| | | | |
|---|---|---|---|
| 8,835,452 | 06/19/2024 | 10/01/2014 | Polymorph |
| 8,853,231 | 06/19/2024 | 11/05/2014 | Polymorph |
| 7,915,275 | 02/23/2025 | 06/18/2015 | Polymorph |
| 7,906,542 | 06/01/2025 | 04/07/2011 | Polymorph |
| 8,518,949 | 02/27/2026 | 09/16/2013 | Polymorph |
| 8,741,904 | 02/27/2026 | 07/11/2014 | Polymorph |
| 9,271,968 | 02/27/2026 | 06/08/2016 | Polymorph |
| 10,703,763 | 02/27/2026 | 07/14/2020 | Polymorph |
| 8,193,196 | 09/02/2027 | 06/18/2012 | Polymorph |
| 10,456,384 | 02/26/2029 | 11/12/2019 | IBS-D method of treatment |
| 10,765,667 | 02/26/2029 | 10/19/2020 | IBS-D method of treatment |
| 11,564,912 | 02/26/2029 | 02/02/2023 | IBS-D method of treatment |
| 11,779,571 | 02/26/2029 | 10/23/2023 | IBS-D method of treatment |
| 8,309,569 | 07/18/2029 | 06/18/2015 | IBS-D method of treatment |
| 8,829,017 | 07/24/2029 | 09/09/2014 | HE method of treatment |
| 8,946,252 | 07/24/2029 | 02/03/2015 | HE method of treatment |
| 9,421,195 | 07/24/2029 | 10/11/2016 | HE method of treatment |
| 9,629,828 | 07/24/2029 | 04/27/2017 | HE method of treatment |
| 10,314,828 | 07/24/2029 | 07/01/2019 | HE method of treatment |
| 10,335,397 | 07/24/2029 | 07/24/2019 | HE method of treatment |
| 10,709,694 | 07/24/2029 | 07/23/2020 | HE method of treatment |
| 8,642,573 | 10/02/2029 | n/a | HE method of treatment |

| 8,969,398 | 10/02/2029 | 03/04/2015 | HE method of treatment |

112.    Like many active pharmaceutical ingredients, rifaximin may exist in a number of different crystalline forms (known as polymorphs). The '620, '199, '206, '275, '542, '644, '781, '196, '949, '904, '452, '231, '968, and '763 patents claim some of these rifaximin polymorphs.

113.    For example, the '620, '199, '206, '275, '542, '644, '452, '231 and '781 patents claim the alpha, beta, and gamma rifaximin polymorphs, including those made by a specific process, compositions containing the same and uses for the same. The '196, '949, '904, and '968 patents claim the delta and epsilon rifaximin polymorphs, including those made by a specific process, compositions containing the same and uses for the same; and the '763 patent claims methods of treatment by administering the delta and epsilon rifaximin polymorphs.

114.    All these polymorph patents were subject to validity challenges.  Moreover, they were specific to a particular polymorph or to particular properties or methods of making or using a given polymorph, making it relatively easy for a generic manufacturer to avoid infringing these patents even if they were valid.

115.    The patents that expired in 2019 claimed certain methods of using rifaximin in patients with IBS, but without specific dosing regimens. Some of the patents expiring after 2019 are directed to the same or similar treatment indications as those that expired in 2019, but have claims reciting specific dosing regimens or target patients. For example, the '608 and '799 patents, both of which expired on August 11, 2019, claimed a method of treating a subject suffering from IBS and a method of treating a subject who has relapsing diarrhea from small intestinal bacterial overgrowth comprising administering rifaximin to the subject in need. The later-expiring '569 patent is directed to certain methods of using rifaximin at a dose of 1650

mg/day for 14 days for the treatment of IBS-D in order to achieve a "durability of response" (about 12 weeks of adequate relief of symptoms). Similarly, the '667 patent claims a method of treating IBS in a subject 65 years of age or older by administering 550 mg of rifaximin three times a day for 14 days, and also had dependent claims claiming treatment of specific symptoms or types of IBS such as where the IBS is IBS-D.

116.    Regardless of the merits of the patents expiring in 2019, those patents all would have been avoided by generics that entered the market after the patents' August 11, 2019 expiration. As for the later-expiring patents, they are all subject to serious validity challenges and/or claim specific indications that a generic manufacturer easily could avoid by using section viii statements.

117.    Nine listed patents claim treatment methods specific to hepatic encephalopathy through administering rifaximin.

118.    For example, the '573 patent covers certain methods of "maintaining remission of hepatic encephalopathy" by "administering . . . rifaximin daily to a subject for a period of about 12 months of longer."

119.    The '017 patent covers certain methods of using rifaximin at a dose of 1,000-1,200 mg/day and "cautiously" for the treatment of hepatic encephalopathy in patients who also have travelers' diarrhea and either a Child-Pugh Class C score or a model end stage liver disease score of 25 or greater.

120.    The '252 patent covers certain methods of using rifaximin to reduce the risk of HE recurrence in certain patients who have travelers' diarrhea and hepatic insufficiency.

121.    The '398 patent covers certain methods of using "rifaximin daily for a period of about 12 months or longer" to decrease a subject's risk of an HE breakthrough episode.

122.    The '195 patent covers methods of using rifaximin at a dose of 1,000-1,200 mg/day "for a period of 12 months or longer" to reduce the risk of HE recurrence in adults.

123.    The '828 patent covers methods of using rifaximin at a dose of 1,000-1,200 mg/day to reduce the risk of HE recurrence in certain patients who have travelers' diarrhea and chronic liver disease.

124.    These patents are all specific to treating HE, so a generic could easily avoid these patents by carving out these HE indications in its labeling via a section viii statement.

125.    In sum, each of the post-2019-expiring listed patents claiming methods of treating IBS indications and each of the listed Polymorph Patents was vulnerable to challenges regarding validity, enforceability, and infringement.

126.    In fact, as noted above, the Court of Appeals for the Federal Circuit affirmed a district court's judgment finding that the claims of the IBS and Polymorph Patents that Bausch asserted against a manufacturer of generic Xifaxan were invalid for obviousness.  Specifically, the court invalidated the claims of the representative later-expiring '569 and '667 patents directed to treating IBS-D with 550 mg rifaximin three times a day for 14 days, and claims of the representative later-expiring '199 and '206 patents directed to rifaximin form beta. *See Salix Pharms., Ltd. v. Norwich Pharms. Inc.*, 98 F.4th 1056 (Fed. Cir. 2024).

127.    The substantial vulnerability and weakness of all the IBS and Polymorph Patents meant that none stood as legitimate impediments to generic competition. By listing them in the Orange Book, however, Bausch ensured that every potential generic competitor would have to address them.

128.    Actavis Laboratories FL, Inc ("Actavis"), a generic manufacturer subsequently acquired by Teva, was the first to file an ANDA seeking approval to manufacture, market, and

sell a generic version of Xifaxan 550 mg. Actavis filed ANDA No. 208959 in or about February 2016 directed to Xifaxan 550 mg. As the first generic to submit a substantially complete ANDA for rifaximin, Actavis was eligible for the 180-day ANDA exclusivity period for generic Xifaxan 550 mg tablets.

129.    On February 11, 2016, Actavis sent a paragraph IV certification to Bausch, asserting that the following patents are invalid, unenforceable, or will not be infringed by the activities described in Actavis's ANDA: the '569 patent; the '573 patent; the '017 patent; the '252 patent; the '398 patent; the '620 patent; the '199 patent; the '206 patent; the '542 patent; the '275 patent; the '644 patent; the '781 patent; the '196 patent; the '949 patent; the '904 patent; the '452 patent; the '231 patent; the '053 patent; the '857 patent; the '240 patent; the '608 patent; and the '799 patent.

130.    Actavis provided Bausch with the factual and legal basis supporting its position that these patents are invalid, unenforceable, or would not be infringed by Actavis's proposed ANDA products.

131.    On March 23, 2016, Bausch filed suit against Teva in the U.S. District Court for the District of Delaware (the "Bausch-Teva Litigation"), alleging that Actavis infringed one or more claims of the '569, '573, '017, '252, '398, '620, '199, '206, '542, '275, '644, '781, '196, '949, '904, '452, '231, '053, '857, '240, '608, and '799 patents. Pursuant to the Hatch-Waxman Amendments, the mere filing of the action triggered an automatic 30-month stay of the approval of Actavis's ANDA. Later in the litigation, Bausch amended its complaint to add new allegations that Actavis also infringed the '968 and '195 patents.

132.    Actavis filed an answer to the claims, denying Bausch's allegations and asserting affirmative defenses and counterclaims (1) denying that its rifaximin tablets would infringe

35

claims of any of the asserted patents, (2) alleging that the asserted patents were invalid, and (3) alleging that the asserted patents were unenforceable due to Bausch's inequitable conduct during prosecution.

133.    On June 14, 2016, Bausch filed its First Amended Complaint, adding U.S. patent 9,271,968 (the "'968 patent") to the suit. Actavis filed its Amended Complaint and Counterclaims on July 1, 2016. Bausch filed its Reply on July 18, 2016.

134.    On August 2, 2016, Teva acquired Actavis and thereby became the owner of ANDA No. 208959 and a participant in the Bausch-Teva Litigation.

135.    On October 5, 2016, the court scheduled a seven-day trial to begin on January 29, 2018.

136.    On December 12, 2016, Bausch filed its Second Amended Complaint, adding U.S. patent 9,421,195 (the "'195 patent") to the suit. Teva filed its Second Amended Answer and Counterclaims on December 27. Bausch filed its Reply on January 10, 2017.

137.    On May 10, 2017, at Teva's request, the parties agreed to a roughly one-year suspension of the litigation that would last until April 30, 2018. All scheduled litigation deadlines and events, including the January 2018 trial date, were indefinitely removed from the Court docket. The parties subsequently requested that the stay be extended four more times, ultimately extending the hiatus to October 1, 2018.

138.    The Bausch-Teva Litigation involved 24 patents (either asserted by Bausch against Teva or introduced by Teva in its declaratory judgment counterclaims). Teva had strong defenses to all those patents. None presented a reason for Teva to agree to wait until 2028 to enter the market with a generic Xifaxan 550 mg.

139.    As described above, the patents asserted against Teva fell into four groups: IBS method-of-treatment patents expiring on August 11, 2019; IBS-D method-of-treatment patents expiring in 2029; Polymorph Patents expiring between June 2024 and September 2027; and HE method-of-treatment patents expiring in 2029.

140.    By the time Bausch and Teva settled the patent case in September 2018, the IBS method of treatment patents expiring on August 11, 2019 had less than one year of life left and thus, even if they were valid, infringed and enforceable, presented no reason for Teva to agree to wait a day beyond August 11, 2019 to enter the market—let alone until 2028.

141.    Teva had strong validity challenges to the IBS-D method of treatment patents expiring in 2029, and those patents were exceptionally vulnerable to being invalidated. The federal courts did indeed invalidate the representative '569 and '667 patents in the later *Salix v. Norwich* action.

142.    Similarly, Teva had strong validity challenges to the Polymorph Patents and those patents were exceptionally vulnerable to being invalidated, as again evidenced by the invalidation (in the *Salix v. Norwich* action) of the representative '199 and '206 patents, which claimed the beta polymorphic form of rifaximin.

143.    Teva also had solid noninfringement defenses to the delta and epsilon polymorphic rifaximin patents, because the Teva generic product does not use the delta or epsilon forms.

144.    As for the patents directed to the HE indication, separate and apart from its invalidity and noninfringement defenses, Teva could have eliminated all of those patents as a barrier to entry by means of a section viii statement carving out the HE indications.

37

### B.    Bausch Paid Teva to Delay Its Entry

145.    Recognizing its vulnerability to generic competition, Bausch paid Teva to delay its entry into the market in order to protect its massive Xifaxan revenues.

146.    Bausch has acknowledged to its investors that Xifaxan sales accounted for "approximately 80% of the Salix segment revenues and approximately 21% of [Bausch's overall] revenues for 2023 and 2022, respectively." In comparison, "no other single product group represented 10% or more of the company's Salix segment product sales." Bausch has cautioned since 2017 that if Xifaxan's patents could not be successfully defended, the company could face losing "a significant portion of sales in a very short period." Xifaxan 550 mg revenue was so critical that any loss of patent protection sooner than anticipated would adversely impact Bausch's future cash flows, result in shortened useful lives of Xifaxan's intangible assets, increase amortization expenses, and "materially affect company operations."

147.    On September 12, 2018, Bausch announced the settlement of the pending litigation against Teva relating to the alleged infringement of Bausch's Xifaxan 550 mg patents. Bausch and Teva settled the patent lawsuit before the Court issued a ruling on the validity and/or infringement of Bausch's patents. That settlement included large and unexplained reverse payments to Teva to delay its market entry until January 1, 2028 and, in doing so, to block other generic entrants as well.

148.    Bausch's press release announcing the settlement stated that Teva was given the option, beginning on January 1, 2028 (or earlier if another generic Xifaxan product entered the market), to "(1) market a royalty-free generic version of XIFAXAN 550 mg tablets, should it receive approval from the U.S. Food and Drug Administration on its Abbreviated New Drug Applicant, or (2) to market an authorized generic version of XIFAXAN 550 mg tablets with drug

38

supply being provided by Salix. In the case an authorized generic is marketed, the volume of the authorized generic will be subject to manufacturing and supply quantities until final patent expiry, and Bausch Health will receive an undisclosed share of the economics from [Teva] on its sales of an authorized generic."

149.    For decades it has been part of Teva's corporate strategy to settle Hatch-Waxman patent cases in ways that provide it "value" beyond what the statute itself provides. The principal way that it extracts this value is by insisting on contract provisions that create "exclusivities" that the statute itself does not provide.

150.    These contractual exclusivities—none of which is authorized by the Hatch-Waxman Amendments—include no-authorized-generic clauses and the deterrence clauses described above. As late as 2018, it was common for Teva to insist on such provisions as part of settling Hatch-Waxman patent litigations.

151.    For its part, Salix's parent company (then known as Valeant) had such an unsavory history of anticompetitive conduct that it was hauled before a Congressional Committee in 2016. Representative Cummings highlighted Salix's exploitation of a brand prescription drug called Glumetza, whose price Salix had suddenly raised by 750%. *Developments in the Prescription Drug Market: Oversight Hearing Before the House Comm. On Oversight and Government Reform*, 114 Cong., at 3, 119 (Feb. 4, 2016), *available at* https://www.govinfo.gov/ content/pkg/CHRG- 114hhrg25500/pdf/CHRG-114hhrg25500.pdf. He noted that Salix had "raise[d] the prices astronomically [for a] temporary period of time before other competitors enter the market." *Id*.

152.    In order to placate Congress, Valeant's then-CEO testified to the U.S. Senate on April 27, 2016 that "it was a mistake to pursue, and in hindsight I regret pursuing, transactions

where a central premise was a planned increase in the prices of the medicines." Statement of J.

Michael Pearson before the Senate Special Committee on Aging (Apr. 27, 2016),

https://www.aging.senate.gov/imo/ media/doc/SCA_Pearson_4_27_16.PDF. And he gave them

the false comfort that, going forward, "[w]e expect our pricing actions to track industry norms."

*Id*.

153.    Yet, at that very moment, Valeant and Salix were concealing from Congress

exactly why Salix was able to take the dramatic price increases on Glumetza. Salix had paid its

generic competitor to delay entry into the market.  In that case, the payment took two basic

forms: (1) a no-AG clause; and (2) deterrence clauses. Salix took the price increases on

Glumetza during the period of delayed generic entry that it had bought from the generic

competitor in exchange for those payments.  *See In re Glumetza Antitrust Litig.*, 2021 WL

1817092 (N.D. Cal. May 6, 2021) (denying summary judgment).

154.    In the wake of the Congressional investigations, in 2016 Valeant got a new CEO

and a new General Counsel. On July 13, 2018, Valeant changed its name to Bausch Health

Companies Inc.—a public-relations gambit to try to distance itself from its unsavory past.

155.    But the new management team was keenly aware of the enormous profits that

Salix gained from the reverse payments that it had made—and failed to disclose to Congress—

with respect to Glumetza. And in 2018, when generic Xifaxan was poised to enter the market,

Bausch and Salix were under enormous financial pressure. Bausch was in the midst of a multi-

year effort to restructure its operations and to pay off debt. And Xifaxan was key to those

efforts—Salix had recently heavily invested in a sales force centered on Xifaxan, the company's

most significant product.

156.    So Bausch responded to the prospect of generic Xifaxan with the same anticompetitive strategy it had used with respect to Glumetza. Bausch paid its generic competitor to delay entry so that it could continue to reap unwarranted profits on a critical drug. Bausch provided Teva with the same type of reverse payments that it had used with respect to Glumetza, namely: (1) a no-AG agreement; and (2) deterrence clauses.

157.    Bausch paid Teva to delay generic entry by effectively giving Teva a no-AG agreement—an agreement that Bausch would not sell an AG in competition with Teva during the six-month period after Teva's launch.  Since Teva was the first filer and entitled to six months of exclusivity vis-à-vis other ANDA filers, that agreement guaranteed that Teva would be the *only* generic Xifaxan 550 mg on the market during that time. The no-AG payment will allow Teva to sell its generic product at a higher price, and to make twice as many sales, as it would if Bausch were to market an AG in competition with Teva.  Those higher prices come out of the pockets of purchasers.

158.    The no-AG agreement between Bausch and Teva took a particular form.  Bausch and Teva agreed that Teva had the option of either launching its own ANDA product, assuming it received FDA approval, or electing to have Bausch supply Teva with rifaximin to market and sell as the Xifaxan authorized generic, but with a limitation on the quantity it could sell under the agreement. This contractual arrangement makes it economically irrational for Bausch to market an authorized generic in competition with Teva. The quantity limit is in economic reality a thinly disguised agreement by Bausch not to market an authorized generic during Teva's 180-day exclusivity period.

159.    At the time of the settlement in 2018, Bausch and Teva could reasonably have expected annual sales of 550 mg Xifaxan to be approximately $2.2 billion in 2028. As noted,

41

annual sales of the drug reached approximately $2 billion in 2024 and are virtually certain to reach the $2.2 billion level in 2025 or 2026.  We will conservatively assume that Bausch and Teva expected sales of $2.2 billion in 2028.

160.    If Teva elects to market its ANDA product without any volume limitation, two generic competitors will be on the market during the 180-day period—Teva with no quantity limitation on its sales, plus Bausch's own authorized generic. Approximately $1.0 billion of brand sales would be substituted to generic sales during those 180 days ($2.2 billion annual brand sales * 90% generic erosion * 0.5 years). The two generics would be priced at approximately 50% of the brand price and would split the generic unit sales equally. Teva's generic sales during the 180-day period would total $1.0 billion sales * 50% of the brand price with two generics * 50% of the generic market = $250.0 million. Bausch's authorized generic sales would be roughly the same.

161.    If Teva elects to market the AG with a volume limitation, Bausch could nominally launch a second AG, but under reasonable assumptions it would be foolish for Bausch to do so. Given the volume limitation on Teva's sales, launching an AG would simply expand the generic market and displace higher-priced *brand* sales with lower-priced *generic* sales.

162.    Any volume limitation that is less than the expected rate of generic substitution will mean that launching an AG will result in the replacement of branded sales with generic sales at a lower price.  Suppose that Teva is subject to a volume limitation of 60% of the total market and that the expected generic substitution rate is 90%.  If Bausch does not launch an AG, and Teva is the only generic on the market, Teva's generic will take 60% of unit sales (the maximum it is permitted) and Bausch's brand product will take the other 40%.  If Bausch were to launch an AG, the generic substitution rate would rise to 90% and brand sales would drop to 10%, so 30%

42

of the market would be converted from higher-priced brand sales to lower-priced authorized generic sales. That will be profitable for Bausch only if the overall revenues generated from the sale of the AG outweigh the cannibalization of Bausch's branded sales. And that will occur only if the amount of cannibalization is small—*i.e.*, if the volume limit is high.

163. Using reasonable assumptions (a 90% generic substitution rate, a 50% price discount with two generics and an equal split of the generic sales), a wide range of volume limits would make it economically irrational for Bausch to sell its own authorized generic because doing so would simply replace sales of branded Xifaxan with sales of the authorized generic.

164. In their September 2018 settlement agreement, Bausch and Teva set the quantity limit so as to make it economically irrational for Bausch to launch an authorized generic. In exchange, Teva agreed to delay its entry into the market far beyond the entry date justified by the strength of Bausch's patents. The economic substance of their agreement is that Bausch will not market an authorized generic during Teva's 180-day ANDA exclusivity period and, in exchange, Teva will delay its entry into the market.

165. Those economics work for Bausch and Teva because they restrain the competition that otherwise would have occurred between them, and they split the gains that competition would have delivered to purchasers. Bausch receives delayed and impaired generic entry, and Teva is permitted to sell during the 180-day period without competition from an authorized generic. Bausch's and Teva's gains are purchasers' losses. Bausch and Teva win; purchasers lose.

166. As noted above, Teva could also elect to market generic rifaximin under its own approved ANDA rather than launching an AG supplied by Bausch. But that, too, was a fig leaf designed to disguise the substance of the deal.

167.    Given a choice between marketing its ANDA product and competing with an AG, or marketing an AG and having the only generic product on the market for six months, it will almost always be in the generic's interest to choose the latter.  This is true even if the generic's output under the AG option is limited.  Not facing competition from an AG allows the generic to take the entire generic market *and* to sell at higher prices.  Without generic competition, Teva is better off despite the quantity limit because it can sell more units at a higher price.

168.    For example, assume that the volume limit imposed on Teva is 60% of total market units and that the generic price with only one generic on the market is 85% of the brand price.  As explained above, if Teva chooses to launch its ANDA product it will make approximately $250 million in sales during its first six months on the market.  If Teva chooses to launch the AG, it will make $2.2 billion in annual sales * .5 years * 60% volume limit * 85% of the brand price with one generic = $561 million, more than twice as much. If the volume limitation is 67% and Teva chooses to launch the AG, it will make even more—$2.2 billion in annual sales * .5 years * 67% volume limit * 85% of the brand price = $626 million.

169.    The only economic function of the quantity limitation is to dissuade Bausch from marketing an authorized generic during Teva's ANDA exclusivity period.  This commercial reality is confirmed by nearly universal business practice when the parties to a licensing agreement are *not* manipulating the licensing terms to dissuade the brand manufacturer from marketing an AG. Under a traditional license and settlement agreement, a brand manufacturer typically does not provide the first filing generic an option to launch an AG. And in the rare cases where the brand does offer an AG arrangement to the first filing generic, the compensation to the brand typically comes in the form of a marked up supply price and/or royalty, not a volume limit, such that the brand would still be incentivized to launch its own AG in competition

with the AG marketed by the first filer.  For example, when the first filer for Forfivo XL

launched an AG, the brand launched a competing AG the same day.  Other examples include

Silenor, Flector, and Zyclara.

170.    Bausch also paid Teva to delay its entry into the market by deterring other generic

manufacturers from entering the market before Teva. Bausch agreed to deter those threats to

Teva; in exchange, Teva agreed to delay entry until January 2028.

171.    When crafting the terms of their agreement, Bausch and Teva knew that other

generic manufacturers would pose a competitive threat to each of them. In September 2018

Xifaxan 550 mg annual sales were already at the blockbuster level (meaning that annual sales

exceeded $1 billion), and Teva was about to agree to delay unrestrained competition for more

than nine years. This created the incentive and ability for other generic manufacturers to try to

enter the market before Teva to get a period of *de facto* market exclusivity—*i.e.*, to be the only

ANDA generic on the market.

172.    As explained above, Congress provided at least three pathways for second filers

to enter the market ahead of a first filer that agreed to such a substantially delayed entry: (a) via

successful litigation; (b) via a license from the brand manufacturer; and (c) via section viii

statements.

173.    Bausch agreed to contractual provisions designed to help protect Teva from the

threat of subsequent filers beating Teva to the market by allowing Teva to accelerate its entry in

the event that a subsequent filer entered before January 2028.  Those provisions deterred

subsequent filers from trying to reach the market ahead of Teva.

174.    First, Bausch's payments to Teva included a clause that prevents second filers

from entering the market ahead of Teva by winning a patent challenge against Bausch. Under the

settlement, Bausch gave Teva the right to launch whenever a second filer receives an appellate court ruling affirming that all the patents entitling Teva to 180-day exclusivity are invalid and/or not infringed. The clause allows Teva to move up its entry date while also retaining its ANDA exclusivity. Without the clause, Teva would forfeit its ANDA exclusivity by failing to enter the market within 75 days of an appellate court affirming that judgment.

175.    Second, Bausch agreed to advance Teva's entry date in the event that a subsequent filer were to enter the market by any means, including the use of section viii statements.  For example, if Teva were to forfeit exclusivity by failing to obtain timely approval, another generic could obtain approval and enter the market by addressing one set of patents (*e.g.*, the HE patents) using section viii statements and winning litigation with respect to another set of patents (*e.g.*, the polymorph and IBS patents).  Again, absent this clause, Teva would be stuck on the sidelines while these more enterprising generic manufacturers entered the market long before Teva's delayed January 2028 date.

176.    Third, Bausch also agreed that if Bausch were to grant a license to any manufacturer to enter the market before Teva's delayed date of January 1, 2028, Teva's agreed entry date would be moved up to the second filer's earlier date.

177.    Thus, Bausch and Teva arranged that second filers could not get ahead of Teva—despite its agreement to a 9+ year delay—via a litigation victory against Bausch or a license from Bausch.

178.    These provisions eliminated pathways that Congress provided for second filers to enter the market ahead of first filers that have agreed with the brand manufacturer to delay entering the market with competing generic products.

179.    In exchange for the no-AG payment and these additional payments from Bausch, Teva agreed to delay entry into the market until January 1, 2028.

**C.    The Payments Were Large and Unexplained.**

180.    The payments from Bausch to Teva were large, which is why Teva agreed in 20*18* to delay entry until January 20*28*.

181.    As noted above, without the no-AG payment, Teva would face competition from Bausch's authorized generic during the 180-day ANDA exclusivity period and could expect to make sales of approximately $250 million during that time. The no-AG agreement will allow Teva to capture the entire generic market at a higher price, more than doubling its revenues.

182.    As shown above, assuming a volume limit of 60% and a price with one generic on the market of 85% of the brand price, Teva could expect to make $2.2 billion in annual sales * .5 years * 60% volume limit * 85% price with one generic on the market = $561 million.  The size of the payment to Teva is the difference between Teva's sales with the no-AG pact ($561 million) and its sales in a competitive market ($250 million), or $311 million.  The exact volume limitation contained in the Bausch/Teva agreement has not been disclosed, and the size of the payment could be higher or lower than $311 million depending on the exact volume limitation agreed to, but the payment is under any circumstances large and unexplained.

183.    In addition to the enormous value given to Teva, the reverse payment represented an economic sacrifice by Bausch.  In a competitive market, Bausch would have earned $250 million (about equal to what Teva would have earned) by marketing its own authorized generic. Of course, the anticompetitive profits that Bausch will earn by delaying generic competition until 2028 will far outweigh that sacrifice.

184.    The size of the payment also far exceeds the litigation costs that Bausch saved by settling the patent case. Bausch saved less than $10 million in litigation costs by settling.  Thus, Bausch's agreement to forgo AG sales of $250 million cannot be explained as merely an effort to avoid litigation costs. It is instead explained as a successful effort to impair and delay generic competition.

**D.    But For the Payments, Generic Competition Would Already Have Begun.**

185.    Bausch's unlawful agreement with Teva has forestalled generic entry of Xifaxan 550 mg.  Notwithstanding the size of the market and the number of generic competitors that have sought FDA approval to market a generic version of Xifaxan, there is no generic version of Xifaxan available today and it is likely that no generic version of Xifaxan will be available until January 2028.  Even when that occurs there will be only one generic version of Xifaxan on the market, the sales of that one generic will be limited and generic prices will be significantly higher than they would have been absent the unlawful payments and delay. Without the unlawful payments, Teva would have already entered the market and other competitors would have followed.

186.    Before the unlawful agreement with Teva, Bausch had concluded that generic Xifaxan 550 mg was likely to be available by 2024.  Bausch discussed the Teva deal in its 2019 annual report filed with the U.S. Securities and Exchange Commission. Bausch did not disclose in the SEC filing the *means* that it used to secure the deal, but it did report the *effect* of the deal.

187.    Before the deal with Teva, Bausch reported that generic entry was likely by 2024. Bausch wrote in its FY 2019 SEC filing (emphasis added):

> Effective September 12, 2018 [the date of the Teva deal], the Company changed the estimated useful life of its Xifaxan 550 mg®-related intangible assets **due to the positive impact of an agreement between the Company and [Teva]**

resolving the intellectual property litigation regarding Xifaxan 550 mg® tablets. Under the agreement, the parties have agreed to dismiss all litigation related to Xifaxan 550 mg® tablets, and all intellectual property protecting Xifaxan 550 mg® will remain intact and enforceable. **As a result, the useful life of the Xifaxan 550 mg® related intangible assets was extended from 2024 to January 1, 2028."**

188.    The financial markets, while unaware that Bausch obtained the late entry date by making unlawful payments to Teva, had no doubt as to the deal's enormous value to Bausch given the weakness of its patents. When valuing a brand manufacturer's stock price, analysts assess the likely outcome of generic manufacturers' challenges to the brand's patents. Settlements without reverse payments do not significantly affect stock prices, on average, indicating they usually meet traders' expectations about generic entry. In contrast, stock prices tend to increase after a settlement with reverse payments because the generic entry date has been delayed beyond traders' expectations.

189.    On September 12, 2018, Bausch announced the entry date that it had paid Teva to accept. The stock market was shocked. Immediately upon Bausch's announcement, its stock price skyrocketed. The stock price rose 14% on the first day of trading after the announcement, and it remained elevated in the ensuing days.

190.    The daily changes in the value of Bausch's stock (its market capitalization) from September 4, 2018 until September 19, 2018 are shown in the following graph:

49



191.    In a single day, the Teva deal added a billion dollars to Bausch's market capitalization. That deal pushed Teva's entry date out to a date far later than merited by the strength of Bausch's patents. Absent that unlawful deal, Teva in fact would have entered the market far sooner than January 1, 2028.

192.    Bausch did not advise investors that it had paid Teva to accept the near-decade-long delay in entering the market. Instead, it falsely reported in its SEC filings that "[t]he Company will not make any financial payments or other transfers of value as part of the agreement."

193.    Absent the unlawful reverse payment, a reasonable generic company in Teva's position would have launched generic Xifaxan 550 mg much earlier than January 1, 2028, either: (i) at risk; (ii) after litigating and winning; or (iii) under a lawful license from Bausch that did not include a reverse payment. Absent the unlawful reverse payments, Teva would have begun

marketing generic Xifaxan 550 mg prior to the filing date of this lawsuit and many years sooner than the agreed January 2028 entry date.

194.    Notably, the payments that Bausch made to Teva were more than Teva could have made *even if it had litigated and won the patent case*. As described in detail above, if Teva had litigated and won, it would have made about $250 million during the 180-day ANDA exclusivity period.  Assuming a 60% volume limitation, Bausch's payments were worth $311 million more than Teva could have made by competing.

195.    Most Hatch-Waxman patent cases are settled without a reverse payment.  It is likely that, absent the unlawful payments, Bausch and Teva would have settled the patent case lawfully—*i.e.*, without a reverse payment and with an earlier entry date.

196.    Alternatively, if the parties had not settled, Teva would have won the patent case. As discussed below, another generic manufacturer—Norwich Pharmaceuticals—in fact litigated essentially the same patent case against Bausch and won. Norwich filed its ANDA much later than Teva did, so Norwich did not receive its favorable ruling until August 2022 in the district court, and April 2024 in the Court of Appeals. Teva would have received similar rulings much earlier.

197.    Further, the FDA approvals of other generic manufacturers have been bottlenecked behind Teva's 180-day ANDA exclusivity. Absent the unlawful reverse payments, Teva would have already launched a generic Xifaxan 550 mg, and its 180-day ANDA exclusivity would have expired. The market for Xifaxan 550 mg would have been fully genericized by now and Bausch would have had no reason to block additional entrants.  Plaintiffs and other purchasers of the drug would be paying a fraction of what they currently pay to acquire rifaximin.

### E.   Additional Manufacturers Have Sought to Enter the Market and Have Been Delayed by Bausch and Teva.

198.    Even after the announcement of the Bausch-Teva settlement, numerous other generics pursued ANDAs seeking to sell generic Xifaxan. Three generic manufacturers filed Xifaxan ANDAs in 2019. Two, Sun and Sandoz, were deterred from litigating and reached settlements. However, the third, Norwich, did not settle. It litigated the patents to a trial which it largely won, confirming the weakness of the majority of Bausch's patent protection. As discussed below, however, Norwich remains bottlenecked behind by Teva due to the unlawful agreement to delay entry into 2028.

189.    In early 2019 Sun Pharmaceutical Industries Ltd. ("Sun") submitted an ANDA (No. 213042) to the FDA, seeking authorization to market a generic version of Xifaxan 200 mg.

190.    By way of a letter dated March 11, 2019, Sun notified Bausch that it had submitted its ANDA and provided a paragraph IV certification to Bausch, providing the detailed factual and legal basis supporting its position that the certain patents listed in the FDA's Orange Book for Xifaxan 200 mg are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, or sale of Suns' generic product.

191.    On April 24, 2019, Bausch initiated a patent lawsuit against Sun in April 2019 in the U.S. District Court for the District of Delaware asserting the '620, '199, '206, '542, '644, '781, '452, '231, '275, '196, 949, '904, '968, and '115 patents.

192.    On June 24, 2019, Sun filed its Answer, Affirmative Defenses, and Counterclaim to Bausch's complaint, asserting declaratory judgment counterclaims of non-infringement and invalidity as to each asserted patent.

193.    On July 15, 2019, Bausch filed its Answer to Sun's Counterclaims.

52

194.    In 2019 Sandoz Inc. ("Sandoz") submitted an ANDA with a paragraph IV certifications to the FDA seeking authorization to market a generic version of Xifaxan 550 mg.

195.    By way of a letter dated September 4, 2019, Sandoz notified Bausch that it had submitted its ANDA and provided a paragraph IV certification to Bausch, providing the detailed factual and legal basis supporting its position that certain patents listed in the FDA's Orange Book for Xifaxan 550 mg are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, or sale of Sandoz's generic product.

196.    On September 30, 2019, Bausch began a patent lawsuit against Sandoz in the U.S. District Court for the District of New Jersey asserting the '620, '199, '206, '542, '275, '644, '781,'196, '569, '949, '904, '452, '231, and '968 patents.

197.    On December 16, 2019, Bausch filed an amended complaint, adding infringement claims relating to the '384 patent, which had issued on October 29, 2019.

198.    On January 15, 2020, Sandoz filed its Answer and Counterclaim to Bausch's Amended Complaint, asserting declaratory judgment counterclaims of non-infringement and invalidity as to each asserted patent.

199.    On February 5, 2020 Bausch answered Sandoz's counterclaims.

200.    On May 6, 2020, Bausch announced that it had entered a settlement with Sandoz pursuant to which Sandoz agreed to refrain from selling generic Xifaxan 550 mg until at least January 1, 2028 (or earlier under certain circumstances) provided it had obtained FDA approval of its ANDA by that date.

201.    Of course, at the time of this settlement, Sandoz was well aware of Teva's first-to-file status (and resulting 180-day ANDA exclusivity) and the basic terms of the Bausch-Teva agreement.

202.    In particular, Sandoz was aware of the deterrence clauses in the Bausch/Teva agreement.  As noted above, those clauses had the purpose and effect of precluding later filers, such as Sandoz, from entering the market before Teva's unlawfully delayed entry date. Those anticompetitive clauses significantly diminished Sandoz's incentives to continue litigating its patent challenges against Bausch. Absent the unlawful restraints, Sandoz would have would have had multiple paths to earlier entry, including (i) after a litigation victory, (ii) an "at risk" launch as to any patents not carved out of its ANDA pursuant to a section viii statement, or (iii) under a lawful license from Bausch.

203.    Absent the unlawful restraints in the Bausch/Teva agreement, Sandoz's generic Xifaxan 550 mg would already be on the market.

204.    While the Bausch-Sun lawsuit over Sun's 200 mg ANDA was pending, in or about August 2020, Sun submitted a paragraph IV certification to the FDA, seeking authorization to market a generic version of Xifaxan 550 mg.

205.    By way of a letter dated August 10, 2020 Sun sent Bausch a Notice of paragraph IV certification asserting that the U.S. patents listed in the FDA's Orange Book for Xifaxan 550 mg were invalid, unenforceable, and/or would not be infringed by the commercial manufacture, use, or sale of Sun's generic product.

206.    On September 22, 2020, shortly after Bausch received Sun's paragraph IV certification regarding Xifaxan 550 mg and before any lawsuit over the implicated patents was filed, Bausch and Sun entered into an agreement by which Sun agreed to refrain from selling generic Xifaxan 550 mg and 200 mg until at least January 1, 2028 (or earlier under certain circumstances) provided it had obtained FDA approval of its ANDA by that date.

207.    Of course, at the time of this settlement, Sun, like Sandoz, was well aware of

Teva's first-to-file status (and resulting 180 day ANA exclusivity) and the basic terms of the

Bausch-Teva agreement.

208.    In particular, Sun was aware of the deterrence clauses in the Bausch/Teva

agreement. Those clauses deterred Sun from trying to enter the market before Teva's unlawfully

delayed entry date. And absent the unlawful restraints in the Bausch/Teva agreement, Sun would

have not settled for a January 2028 licensed entry date—the date that the unlawful restraints

caused Sun to accept—but would have had multiple paths to earlier entry, including: (i) after a

litigation victory, (ii) an "at risk" launch as to any patents not carved out of its ANDA pursuant

to a section viii statement, or (iii) under a lawful license from Bausch.

209.    Absent the unlawful restraints in the Bausch/Teva agreement, Sun's generic

Xifaxan 550 mg would already be on the market.

**F.    The Courts Have Invalidated Some of Bausch's Key Patents.**

210.    Other generic manufacturers have submitted ANDAs and have declined to settle.

211.    In December 2019, Norwich submitted ANDA No. 214369, seeking approval for

both IBS-D and HE indications, and included paragraph IV certifications to a number of the

Orange Book-listed patents.

212.    On December 20, 2019, Norwich submitted ANDA No. 214370, seeking FDA

approval to market generic rifaximin 200 mg.  Norwich's 200 mg ANDA (No. 214370) did not

include any paragraph IV certifications.

213.    On February 14, 2020, Norwich notified Bausch that it had submitted an ANDA

seeking FDA approval to market generic rifaximin 550 mg and provided paragraph IV

certifications to Bausch to certain patents Bausch had listed in the Orange Book, which set forth

the detailed factual and legal basis supporting its position that those patents were invalid, unenforceable, and/or would not be infringed by the commercial manufacture, use, or sale of Norwich's generic 550 mg product.

214.    On March 26, 2020, Bausch filed suit against Norwich, alleging infringement by Norwich of one or more claims of twenty-three Xifaxan patents. *Salix Pharmaceuticals, LTD. et al v. Norwich Pharmaceuticals, Inc*., No. 20-cv-00430 (D. Del.).

215.    On November 13, 2020, Bausch filed its First Amended Complaint, adding an additional three patents alleged to be infringed by Norwich.

216.    The case against Norwich went to trial in March 2022 based on three key groups of representative patents: (i) patents claiming methods of treating IBS-D with a dosing regimen based on 1650 mg per day (or 550 mg three times a day) of rifaximin; (ii) patents claiming the beta polymorphic form of rifaximin; and (iii) patents claiming treatment methods related to hepatic encephalopathy ("HE").

217.    The U.S. District Court for the District of Delaware issued a final judgment on August 10, 2022, (the "Norwich Judgment"), finding invalid the representative patents protecting the beta polymorph rifaximin composition and the claims for the methods of using Xifaxan for treating IBS-D based on a 1650 mg per day or three-times-a-day 550 mg dosing regimen.  It also found certain of Bausch's HE patents valid and infringed.

218.    As a result of the Norwich Judgment, Bausch effectively lost the protection of its U.S. patents against generic competition for IBS-D indications.

219.    The district court's findings apply equally to the other claims Bausch had previously asserted but later withdrew. The court found the polymorph claims invalid because the prior art taught the preparation and use of crystalline rifaximin, and that one skilled in the art

had good reason to use routine techniques to characterize the crystalline rifaximin produced by the prior art which would have led to detection of the beta polymorph form claimed and asserted as present in the accused product. The other polymorphic forms of rifaximin would similarly been detected by routine characterization of the crystalline rifaximin produced by the prior art and the other rifaximin polymorph patent claims differ only in minor variations of excipients, hydration levels, or pharmaceutical formulation—none of which, under the court's obviousness analysis, would have conferred patentability. Accordingly, the other polymorph patent claims likewise would have been found invalid as obvious had they been tried.

220.    Bausch appealed the Norwich Judgment to the U.S. Court of Appeals for the Federal Circuit on August 16, 2022.

221.    On April 11, 2024, the appellate court affirmed the Norwich Judgment.

222.    Although the Norwich Judgment invalidated Bausch's key polymorph and IBS-D indication patents, it also found that Bausch's representative patents protecting the use of Xifaxan 550 mg tablets for hepatic encephalopathy ("HE") indications were not proven invalid and were infringed by the HE indications in Norwich's ANDA.

223.    Norwich's 550 mg ANDA label included both IBS-D and HE treatment indications, so the District Court's final judgment enjoined FDA approval of Norwich's 550 mg ANDA until the last expiring HE patent in October 2029.

224.    After the Norwich Judgment, Norwich amended its ANDA to carve out the HE indications from its label via section viii statements. Norwich then filed a motion in the District Court requesting modification of the final judgment to permit the FDA to approve Norwich's revised ANDA, which is now directed to only the IBS-D indications.

225.    On May 17, 2023, the District Court denied Norwich's motion to modify the final judgment to allow Norwich to market its 550 mg ANDA product for the IBS-D indications. The court confirmed that the FDA remains enjoined from granting final approval to Norwich's ANDA until October 2, 2029. The Court of Appeals for the Federal Circuit affirmed that decision. Accordingly, Norwich cannot yet market its generic Xifaxan 550 mg even for the IBS-D indications on which it prevailed in the patent case.

226.    Bausch and Teva's unlawful conduct has delayed the entry of Norwich's generic Xifaxan 550 mg into the market. Absent the reverse payment, Teva could have litigated its challenge to conclusion and would have won, just as Norwich did, but much earlier. Because Teva would have received a favorable district court decision well before Norwich's judgment, Norwich would have been apprised of the need to "carve out" the HE indications from its ANDA application, and it would have done so from the start.

227.    Alternatively, but for Bausch's unlawful payments to Teva, Teva would have launched by now and Bausch's incentive to keep other generics off the market would have been significantly reduced.

228.    Consequently, Norwich—like Sandoz and Sun—would have been on the market selling generic Xifaxan 500mg by now.

**G.    Bausch and Teva Have Excluded Amneal From the Market.**

229.    In or about February 2024 Amneal Pharmaceuticals of New York, LLC and Amneal EU, Limited (collectively "Amneal") submitted an ANDA to the FDA seeking approval to market generic Xifaxan 550 mg tablets. Amneal's ANDA included a paragraph IV certification that Bausch's listed patents were invalid, unenforceable, and/or would not be infringed by Amneal's proposed ANDA product. The only indication for which Amneal's

ANDA seeks FDA approval is for the treatment of IBS-D.  Accordingly, Amneal filed section

viii statements carving out the HE indications.

230.    On February 27, 2024, Amneal sent a Notice of the paragraph IV certification to

Bausch, asserting that the Amneal generic would not infringe any valid and enforceable claim of

the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a

method of using it.

231.    Bausch had listed the following patents in the Orange Book as claiming Xifaxan

550 mg (the "Polymorph Patents") or a method of using it (the "IBS Patents"), among others:

**Polymorph Patents**

U.S. Patent No. 8,193,196 ("the '196 patent")

U.S. Patent No. 8,518,949 ("the '949 patent")

U.S. Patent No. 8,741,904 ("the '904 patent")

U.S. Patent No. 9,271,968 ("the '968 patent")

U.S. Patent No. 10,703,763 ("the '763 patent")

**IBS Patents**

U.S. Patent No. 11,779,571 ("the '571 patent")

U.S. Patent No. 11,564,912 ("the '912 patent")

U.S. Patent No. 10,456,384 ("the '384 patent")

232.    On or around April 5, 2024, Bausch filed a patent infringement lawsuit in the

District of New Jersey against Amneal, alleging that Amneal's proposed product infringed these

patents.  Bausch amended its complaint on June 4, 2024.

233.    Bausch's lawsuit against Amneal triggered an automatic 30-month stay of final

FDA approval of Amneal's ANDA. The 30-month stay is not set to expire until August 29, 2026.

234.    In listing the Polymorph Patents and the IBS-D Patents in the Orange Book, Bausch asserted that they claim Xifaxan 550 mg or a method of using it, and that Bausch could reasonably assert a claim of patent infringement against anyone who made a generic version of Xifaxan 550 mg without a license from Bausch. 21 U.S.C. § 355(b)(1)(A)(viii). The Hatch-Waxman Amendments prohibit NDA holders from submitting information on patents that do not meet these criteria. 21 U.S.C. § 355(c)(2) ("Patent information that is not the type of patent information required by subsection (b)(1)(A)(viii) shall not be submitted under this paragraph.").

235.    The FDA does not verify that submitted patents actually meet the statutory listing criteria. Instead, the FDA's role with respect to the Orange Book patent listings is purely ministerial. The NDA holder is responsible for determining whether a patent claims the drug or a method of using the drug that is the subject of the NDA and therefore should be listed in the Orange Book.

236.    As detailed below, none of Bausch's unexpired IBS-D or unexpired Polymorph Patents should have been listed in the Orange Book because they did not meet the listing requirements. But merely by wrongfully listing those patents in the Orange Book, Bausch required Amneal and other subsequent filers to file Paragraph IV Certifications against them.

237.    Had Amneal not been required to file Paragraph IV Certifications against those patents, its ANDA would have contained only section viii carve outs and non-Paragraph IV Certifications.  As a result, Amneal would not have been subject to either a 30-month stay or Teva's 180-day exclusivity and would have been finally approved by now.

238.    To the extent Amneal filed Paragraph IV Certifications against additional patents such as the '542 patent and the '275 patent, those patents have since expired.

60

1.   **The Polymorph Patents**

239.    Rifaximin exists in five different polymorphic hydrate forms, each of which differs by, *inter alia*, the amount of water in the crystal form of each polymorph.  The five different known rifaximin hydrate polymorphs have been designated the alpha, beta, gamma, delta, and epsilon forms, with each designation having a specific water content or range of water content and each having a unique crystalline form, with its own physical and analytical characteristics.

240.    The manufacturing conditions under which rifaximin is created may impact the polymorphic form and thus, in some instances, the compound's properties.

241.    Xifaxan and Amneal's generic drug product contain the alpha polymorph.

242.    All of the unexpired Polymorph Patents except the '763 Patent claim rifaximin delta and/or epsilon and methods of using those polymorphs. The '763 Patent claims only methods of using polymorph delta and/or polymorph epsilon. None of the unexpired Polymorph Patents claims rifaximin alpha or its use.

243.    Bausch was well aware that the unexpired Polymorph Patents did not satisfy the requirements of the Orange Book listing statute.  It nevertheless made a deliberate and knowing decision to wrongfully list them for anticompetitive reasons.

244.    The unexpired Polymorph Patents were not eligible for Orange Book listing because they do not claim Xifaxan or a method of using it.

245.    Moreover, Bausch also believed that its delta and epsilon polymorph patents could never reasonably be asserted against generic Xifaxan because no such generic manufacturer could ever establish bioequivalence using the delta and epsilon polymorphs. Specifically, on October 17, 2016, Bausch filed a Citizen Petition asking the FDA to "refrain

from approving any [ANDA] . . . referencing any strength of Xifaxan . . . unless" ANDA filers

provide "[c]haracterization studies [that] demonstrate that the Proposed Generic's active

ingredient is identical in rifaximin polymorph profile to that of the Xifaxan active ingredient."  In

other words, Bausch was requesting that no ANDA be approved unless it contained rifaximin

polymorph alpha or a polymorph bioequivalent to polymorph alpha.

246.    Importantly, the Citizen Petition's rationale for this request was that other

polymorphs of rifaximin could not possibly be shown to be bioequivalent to polymorph alpha

because it was not technologically possible to do so:

> For many drugs, polymorph form of the active ingredient does not
> affect potency. For Xifaxan, polymorph form matters, greatly . . .
> FDA recognizes that, in reviewing an ANDA for approval, it must
> assess active ingredient "sameness" on a case-by-case basis, and
> may need to prescribe standards—including specification of
> crystalline structure—when necessary to ensure sameness. This is
> one of those cases: Different Polymorph Proposed Generics are
> expected to have topical and systemic drug potencies different
> from those of Xifaxan. Thus, such Proposed Generics cannot meet
> the sameness of active ingredient criterion.
>
> ***Additionally, a Different Polymorph Proposed Generic cannot be
> demonstrated to have sameness of strength to, or be
> bioequivalent to, Xifaxan. Testing technology needed to make
> those demonstrations for an ANDA does not exist.***

247.    In submitting its Citizen Petition, Salix was required to certify "that the

information upon which [it] ha[s] based the action requested herein first became known to [it] on

or about" a given date. Salix certified that at least some of the information upon which it based

its request, including the lack of technology to establish bioequivalence between rifaximin

polymorphs predated the listing dates of each Unexpired Polymorph Patent:

> Information regarding the point that Different Polymorph Proposed
> Generics cannot be demonstrated to meet the sameness of active
> ingredient, sameness of strength or bioequivalence criteria,

because testing technology needed to make those demonstrations does not exist (Petition § II.D.2): The following guidance became available to Salix on its dates of initial publication: Draft BA & BE Studies Guidance 2003 (March 19, 2003); Non-Inferiority Draft Guidance (March 1, 2010). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

248.    Though the publicly available version of Bausch's Citizen Petition is heavily redacted, it is clear that Bausch's arguments rely heavily on studies and publications predating the unexpired Polymorph Patent listing dates.

249.    In the ongoing *Amneal* litigation, Bausch represented that the delta and epsilon polymorphs have significantly different absorption properties compared to alpha. Given the publicly known information about the bioavailability of the different polymorphs relative to one another, discussed in the paragraph below, it is implausible that either delta or epsilon could be bioequivalent to alpha or each other.

250.    Bausch's Citizen Petition includes the following table, showing that rifaximin delta and epsilon are nowhere close to bioequivalent to rifaximin alpha within the required regulatory guideposts for bioequivalence (AUC and Cmax within 80-125% at a 90% confidence interval):

**Table 6:** Study of Bioavailability of the Crystalline Forms of Rifaximin in Dogs. Mean ± S.E.M. of the PK Parameters After Oral Administration of 100 mg $kg^{-1}$ (n=4)[90]

| Rifaximin Form | $Cmax^a$ (ng/mL) | $Tmax^b$ (h) | $AUC_{0-24h}^c$ | $AUC_{0-inf}^d$ (ng.h/mL) |
|---|---|---|---|---|
| α | 2.6 ± 0.7 | 4 | 17 ± 7 | 17 ± 7 |
| β | 1.1 ± 0.6 | 4 | 10 ± 7 | 12 ± 8 |
| γ | 1,085.1 ± 78.7 | 2 | 4,795 ± 4,120 | 4,894 ± 4,107 |
| δ | 308.3 ± 224.1 | 2 | 801 ± 517 | 830 ± 515 |
| ε | 6.9 ± 5.1 | 4 | 42 ± 35 | 77 ± 42 |

[a] Maximum observed plasma concentration. [b] Time from administration to obtain $C_{max}$; the values are given as median. [c] Area under the concentration-time curve from time zero up to last sampling (24 h after administration). [d] Area under the concentration-time curve calculating the extrapolation to infinity.

251.    Bausch's own position meant that it believed that: (1) no generic with a delta- or epsilon-based rifaximin could ever establish bioequivalence to Xifaxan or to each other because it was impossible to even test for bioequivalence; and (2) a patent claiming only these polymorphs certainly could not be reasonably asserted in litigation because no generic would ever seek approval for a formulation that could never meet FDA approval standards.

252.    If a brand believes that a drug substance patent claiming different polymorphs of the approved product could reasonably be asserted in litigation, then it must list such patents in the Orange Book and must certify on FDA form 3542a that it has conducted testing to confirm that the listed polymorphs perform the "same" as the approved polymorph (i.e., with respect to such characteristics as dissolution, solubility, bioavailability), and to meet other requirements such as a demonstration of bioequivalence. 21 C.F.R. § 314.53; 68 Fed. Reg. 36676 at 36677-78.

253.    The sponsor is not required to submit its data, and the certifications are not verified by the FDA. 68 Fed. Reg. at 36679.

254.    The form at Section 2.2 asks "does the patent claim a drug substance that is a different polymorph of the active ingredient described in the pending NDA, amendment or supplement?" Section 2.3 of the form continues, "If the answer to question 2.2 is 'Yes,' do you certify that, as of the date of this declaration, you have test data demonstrating that a drug product containing the polymorph will perform the same as the drug product described in the NDA? The type of test data required is described at 21 CFR 314.53(b)." The sponsor is then required to "[s]pecify the polymorphic form(s) claimed by the patent for which you have the test results described in 2.3."

255.    On the form associated with the '196, '949, and '904 Patents, Salix answered "No" to the Section 2.2 question, a demonstrable lie to the FDA and potentially a criminal offense. *E.g.*:

| Department of Health and Human Services<br>Food and Drug Administration | Form Approved: OMB No. 0910-0513<br>Expiration Date: 10/31/2016<br>See OMB Statement on Page 3. |
|---|---|

## PATENT INFORMATION SUBMITTED WITH THE FILING OF AN NDA, AMENDMENT, OR SUPPLEMENT

### For Each Patent That Claims a Drug Substance (Active Ingredient), Drug Product (Formulation and Composition) and/or Method of Use

NDA NUMBER
021361

NAME OF APPLICANT/NDA HOLDER
Salix Pharmaceuticals, Inc.

*The following is provided in accordance with Section 505(b) and (c) of the Federal Food, Drug, and Cosmetic Act.*

TRADE NAME (OR PROPOSED TRADE NAME)
XIFAXAN ®

| ACTIVE INGREDIENT(S)<br>Rifaximin | STRENGTH(S)<br>550mg |
|---|---|

DOSAGE FORM
Tablet

This patent declaration form is required to be submitted to the Food and Drug Administration (FDA) with an NDA application, amendment, or supplement as required by 21 CFR 314.53 at the address provided in 21 CFR 314.53(d)(4).

Within thirty (30) days after approval of an NDA or supplement, or within thirty (30) days of issuance of a new patent, a new patent declaration must be submitted pursuant to 21 CFR 314.53(c)(2)(ii) with all of the required information based on the approved NDA or supplement. The information submitted in the declaration form submitted upon or after approval will be the *only* information relied upon by FDA for listing a patent in the Orange Book.

**For hand-written or typewriter versions (only) of this report:** If additional space is required for any narrative answer (i.e., one that does not require a "Yes" or "No" response), please attach an additional page referencing the question number.

**FDA will not list patent information if you submit an incomplete patent declaration or the patent declaration indicates the patent is not eligible for listing.**

*For each patent submitted for the pending NDA, amendment, or supplement referenced above, you must submit all the information described below. If you are not submitting any patents for this pending NDA, amendment, or supplement, complete above section and sections 5 and 6.*

### 1. GENERAL

| a. United States Patent Number | b. Issue Date of Patent | c. Expiration Date of Patent |
|---|---|---|
| 8,193,196 | 5 June 2012 | 2 September 2027 |

| d. Name of Patent Owner | Address *(of Patent Owner)* | |
|---|---|---|
| ALFA WASSERMANN S.p.A. | 1, VIA ENRICO FERMI | |
| | City/State<br>ALANNNO (PE), ITALY 65020 | |
| | ZIP Code<br>1-65020 | FAX Number *(if available)*<br>+39-051 388593 |
| | Telephone Number<br>+39-051 6489511 | E-Mail Address *(if available)* |

e. Name of agent or representative who resides or maintains    Address *(of agent or representative named in 1.e.)*

| 2. Drug Substance (Active Ingredient) | | |
|---|---|---|
| 2.1 Does the patent claim the drug substance that is the active ingredient in the drug product described in the pending NDA, amendment, or supplement? | ☒ Yes | ☐ No |
| 2.2 Does the patent claim a drug substance that is a different polymorph of the active ingredient described in the pending NDA, amendment, or supplement? | ☐ Yes | ☒ No |
| 2.3 If the answer to question 2.2 is "Yes," do you certify that, as of the date of this declaration, you have test data demonstrating that a drug product containing the polymorph will perform the same as the drug product described in the NDA? The type of test data required is described at 21 CFR 314.53(b). | ☐ Yes | ☐ No |
| 2.4 Specify the polymorphic form(s) claimed by the patent for which you have the test results described in 2.3. | | |

| 6. Declaration Certification | |
|---|---|
| 6.1 **The undersigned declares that this is an accurate and complete submission of patent information for the NDA, amendment, or supplement pending under section 505 of the Federal Food, Drug, and Cosmetic Act. This time-sensitive patent information is submitted pursuant to 21 CFR 314.53. I attest that I am familiar with 21 CFR 314.53 and this submission complies with the requirements of the regulation. I verify under penalty of perjury that the foregoing is true and correct.**<br><br>**Warning: A willfully and knowingly false statement is a criminal offense under 18 U.S.C. 1001.** | |
| 6.2 Authorized Signature of NDA Applicant/Holder or Patent Owner *(Attorney, Agent, Representative or other Authorized Official) (Provide Information below)*<br><br>*Hail Seft* | Date Signed<br><br>*01 August 2014* |

**Form FDA 3542a for U.S. Patent No. 8,193,196**

256.    Based on Bausch's representations, the FDA listed the '196, '949, and '904 Patents in the Orange Book (a ministerial act), and Bausch was able to use them to obtain improper 30-month stays and to bottleneck Amneal and others behind Teva's Paragraph IV Certifications.

257.    Had Bausch been honest and answered "yes" to the Section 2.2. question, it would have had to certify that it had data to demonstrate that rifaximin polymorphs delta and/or epsilon were bioequivalent to rifaximin polymorph alpha. Without such a certification, the FDA would not have listed the patents. As demonstrated above, Salix believed it was impossible to marshal such evidence, and represented as much to the FDA.

66

258.    The '763 Patent was also improperly listed because it runs afoul of the FDA's "Use Code" regulations.

259.    When a brand like Bausch lists a method of use patent like the '763 Patent, it is required to describe the use in its Form 3542a so that it can be published in the Orange Book. The Use Code must contain a "description of the patented method of use as required for publication, which must contain adequate information to assist 505(b)(2) and ANDA applicants in determining whether a listed method-of-use patent claims a use for which the 505(b)(2) or ANDA applicant is not seeking approval." 21 C.F.R. § 314.53(c)(2)(ii)(P)(3).

260.    The purpose of such publication is to put potential ANDA filers on notice of the claimed use and the ability to file section viii carve outs of that use.  The FDA explained that it codified this requirement to "address overbroad or ambiguous use codes" and "to assist FDA and 505(b)(2) and ANDA applicants in determining whether a listed method-of-use patent claims a use for which the 505(b)(2) or ANDA applicant is not seeking approval. To address overbroad or ambiguous use codes, we are expressly requiring that if the method(s) of use claimed by the patent does not cover an indication or other approved condition of use in its entirety, the NDA holder's use code must describe only the specific approved method of use claimed by the patent for which a claim of patent infringement could reasonably be asserted if a person not licensed by the patent owner engaged in the manufacture, use, or sale of the drug product." 81 Fed. Reg. 69580 at 581.

261.    The FDA takes the sponsor's listed code as a given.  It does not independently assess the patent's scope or otherwise look behind the description authored by the brand. In other words, the FDA's role with respect to patent listing, including Use Codes, is purely ministerial.

262.    Thus, whether a section viii statement is available to a generic manufacturer for a method-of-use patent depends entirely on how the brand describes its patent, and whether it faithfully follows the rules for Orange Book listings and Use Codes.

263.    In its Form 3542a for the '763 Patent, Bausch identified claim numbers 1, 2, and 5 as claiming an approved method of using Xifaxan. Independent claim 1 recites:

> A method of treating bacterial activity in the gastrointestinal tract of a subject, the method comprising:
>
> orally administering to the subject a pharmaceutical composition comprising a therapeutically effective amount of rifaximin δ [(delta)] together with a pharmaceutically acceptable excipient selected from the group consisting of diluting, binding, lubricating, disintegrating, colouring, flavouring and sweetening agents, wherein rifaximin δ [(delta)] has a powder X-ray diffractogram showing peaks at values of the diffraction angles 2θ of about 5.7°±0.2, 6.7°±0.2, 7.1°±0.2, 8.0°±0.2, 8.7°±0.2, 10.4°±0.2, 10.8°±0.2, 11.3°±0.2, 12.1°±0.2, 17.0°±0.2, 17.3°±0.2, 17.5°±0.2, 18.5°±0.2, 18.8°±0.2, 19.1°±0.2, 21.0°±0.2, 21.5°±0.2.

264.    Dependent claim 2 recites:

> The method of claim 1, wherein the pharmaceutical composition is in a formulation selected from the group consisting of coated or uncoated tablet, hard or soft gelatin capsule, sugar-coated pill, lozenge, wafer sheet, pellet, and powder in sealed packet.

265.    Dependent claim 5 recites:

> The method of claim 1, wherein rifaximin δ [(delta)] has a water content between 3.0% and 4.5%.

266.    The Use Codes submitted for the '763 Patent are much broader than these claims. They read "Reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults," and "Treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults" which are not limited to the specific polymorph claimed as therapeutically effective.

267. But 21 C.F.R. § 314.53(b)(1) requires the use code to "describe the method of use," not just the indication. By not specifying in its use code that the patent claims only a method of using the delta polymorph of rifaximin, Salix was able to bottleneck generics behind the '763 Patent, which claims methods of using a polymorph that Salix itself argued could not even be approved as the active ingredient in a generic form of Xifaxan.

268. 21 C.F.R. § 314.53(b)(1) further requires that "[f]or approved NDAs, the NDA holder's description of the patented method of use . . . describe only the approved method(s) of use claimed by the patent for which a claim of patent infringement could reasonably be asserted." The '763 Patent could not reasonably be believed to cover Xifaxan, which uses rifaximin alpha.  It should not have been listed in the Orange Book.

269. The overbroad Use Code that extended far beyond the Patent's claim thus denied generics like Amneal the opportunity to carve out the claimed use of rifaximin delta simply by using rifaximin alpha, as Salix's submissions to FDA argued should have been required.

270. Thus, for example, Amneal was required to file a Paragraph IV certification against the '763 Patent even though its ANDA product contains only rifaximin alpha. Generics like Amneal could have avoided having to file Paragraph IV Certifications against the '763 Patent easily if Salix had accurately described these uses in the Orange Book, because Amneal and others were not seeking to market a version of rifaximin containing polymorph delta.

271. If Amneal and others had not been required to file a Paragraph IV Certification against the '763 Patent, and could have instead filed section viii statements, their path to immediate approval would have been that much easier.

### 2. The IBS-D Patents

272. In addition to improperly listing the Polymorph Patents, Bausch also improperly

listed the unexpired IBS-D Patents in the Orange Book, which had the effect of requiring generics to file Paragraph IV Certifications that would otherwise not have been necessary. Absent those certifications, Amneal and other generics would not have been subject to either a 30-month stay or Teva's 180-day exclusivity.

273.    Bausch obtained the unexpired IBS-D Patents by defrauding the PTO, starting with the '569 Patent.  Dr. William Forbes, a named inventor and a high-ranking executive in charge of research and development at Bausch, withheld material information from the PTO. Had Dr. Forbes disclosed the withheld information, including evidence of prior art uses of rifaximin to treat IBS, a reasonable examiner would not have allowed the patents to issue. Moreover, the only plausible reason for the failure of Dr. Forbes (and any other individuals substantively involved in the prosecution of the '569 Patent and its descendants) to not disclose the withheld information is an intent to deceive the PTO examiner into issuing the patents. This fraud on the PTO caused significant injury, in part because absent the fraud neither the '569 Patent nor its descendants would have issued, been listed, or been the subject of patent litigation. Thus, absent the fraud, those patents would not have been a barrier to competition.

274.    The '569 Patent claims:

1. A method of providing acute treatment for diarrhea-associated Irritable Bowel Syndrome (dIBS) comprising: administering 1650 mg/day of rifaximin for 14 days to a subject in need thereof, wherein removing the subject from treatment after the 14 days results in a durability of response, wherein the durability of response comprises about 12 weeks of adequate relief of symptoms.

2. The method of claim 1, wherein the 1650 mg is administered as 550 mg three times per day.

275.    Information material to the patentability of these claimed elements wa: (1) in the public domain; (2) on sale; and/or (3) disclosed in the prior art. This material information was material and known to Dr. Forbes.  Dr. Forbes nevertheless withheld it from the PTO in violation of his duty of candor with the intent to deceive the PTO into issuing the '569 patent.

276.    The application that issued as the '569 Patent was filed on February 26, 2009 and the earliest claimed effective filing date for the patent is February 26, 2008 based on a provisional application filed on that date.

277.    In the *Norwich* case, the district court and the Federal Circuit Court of Appeals agreed that there had been "widespread" use of Xifaxan by the public before that date to treat IBS-D.

278.    These public uses were well known to Bausch generally and Forbes specifically. Indeed, Salix and Forbes had encouraged such use years before the filing date of the '569 Patent.

279.    The public uses and on sale activities were material information about statutory bars that rendered the claims of the '569 Patent unpatentable under 35 U.S.C. § 102(a) and (b).

280.    In separate *qui tam* suits, multiple relators alleged that a central aspect of Bausch's business model dating back to Xifaxan's approval was to promote Xifaxan off-label for IBS-D. This was not disclosed to the examiner.

281.    In November 2005, more than two years before the earliest possible effective filing date for the '569 Patent, Forbes hosted an analyst call with Dr. Mark Pimentel, a prominent gastroenterologist, Bausch consultant, and licensor of certain Xifaxan patents.

282.    On that call, Pimentel disclosed that at his practice at Cedars-Sinai Hospital in California, he and his colleagues had treated approximately 900 patients with Xifaxan and had seen the "most dramatic improvements in IBS" compared to other antibiotics.

283.    Pimentel further stated that in addition to his practice's 900 uses, "nearly 50% of [gastroenterologists] on the West Coast are in tune with this already and perhaps more, and across the U.S. it's advancing very rapidly."

284.    Pimentel further stated that he was dosing IBS patients with Xifaxan at a dose of 1,200 mg/day, very close to and just below the claimed dose in the '569 Patent.

285.    The analyst call was not disclosed to the examiner.

286.    Salix conducted independent market research which confirmed widespread physician adoption of Xifaxan for IBS as early as 2005.

287.    This market research was not disclosed to the examiner.

288.    On February 25, 2006, more than two years before the earliest possible effective filing date for the '569 Patent, Leonard Weinstock, M.D., a gastroenterologist who had received honoraria from Bausch and whose research had been funded by Bausch, emailed Forbes regarding one of his patients.

289.    In that email, Weinstock reported a "90% global sx response [sic] with 1800 mg Xifaxan/day x 14 days," very close to and just above the claimed dose in the '569 Patent.

290.    In deposition testimony presented at the *Norwich* trial, Forbes did not contest that the Weinstock email referred to treating IBS.

291.    The Weinstock email was not disclosed to the examiner.

292.    If Forbes had disclosed that prior art public uses of both 1,200 mg rifamixin and 1,800 mg rifamixin had been used successfully to treat IBS, a reasonable examiner would never have allowed a claim to a dose of 1,650 mg as recited in claim 1 of the '569 Patent. Forbes was personally in possession of that information yet never disclosed it to the examiner.

72

293.    In 2011, before the '569 Patent had been issued, Weinstock conducted a retrospective chart review of patients treated with rifaximin between 2005 and 2011 in doses 800–1800 mg/day for 10–14 days.

294.    That analysis, Weinstock, LB, *Long-Term Outcome of Rifaximin Therapy in Non-Constipation Irritable Bowel Syndrome*, Digestive Diseases and Sciences, Sept. 2011 ("Weinstock 2011"), reported that "74% of patients had an adequate response."

295.    The specific chart data underlying Weinstock 2011 confirms that multiple of Weinstock's patients were treated with up to 1,800 mg/day of rifaximin for 10–14 days and obtained durable results more than a year before the February 28, 2008.

296.    While Weinstock 2011 was not itself prior art, it contained a reporting of prior art activities and was not disclosed to the examiner.

297.    Thus, the data underpinning Weinstock 2011, much of which was prior art, was not disclosed to the examiner.

298.    Forbes had a longstanding relationship with Weinstock.

299.    The Weinstock email shows that Forbes and Weinstock were in contact about treating IBS-D with Xifaxan.

300.    In addition, Forbes and Weinstock co-authored at least two articles, including at least one during prosecution of the '569 Patent.

301.    Weinstock served on the Salix speakers' bureau.

302.    Multiple Weinstock publications contain acknowledgments of financial and other support from Salix. For example, Weinstock 2011 discloses that "Leonard B. Weinstock is on the Salix Pharmaceuticals speakers' bureau. Funding for this study was received from Salix Pharmaceuticals, Inc. Editorial assistance was provided under the direction of Leonard B.

73

Weinstock by MedThink Communications with support from Salix Pharmaceuticals, Inc."

303.    Other Weinstock publications contain similar disclosures.

304.    On December 1, 2011, the examiner rejected Bausch's '569 claims as obvious over Viscomi, U.S. patent application US 2005/0272754 (in combination with other prior art).

305.    The examiner found that Viscomi taught rifaximin for IBS, and disclosed dosages 100–1800 mg/day with wide regimen variation over days to months.

306.    The examiner concluded that, with Viscomi's guidelines, a skilled gastroenterologist would be motivated to seek an optimal dosage range/regimen through no more than routine experimentation.

307.    The examiner concluded that "it is not inventive to discover the optimal dose, or regimen, by routine experimentation when general conditions of a claim are disclosed in prior art."

308.    On May 12, 2012, Bausch's attorneys told the examiner that Alfa Wasserman, which employed Viscomi and had rights to the Viscomi patent, and Salix were parties to a Joint Research Agreement ("JRA"). Salix argued that Viscomi was therefore not prior art under 35 U.S.C. § 103's Joint Research Exception.

309.    The examiner subsequently withdrew the rejection based on Viscomi in view of Bausch's statements. Had Forbes disclosed the successful prior art uses of rifamixin at 1,200 mg and 1,800 mg known to him for treating IBS, the examiner would not have withdrawn the objection because the prior art public uses withheld by Forbes involved the very subject matter the examiner had relied upon in rejecting the claims based on Viscomi. It was inconsistent with the duty of candor for Forbes to argue that Viscomi was not prior art while at the same time withholding evidence of prior art uses that were equivalent with the teachings of Viscomi that

the examiner had relied upon.

310.    The '569 Patent issued on November 13, 2012.

311.    Salix's attorneys' successful removal of Viscomi US 2005/0272754 as a prior art reference was based on misleading the examiner into believing it was exempted as prior art under the Joint Research Exception. However, Salix knew Viscomi US2005/0272754 was published more than one year prior to the earliest priority date for the '569 patent, and therefore Viscomi US2005/0272754 qualified as printed publication prior art under 35 U.S.C. § 102(b) to the '569 Patent. The Joint Research Exception does not apply to printed publications which qualify as prior art under 35 U.S.C. § 102(b) and as such Viscomi US2005/0272754 was not entitled to the Joint Research Exception.

312.    The Joint Research Exception that Bausch relied on also does not apply to foreign patent applications and publications.

313.    Foreign family members of Viscomi, for example, European Patent Publication EP1676847A1 disclosed medicinal preparations of rifaximin and a dosage range encompassing 1,650 mg/day and the 1,800mg per day disclosed in Viscomi.

314.    Foreign family members of Viscomi, for example EP1676847A1, and other prior art publications would have been material to the Examiner's consideration of the claims, without being excludable under the JRE.

315.    Foreign family members of Viscomi, for example EP1676847A1, were not disclosed to the examiner.

316.    Additionally, on information and belief, other publications of the same or similar material information occurred at or around this same time and were known to those having a duty of candor to the PTO during the prosecution of the '569 Patent and were also not disclosed

to the examiner.

317.    Bausch similarly failed to disclose its public uses, known public uses by others or material publications such as those relating to Viscomi et. al. in the related applications to the '569 Patent which issued as the remaining unexpired IBS-D Patents. Each of these withholdings was an independent act of fraud on the PTO, which renders those patents invalid and/or unenforceable for the same reasons.

318.    All the remaining unexpired IBS-D Patents descend from the patent application that led to the '569 Patent.

319.    For example, the 384 and '667 patents Bausch listed in the Orange Book descended from U.S. Patent Nos. 7,566,270 and 9,931,325, which themselves descended from the '569 Patent. Salix never listed the '270 and '325 Patents in the Orange Book. Accordingly, Salix concluded that they did not cover any approved use of Xifaxan.

320.    As a result, no ANDA filer was ever required to submit a Paragraph IV certification against the '270 or '325 Patents.

321.    Bausch filed the applications that lead to the '384 and '667 patents on February 22, 2018, and January 9, 2020, respectively, after its settlement with first filer Teva.

322.    The PTO rejected both applications as obvious in view of the unlisted '270 and '325 Patents.

323.    Rather than attempt to show the '384 and '667 Patents were patentably distinct from the unlisted '270 and '325 Patents, Bausch filed terminal disclaimers,

324.    A patentee uses a terminal disclaimer to overcome certain rejections such as a non-statutory double patenting rejection.

325.    When the PTO issues a patent subject to a terminal disclaimer, that patent expires

no later than the earlier expiring patent over which it has been disclaimed and the two patents must remain in common ownership.

326.    The PTO issued the '384 Patent on October 29, 2019, and the '667 Patent on September 8, 2020.

327.    By listing the '384 and '667 Patents ANDA filers subsequent to Teva were forced to submit otherwise unnecessary Paragraph IV Certifications.

328.    Bausch listed the '571 and '912 Patents in the Orange Book shortly after the *Norwich* court invalidated the related '667 and '569 Patents.

329.    The claims invalidated in *Norwich* involved using rifaximin to treat IBS-D, including claims directed to subjects 65 years of age or older.

330.    The '571 and '912 Patents are also directed to treating IBS-D "in a female subject." As subjects 65 years or older (as claimed in the '667 and '569 Patents) necessarily includes female subjects, the '571 and '912 Patents are subject to, and invalidated by, the same prior art that invalidated the '667 and '569 Patents. In other words, Bausch listed the '571 and '912 Patents in the Orange Book even though those patents are substantively the same as those that had just been invalidated.

331.    Accordingly, Bausch had no basis to attest that the '571 and '912 Patents "could reasonably be asserted" in patent litigation against unlicensed generic manufacturers.

332.    Listing the '571 and '912 Patents nonetheless compelled generic applicants like Amneal to file Paragraph IV Certifications, subjected them to a 30-month stay, and bottlenecked them behind Teva's 180-day exclusivity.

333.    Amneal received tentative FDA approval on January 16, 2025.  The approval was tentative rather than final due to the pending 30-month stay and Teva's unexpired exclusivity.

But for Bausch's and Teva's unlawful conduct, Amneal would have received final approval and its generic version of Xifaxan would be on the market today.

### H.     Bausch and Teva Have Excluded Zydus From the Market.

334.    In or about August 2024, Zydux Pharmaceuticals (USA) Inc. ("Zydus) submitted an ANDA to the FDA, seeking approval for its rifaximin 550 mg tablets. Zydus's ANDA included a paragraph IV certification asserting that Bausch's listed patents were invalid, unenforceable, and/or would not be infringed by Zydus's proposed generic product. The only indication for which Zydus seeks FDA approval is for the treatment of IBS-D.

335.    On or about August 15, 2024, Zydus sent a Notice of the paragraph IV certification to Bausch, asserting that the Zydus generic would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using Xifaxan 550 mg.

336.    Bausch had listed in the Orange Book the Polymorph Patents (as defined above) and the IBS Patents (as defined above).

337.    On September 27, 2024, Bausch sued Zydus on those patents in the District of New Jersey. Bausch alleged that each of the Polymorph Patents and IBS Patents is valid and infringed.

338.    By having listed those patents in the Orange Book and suing on them, Bausch elicited an automatic 30-month stay—until March 2027—on the FDA's granting approval to Zydus's ANDA.

339.    Bausch and Zydus subsequently negotiated a settlement and license agreement and, on August 19, 2025, the Court entered a stipulation dismissing Bausch's patent infringement claims.

340.    Zydus is bottlenecked by Teva's unexpired exclusivity.

**I.      Bausch and Teva Have Excluded Cipla and Carnegie From the Market.**

341.    In or about August 2024, Cipla USA, Inc., and Cipla Limited (collectively "Cipla"), submitted an ANDA (No. 219570) to the FDA, seeking FDA approval for its rifaximin 550 mg tablets.

342.    Cipla's ANDA includes a paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and/or would not be infringed by Cipla's proposed generic product. Cipla's ANDA seeks FDA approval for the treatment of IBS-D.

343.    On or about September 18, 2024, Cipla sent a notice letter and detailed statement as to of its paragraph IV certification to Bausch, asserting that the Cipla generic would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it.

344.    On November 1, 2024, Bausch filed a patent infringement lawsuit against Cipla under the Hatch-Waxman Amendments, in the United States District Court for the District of New Jersey alleging that Cipla's ANDA product would infringe the '571, '912, '384, '196, '949, '904, '968, and '763 patents.

345.    Cipla is blocked from the market by Teva's unexpired exclusivity and the 30-month stay triggered by Bausch's patent lawsuit.  But for Bausch's unlawful payments to Teva, neither obstacle would exist.  Absent Bausch's and Teva's unlawful conduct, Cipla's ANDA would be approved earlier and Cipla would then immediately enter the market.

346.    In or about September 2024 Carnegie Pharmaceuticals LLC and Carnegie Pharma Limited (collectively "Carnegie"), submitted an ANDA (No. 219892) to the FDA, seeking FDA approval for its rifaximin 550 mg tablets.

347.    Carnegie's ANDA includes a paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and/or would not be infringed by Carnegie's proposed generic producgt. Carnegie's ANDA seeks FDA approval for the treatment of IBS-D.

348.    On or about October 1, 2024, Carnegie sent a notice letter and detailed statement as to of its paragraph IV certification to Bausch, asserting that the Carnegie ANDA Product would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it.

349.    On November 7, 2024, Bausch filed a patent infringement lawsuit against Carnegie in the United States District Court for the District of New Jersey alleging that Carnegie ANDA product would infringe the '571, '912, '384, '196, '949, '904, '968, and '763 patents.

350.    Bausch and Carnegie subsequently entered into a settlement and license agreement and, on June 23, 2025, the Court entered a stipulation dismissing Bausch's patent infringement claims.

351.    Carnegie is blocked from the market by Teva's unexpired exclusivity.  Absent Bausch's and Teva's unlawful conduct, Carnegie's ANDA would be approved earlier and Carnegie would then immediately enter the market.

**J.    Bausch and Teva Have Excluded Saba From the Market.**

352.    In February 2025, Saba Ilac Sanayi ve Ticaret A.S. ("Saba") submitted an ANDA to the FDA seeking approval to market its rifaximin 550 mg product in the United States.

353.    Saba's ANDA includes a paragraph IV certification that Bausch's relevant patents are invalid, unenforceable and would not be infringed by Saba's generic rifaxmin product. Saba's ANDA seeks FDA approval for the treatment of IBS-D.

354.    On or about February 20, 2025, Saba sent a notice letter and detailed statement asserting that the Saba product would not infringe any valid and enforceable claim of the various patents that Bausch listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it, specifically including the '571, '912, '196 and '115 patents.

355.    On April 4, 2025, Bausch filed a patent infringement lawsuit against Saba under the Hatch-Waxman Amendments in the District of New Jersey alleging that Saba's ANDA product would infringe the '571, '912, '196 and '115 patents.

356.    Bausch and Saba subsequently negotiated a settlement and license agreement and, on August 21, 2025, the parties filed a stipulation of dismissal as to Bausch's patent infringement claims.

357.    Saba's ANDA remains bottlenecked behind Teva.

**K.    Bausch and Teva Have Excluded Alkem From the Market.**

358.    In or about April 2025, Alkem Laboratories Ltd. ("Alkem") submitted an ANDA to the FDA seeking approval to market its rifaximin 550 mg tablet product.

359.    Alkem's ANDA includes a paragraph IV certification that Bausch's relevant patents are invalid, unenforceable and would not be infringed by Alkem's generic product. Alkem's ANDA seeks approval for the treatment of IBS-D.

360.    On or about April 28, 2025, Alkem sent a notice letter and detailed statement asserting that Alkem's generic product would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it, specifically including the '571, '912 and '196 patents.

361.     On June 10, 2025, Bausch filed a patent infringement lawsuit against Alkem under the Hatch-Waxman Amendments in the District of New Jersey alleging that Alkem's product would infringe the '571, '912 and '196 patents.

362.     Bausch and Alkem subsequently a settlement and license agreement and, on August 14, 2025, the parties filed a stipulation of dismissal as to Bausch's patent infringement claims.

363.     Alkem's ANDA remains bottlenecked behind Teva.

## VI.     MARKET POWER AND RELEVANT MARKET

364.     At all relevant times, Bausch has had monopoly power in the market for Xifaxan and its AB-rated generic equivalents (of which there are none) because it had the power to maintain the price of rifaxamin at supracompetitive levels without losing enough sales to make those supracompetitive prices unprofitable.

365.     At all relevant times, a small but significant, non-transitory increase in the price of brand Xifaxan would not have caused a loss of sales sufficient to make the price increase non-profitable.

366.     Xifaxan does not exhibit significant, positive cross-elasticity of demand with respect to price with any other drug other than AB-rated generic versions of Xifaxan.

367.     Xifaxan is differentiated from all drugs other than AB-rated generic versions of Xifaxan.

368.     Bausch needed to control only branded Xifaxan and its AB-rated generic equivalents, and no other products, in order to maintain the price of rifaxamin profitably at supracompetitive prices.

369.    Bausch sold brand Xifaxan at prices well in excess of its marginal cost and in excess of the competitive price, and as a result had extremely high profit margins.

370.    Bausch had, and exercised, the power to exclude generic competition to branded Xifaxan.

371.    At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected brand Xifaxan from the forces of price competition.

372.    There is direct evidence of Bausch's monopoly power with respect to Xifaxan. That evidence includes, among other things, the ratio of the price of Xifaxan to its marginal cost; the margins earned by Bausch on the sale of Xifaxan; and the size and existence of the reverse payment from Bausch to Teva. As the Supreme Court recognized in *Actavis*, firms lacking market power are not likely to pay a competitor a large sum to avoid the risk of competition. 570 U.S. at 157.

373.    To the extent proof of monopoly power by defining a relevant product market is required, the relevant antitrust product market is the market for Xifaxan and its AB-rated generic equivalents, and the relevant geographic market is the United States.

374.    Bausch's share of the relevant market has been 100% since the drug was launched.

## VII.    MARKET EFFECTS

375.    Defendants' conspiracy has had the purpose and effect of restraining competition in the relevant market, allowing Bausch to maintain and extend its monopoly over rifaximin and avoid AB-rated generic competition until January 1, 2028.  It will also allow Teva to enjoy a monopoly over sales of generic Xifaxan starting on January 1, 2028.

## VIII.   ANTITRUST IMPACT

376.    During the relevant time period, Plaintiffs' assignors purchased substantial quantities of Xifaxan directly from Bausch.  As a result of Defendants' illegal conduct, the entry of a generic version of Xifaxan will be delayed until January 2028 and the price of generic Xifaxan when it ultimately becomes available will be higher than it would have been if the violation had not occurred. As a result, Plaintiffs and their assignors have been compelled to pay artificially inflated prices for branded Xifaxan and will be compelled to pay artificially inflated prices for generic Xifaxan when it finally becomes available in 2028.

377.    Defendants' unlawful conduct and its anticompetitive effects continue through the present day.  Defendants' violations threaten continuing loss and damage to Plaintiffs if not enjoined.

## IX.    CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF 15 U.S.C. § 1
### (AGAINST ALL DEFENDANTS)

378.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 377 above as though fully set forth herein.

379.    Bausch has possessed monopoly power in the relevant market from the launch of Xifaxan through the present.

380.    In or about September 2018, Bausch and Teva entered into an unlawful reverse-payment agreement whereby Bausch made large and unjustified payments to Teva in exchange for Teva's agreement to delay the sale of generic Xifaxan until January 1, 2028.  That payment included an effective agreement by Bausch not to launch an authorized generic to compete with Teva's ANDA product and provisions that effectively deterred subsequent filers from beating Teva to the market. The purpose and effect of the agreement were: (i) to delay the entry of

generic Xifaxan and allow Bausch to maintain and extend its monopoly in the relevant market until January 2028, to the detriment of Plaintiffs and other purchasers of the drug; and (ii) to induce Teva to accept a later entry date by effectively granting Teva a  monopoly over the sale of generic Xifaxan for at least six months after January 2028, also to the detriment of Plaintiffs and other purchasers of the drug.

381.    Defendants' unlawful agreement has had a substantially adverse effect on competition within the relevant market.

382.    There is and was no legitimate, non-pretextual, procompetitive business justification for this reverse payment agreement that outweighs its harmful effect on direct purchasers and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve such a purpose.

383.    In the alternative, the agreement between Bausch and Teva was an illegal temporal horizontal market-allocation agreement, a *per se* violation of section 1 of the Sherman Act. Teva agreed not to compete with Bausch from 2018 until January 1, 2028, and Bausch agreed not to compete with Teva from January 1, 2028 until six months after Teva's entry.

384.    During the relevant period, Plaintiffs' assignors purchased substantial quantities of Xifaxan directly from Bausch. As a result of Bausch's illegal conduct, Plaintiffs and their assignors have been compelled to pay, and continue to pay, inflated prices for Xifaxan.  Plaintiffs and their assignors will also pay inflated prices for generic Xifaxan when it becomes available.

385.    Plaintiffs and their assignors have been injured in their business or property by Defendants' antitrust violation. That injury consists of paying higher prices for brand (and generic) Xifaxan than would have been paid in the absence of Defendants' antitrust violations.

Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

386.    Absent injunctive relief, Plaintiffs and their assignors will continue to pay artificially inflated prices for rifaxamin for many years into the future.

## COUNT TWO – VIOLATION OF 15 U.S.C. § 2 (MONOPOLIZATION) (AGAINST BAUSCH)

387.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 377 above as though fully set forth herein. This claim is asserted against Bausch only.

388.    Bausch has possessed monopoly power in the relevant market from the launch of Xifaxan through the present.

389.    Bausch has unlawfully maintained its monopoly power by, *inter alia*, (a) entering into a reverse-payment agreement with Teva that included large and unjustified payments in exchange for Teva's agreement to delay the launch of generic Xifaxan until January 1, 2028; (b) improperly listing various patents in the Orange Book, thereby subjecting putative generic competitors to regulatory barriers to the entry of generic Xifaxan that otherwise would not have existed; (c) enforcing patents that had been obtained by fraud on the PTO, absent which those patents would not have issued; and (d) knowingly providing false information to the FDA in order to create regulatory barriers to the entry of generic Xifaxan that otherwise would not have existed.  As a result of Bausch's misconduct, generic Xifaxan is not likely to be available until January 1, 2028 and Teva is likely to be the only generic competitor on the market for at least six months after January 1, 2028.  Plaintiffs and other purchasers of the drug will pay monopoly prices for rifaximin for years to come.

390.    The goal, purpose, and effect of Bausch's unlawful conduct was to maintain and extend its monopoly power in the relevant market. The delay in the introduction of generic

Xifaxan that Bausch engineered will allow it to continue charging supracompetitive prices for the drug and earning supracompetitive profits until full generic competition reaches the market, which will likely not occur until at least 2028.  Because the payment to Teva includes the grant of a monopoly on sales of generic Xifaxan, Teva will be able to maintain supracompetitive prices on generic Xifaxan even after its belated entry into the market in January 2028, creating further harm to the market and to Plaintiffs and other purchasers of the drug.

391.    During the relevant period, Plaintiffs' assignors purchased substantial quantities of Xifaxan directly from Bausch. As a result of Bausch's illegal conduct, Plaintiffs and their assignors have been compelled to pay, and continue to pay, inflated prices for Xifaxan.  Plaintiffs and their assignors will also pay inflated prices for generic Xifaxan when it becomes available.

392.    The anticompetitive consequences of Bausch's actions far outweigh any arguable procompetitive benefits.

393.    Plaintiffs and their assignors have been injured in their business or property by Bausch's antitrust violation. That injury consists of paying higher prices for branded (and ultimately for generic) Xifaxan than would have been paid in the absence of the antitrust violations. Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

394.    Absent injunctive relief, Plaintiffs and their assignors will continue to pay artificially inflated prices for rifaximin for many years into the future.

## X.    DEMAND FOR JUDGMENT

WHEREFORE, with respect to Count One, Plaintiffs seek judgment against all Defendants, jointly and severally, and with respect to Count Two, Plaintiffs seek judgment against Bausch, and with respect to each Count Plaintiffs request the following relief:

A.    An award of Plaintiffs' overcharge damages in an amount to be determined at trial, trebled as provided by law;

B.    Permanent injunctive relief prohibiting Defendants from continuing their unlawful conduct and requiring them to take affirmative steps to remedy the continuing adverse effects of their prior conduct;

C.    The costs of this suit, including reasonable attorneys' fees, as provided by law; and

D.    Such further and additional relief as the Court deems just and proper.

## XI.    JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Plaintiffs,
Walgreen Co., The Kroger Co., Albertsons Companies, Inc., H-E-B, L.P. and Supervalu, Inc.
By their Attorneys,

*/s/ Matthew T. Oliverio*

Matthew T. Oliverio, Esquire (#3372)
OLIVERIO & MARCACCIO LLP
30 Romano Vineyard Way, Suite 109
North Kingstown, Rhode Island 02852
Telephone: (401) 861-2900
Email: mto@om-rilaw.com

Scott E. Perwin (*pro hac vice*)
Lauren C. Ravkind (*pro hac vice*)
Anna T. Neill (*pro hac vice*)
SPERLING KENNY NACHWALTER LLC
Four Seasons Tower, Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Telephone: (305) 373-1000
Email: sperwin@sperlingkenny.com
Email: lravkind@sperlingkenny.com
Email: aneill@sperlingkenny.com

David Lesht (*pro hac vice forthcoming*)
SPERLING KENNY NACHWALTER LLC
321 North Clark Street, 25th Floor
Chicago, IL 60654
Telephone: (312) 641-3200
Email: dlesht@sperlingkenny.com

*Attorneys for all Plaintiffs*

Steve D. Shadowen (*pro hac vice forthcoming*)
Matthew C. Weiner (*pro hac vice forthcoming*)
Melissa Mather (*pro hac vice forthcoming*)
HILLIARD SHADOWEN LLP
1135 W. 6th Street, Suite 125
Austin, TX 78703
Telephone: (855) 344-3298
steve@hilliardshadowen.com
matt@hilliardshadowen.com
mmather@hilliardshadowen.com

*Attorneys for Plaintiff Supervalu, Inc. only*

Dated:  December 1, 2025